# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

AHMAD FAWZI ISSA,                              :

       Petitioner,                       :       Case No. 1:03-cv-280

                          :       Chief District Judge Sandra S. Beckwith
     -vs-                                     Chief Magistrate Judge Michael R. Merz

                          :

MARGARET BRADSHAW, Warden,
                          :

       Respondent.

---

## CORRECTED[1] REPORT AND RECOMMENDATIONS

---

Petitioner Ahmad Fawzi Issa was convicted in Ohio of the aggravated murder-for-hire of Maher Khriss, and sentenced to death. (Appendix, Vol. 1 at 275.) Issa filed his petition for a writ of habeas corpus (Doc. No. 8), and three amended petitions (Doc. Nos. 26, 33, 62[2]). Respondent filed an original and two amended returns of writ (Doc. Nos. 28, 35, 73), Issa filed his traverse (Doc. No. 41), and the case is now ripe.

In his petition, Issa raises twenty-seven grounds for relief as follows:

### First Ground for Relief

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because

---

[1]Because of a computer error, an uncorrected draft of this Report and Recommendations was filed on November 4, 1008. This Corrected Report and Recommendations replaces it.

[2]For the sake of brevity, all record references to Issa's third amended petition (Doc. No. 62), which is comprehensive of the original, first amended, and second amended petitions, will appear as "Petition, Doc. No. 62." Respondent's amended returns of writ are not comprehensive, and will be cited as "First Amended Return of Writ, Doc. No. 35," and "Second Amended Return of Writ, Doc. No. 73."

he received the ineffective assistance of counsel during the guilt phase of his capital proceedings. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Second Ground for Relief**

Intentional prosecutorial misconduct in Petitioner's state court trial denied him his right to due process of law and his right to a fair trial protected by the Sixth and Fourteenths [sic] Amendment[s]. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Third Ground for Relief**

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because he received the ineffective assistance of counsel during the penalty phase of his capital proceedings. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Fourth, Fifth, Eighth, and Twelfth Grounds for Relief**

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because he received the ineffective assistance of counsel during the sentencing phase of his capital proceedings. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Sixth Ground for Relief**

The trial court admitted hearsay statements of Andre Miles as to Petitioner's alleged role in the murder for hire thereby violating Petitioner's right to confront witnesses protected by the Sixth and Fourteenth Amendments to the United States Constitution. The resultant sentence of death violates the Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Seventh Ground for Relief**

Appellant's [sic] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the

[j]ury's [v]erdict and the resultant sentence of death because the judgment of conviction on the aggravated murder counts is unsupported by legally sufficient evidence and is contrary to the manifest weight of the evidence. The resultant sentence violates the Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Ninth Ground for Relief**

Petitioner Issa was deprived of the effective assistance of counsel on his direct appeal as of right in violation of the Sixth Amendment and [D]ue [P]rocess [C]lause of the Fourteenth Amendment [to the United States Constitution].

**Tenth Ground for Relief**

Petitioner Issa's conviction and/or sentence of death are void or voidable because the Ohio death penalty scheme is violative of the Eighth and Fourteenth Amendments to the United States Constitution for the State's failure to provide meaningful direct appeal of Petitioner's claim of ineffective assistance of appellate counsel.

**Eleventh Ground for Relief**

The Petitioner's rights to be free from arbitrary and capricious State action as protected by the Fifth and Fourteenth Amendments to the United States Constitution have been violated by the imposition of a disproportional sentence of death. The resultant death sentence violates the Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Thirteenth Ground for Relief**

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because he was incompetent to stand trial as he could not effectively assist his trial counsel in the preparation and presentation of his capital case. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Fourteenth Ground for Relief**

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because

he received the ineffective assistance of counsel during the voir dire, trial and penalty phase[s] of his capital proceedings. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Fifteenth Ground for Relief**

There occurred in Petitioner's capital trial structural error which denied Petitioner his right to a fair trial as protected by the Sixth and Fourteenth Amendment[s] to the United States Constitution. The resultant sentence of death violates the Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Sixteenth Ground for Relief**

Petitioner's rights guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated because he received the ineffective assistance of counsel during the voir dire, trial and penalty phase[s] of his capital proceedings. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Seventeenth Ground for Relief**

Petitioner's Fifth, Sixth and Fourteenth Amendments [sic] rights to the United States Constitution were violated by the return of an [i]ndictment by an improperly constituted [g]rand [j]ury. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Eighteenth Ground for Relief**

The prejudicial publicity, which occurred throughout Petitioner's capital trial, deprived him of his right to a fair trial and a fair and reliable sentencing determination as protected by the Sixth and Fourteenth Amendments to the United States Constitution. The resultant sentence of death violates the Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Nineteenth Ground for Relief**

Petitioner's rights protected by the Fifth and Fourteenth Amendments to the United States Constitution were violated when he was denied a fair and impartial grand jury foreman in violation of the Equal

Protection Clause. The resultant sentence of death violates Petitioner's right to be free from cruel and unusual punishment.

**Twentieth Ground for Relief**

Petitioner's rights protected by the Sixth, Seventh, Eighth and Fourteenth Amendments to the United States Constitution were violated by the failure of the court to provide funds necessary for the defense team to hire necessary experts. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-first Ground for Relief**

Petitioner's rights secured by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the admission of gruesome, inflammatory and cumulative photographs that prejudiced Petitioner and denied him a fair trial. The resultant death sentence violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-second Ground for Relief**

Petitioner's rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by Ohio's requirement that mitigating factors be proven by a preponderance of the evidence before they can be weighed, which sentencing scheme precludes consideration of mitigating evidence and compels a presumption of death. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-third Ground for Relief**

Petitioner's rights secured by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated by the definitions which the trial [c]ourt used in its instructions to the jury which misled the jury concerning their deliberations in the sentencing phase, and created an unconstitutional presumption in favor of death. The resultant sentence of death violates Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-fourth Ground for Relief**

The trial court's application of Ohio's statutory definition of reasonable doubt in the mitigation phase of Petitioner's capital trial deprived him of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The resultant sentence of death violated Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-fifth Ground for Relief**

The Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by the use of the Ohio [d]eath [p]enalty [l]aws because that [s]tatutory [d]eath [s]cheme does not meet the prescribed constitutional requirements and is unconstitutional on its face and as applied to Petitioner Issa. The resultant sentence of death is a violation of Petitioner's Eighth Amendment right to be free from cruel and unusual punishment.

**Twenty-sixth Ground for Relief**

The Petitioner's Sixth Amendment rights to effective assistance of counsel were violated when defense counsel violated [sic] because he received the ineffective assistance of counsel during the sentencing phase of his capital proceedings.

**Twenty-seventh Ground for Relief**

The Petitioner's Sixth Amendment rights to effective assistance of counsel were violated when one of his two appellate counsel on his direct appeal labored under a conflict of interest representing both Petitioner in the Ohio Supreme Court and Petitioner's co-defendant Andre Miles in the First District Court of Appeals.

(Petition, Doc. No. 62.)

## FACTS

The facts of Issa's case, as found by the Ohio Supreme Court, are as follows:

At approximately 1:30 a.m. on November 22, 1997, Andre Miles, armed with a high-powered assault rifle, confronted brothers Maher and Ziad Khriss in a parking lot in front of Save-Way II Supermarket in Cincinnati, Ohio ("Save-Way") and demanded money. As Maher and Ziad put money on the ground and pleaded for their lives, Miles shot and killed them.

After investigating the shootings, Cincinnati police concluded that Miles had been hired to kill Maher. The police theorized that Maher's wife, Linda Khriss, had offered to pay . . . Issa, to kill Maher. The police believed that [Issa] then enlisted Miles to do the killing, supplied him with the weapon, and arranged the opportunity. [Issa], Miles, and Linda were each charged with aggravated murder.

Prior to the murders, Maher and Linda Khriss owned and operated Save-Way. In addition to Maher and Linda, Renee Hays, Souhail Gammoh, and [Issa] worked at the store. Bonnie Willis and her brother Joshua Willis, who were both teenagers at the time of the murders, lived with their mother approximately one block from Save-Way. Because they often shopped at Save-Way, they were familiar with the store employees. Miles had previously lived with the Willis family and was a close friend of Bonnie and Joshua.

In the two weeks preceding the murders, two witnesses saw [Issa] with a rifle in his apartment. On November 14, Dwyane Howard, Hayes's husband, went to [Issa's] apartment to wake him for work. [Issa] invited Howard in and showed him a military-style rifle. When Howard asked [Issa] what he was going to do with the rifle, [Issa's] only response was "a little sneer." After the murders, [Issa] called Howard and told him not to tell anyone that he had seen [Issa] with a gun. At [Issa's] trial, Howard identified the murder weapon as being identical to the rifle [Issa] had shown him. No more than two weeks before the murders, [Issa's] coworker and friend, Gammoh, while visiting at [Issa's] apartment, also saw [Issa] with a rifle.

. . .

Linda, Maher, Gammoh, and Hays worked late at Save-Way on the evening of November 21. At approximately 10:00 p.m., Miles arrived at the store and asked for [Issa]. Although [Issa] was scheduled to work at 10:00 p.m., he was not yet there. Linda drove to [Issa's] apartment to wake him, and then she returned to the store. [Issa] arrived around 11:15 p.m. Miles was waiting at the store for [Issa], and when he arrived, [Issa] and Miles went outside together to talk.

Around midnight, Maher left Save-Way with a friend to check on another store that Maher owned. Maher left his truck in the Save-Way parking lot and instructed Linda and [Issa] to put the keys to the truck near the right front tire and that Maher would come back later to get the truck.

At approximately 1:09 a.m. the Save-Way employees closed the store for the night. [Issa] put the keys near Maher's truck as he had been instructed. [Issa's] mother was visiting from Jordan and was with [Issa] at the store when it closed. [Issa], his mother, and Gammoh left the store in [Issa's] car. [Issa] drove his mother to his apartment, and then he drove Gammoh home. When [Issa] dropped Gammoh off at approximately 1:20 a.m., he told Gammoh that he was going back home to check on his mother but that he might come back later and take Gammoh to a bar. Approximately twenty-five to thirty-five minutes later, [Issa] returned to Gammoh's apartment and they went to a bar together. After Gammoh heard about the murders, he asked [Issa] where he went before he returned to Gammoh's apartment. [Issa] told Gammoh, "Don't tell the police. Tell them that we were together all the time."

At approximately 1:26 a.m. on November 22, Sherese Washington was driving near Save-Way when she heard gunshots. Frightened, she stopped her car and turned off the headlights. She then saw a man run from the Save-Way parking lot and down Iroll Street (the street on which Bonnie and Joshua lived). Sherese went home and called 911. Within four minutes of the shooting, Cincinnati police officers arrived at Save-Way and discovered Maher's and Ziad's bodies in the parking lot. Medical personnel arrived shortly thereafter but were unable to revive the Khriss brothers.

. . .

Joshua testified that around 5:00 p.m. on November 22, Miles called him and told him that he had killed Maher and Ziad and that he had put the gun in Bonnie and Joshua's back yard in a white plastic bag. He told Joshua not to touch the gun.

The following day, November 23, Miles . . . told [Bonnie and Joshua] that [Issa] was going to pay him $2,000 for killing Maher but "[s]ince [Maher's] brother also got killed that night he had to throw in an extra $1,500." According to Miles, [Issa] had not paid him yet. Miles told the Willises that, on the night of the shooting, [Issa] gave Miles the rifle, which Miles described as an M-90. . . .

A few days later, Joshua went to Save-Way, and as soon as [Issa] saw him [Issa] asked, "does anybody know?" Joshua said, "No, not that I know of." Joshua then told [Issa], "you're going to have to come and get this gun. I don't want to put my family in this type situation." Although Joshua did not mention Miles, [Issa] replied,

> "Okay. I'll talk to Andre . . . and if Andre don't come and get it, I
> will." After a few days, Joshua noticed the white bag was still in his
> yard. Joshua again went to the store and confronted [Issa] about it.
> [Issa] again promised Joshua that either he or Miles would remove
> the gun. Bonnie also went to the store and told [Issa] that the gun
> needed to be removed from their yard. [Issa] told her the same thing
> he had told Joshua. [Issa] also told Bonnie to "[t]ell [Miles] not to
> come around the store because the police were investigating, that he
> would get in touch with him." A few days later, Miles removed the
> gun.

*State v. Issa*, 93 Ohio St. 3d 49, 50-53, 752 N.E.2d 904 (2001). The police eventually arrested

Miles, and he confessed to the murders, and drew a sketch which led to the recovery of the murder

weapon and its corresponding ammunition clip. *Id*. at 53. A subsequent search of Issa's residence

netted a single 7.62 caliber cartridge which matched the murder weapon's caliber, but was from a

different manufacturer than were the bullets that killed the Khriss brothers. *Id*. at 53-54.

Issa was convicted of the aggravated murder of Maher Khriss and one death penalty

specification, that being that the murder was committed for hire. *Id*. at 54. Following a mitigation

hearing, the jury recommended a sentence of death (Trial Tr. at 1642; Appendix, Vol. 1 at 267),

which the trial court later adopted (Appendix, Vol. 1 at 271-74).

## PROCEDURAL HISTORY

Issa appealed his conviction and death sentence to the Ohio Supreme Court on November

16, 1998, raising fifteen propositions of law. (Appendix, Vol. 2 at 4-6, 52-129.) The state court

overruled each of Issa's propositions, independently weighed the aggravating circumstance against

the mitigating factors, performed a proportionality review of Issa's sentence, and affirmed his

conviction and death sentence. *State v. Issa*, 93 Ohio St. 3d 49, 54, 752 N.E.2d 904 (2001).

While Issa was pursuing his direct appeal in the Ohio Supreme Court, he also petitioned the

state court for post-conviction relief on twenty-two grounds. (Appendix, Vol. 3 at 263-398; Vol. 5 at 18-89, 95-166.) After the trial court rejected Issa's claims (Appendix, Vol. 5 at 306-312), he unsuccessfully pursued an appeal to the state court of appeals, *State v. Issa*, No. C-000793, 2001 WL 1635592 (Ohio App. 1st Dist. Dec. 21, 2001)(unreported). The Ohio Supreme Court declined jurisdiction over Issa's subsequent appeal. *State v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table).

Issa filed his petition for a writ of habeas corpus on April 17, 2003 (Doc. No. 8), but soon thereafter, this Court held his habeas petition in abeyance while Issa returned to the state courts to litigate an application to reopen his direct appeal (Doc. No. 15). On September 24, 2003, the Ohio Supreme Court denied Issa's application to reopen (Appendix, Vol. 2 at 402), and this Court dissolved the stay of Issa's habeas petition (Doc. No. 20). After Issa filed three amended habeas petitions (Doc. Nos. 26, 33, 62), Issa's habeas proceedings were once again held in abeyance while he pursued a second application to reopen his direct appeal in the state courts (Doc. No. 64). *See State v. Issa*, No. 98-2449, 2005 WL 5353626 (2005) (Application for Reopening). The Ohio Supreme Court denied Issa's application because he had filed beyond the state filing deadline, and because Ohio law does not permit the filing of second or successive applications to reopen a direct appeal. *State v. Issa*, 106 Ohio St. 3d 1407, 830 N.E.2d 342 (2005)(table). This Court's stay was dissolved on July 7, 2005. (Doc. No. 68.) On December 20, 2007, this Court issued a Report and Recommendations ("R&R") on the procedural and statute of limitations defenses raised by Respondent, and ultimately recommended denial of Issa's ninth, tenth, fifteenth, seventeenth, eighteenth, nineteenth, and twenty-third grounds for relief (Doc. No. 134); this Report and Recommendations addresses the merits of the remaining claims as well as Issa's objections to the

earlier Report and Recommendations (*see* Petitioner's Objections, Doc. No. 138).

## ANALYSIS

Since Issa filed his petition for a writ of habeas corpus well after the effective date of the

Anti-terrorism and Effective Death Penalty Act of 1996, 110 Stat. 1214, the amendments to 28

U.S.C. § 2254 embodied in that Act are applicable to his petition.  (*See* Petition, Doc. No. 62.)  The

Sixth Circuit has summarized the standard of review under the AEDPA as follows:

> Under the Antiterrorism and Effective Death Penalty Act of 1996
> (AEDPA) . . . , a federal court
>
>> may not grant a writ of habeas to a petitioner in state custody
>> with respect to any claim adjudicated on the merits in state court
>> unless (1) the state court's decision "was contrary to, or involved
>> an unreasonable application of, clearly established Federal law,
>> as determined by the Supreme Court" . . . or (2) the state court's
>> decision "was based on an unreasonable determination of the
>> facts in light of the evidence presented in the State court
>> proceedings."
>
> *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir.2002) (quoting 28
> U.S.C. § 2254(d)).
>
> This standard requires the federal courts to give considerable
> deference to state-court decisions.  *Herbert v. Billy*, 160 F.3d 1131,
> 1135 (6th Cir.1998) ("[the AEDPA] tells federal courts:  Hands off,
> unless the judgment in place is based on an error grave enough to be
> called unreasonable.") (citation and quotation marks omitted).
>
> The first line of analysis under [the] AEDPA involves the consistency
> of the state-court decision with existing federal law.  A state-court
> decision is considered "contrary to . . . clearly established Federal
> law" if it is "diametrically different, opposite in character or nature,
> or mutually opposed."  *Williams v. Taylor*, 529 U.S. 362, 405 (2000)
> (emphasis and quotation marks omitted).  Alternatively, to be found
> an "unreasonable application of . . . clearly established Federal law,"
> the state-court decision must be "objectively unreasonable" and not
> simply erroneous or incorrect.  *Id*. at 409-11.

> The second line of analysis under [the] AEDPA concerns findings of fact made by the state courts. [The] AEDPA requires federal courts to accord a high degree of deference to such factual determinations. "A federal court is to apply a presumption of correctness to state court findings of fact for habeas corpus purposes unless clear and convincing evidence is offered to rebut this presumption. The [federal] court gives complete deference to the . . . state court's findings of fact supported by the evidence." *McAdoo v. Elo*, 365 F.3d 487, 493-94 (6th Cir.2004) (citations omitted).

*Nields v. Bradshaw*, 482 F.3d 442, 449 (6th Cir. 2007)(parallel citations omitted). It is with these principles in mind that this Court considers the merits of Issa's grounds for relief.

**First Ground for Relief**

In his first ground for relief, Issa contends his trial counsel's representation was ineffective because they failed to call Linda Khriss as a witness or introduce her testimony from her own trial which Issa claims would have supported the defense's theory of innocence. (Petition, Doc. No. 62 at 11-14.) Respondent argues the state court's decision rejecting Issa's claim was neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court, and that Issa is consequently not entitled to habeas corpus relief. (Return of Writ, Doc. No. 28 at 38-42.) Issa disputes Respondent's interpretation. (Traverse, Doc. No. 41-1 at 18-26.)

The governing standard for effective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984), which states as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a

-12-

fair trial, a trial whose result is reliable.  Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

With respect to the first prong of the *Strickland* test, the Supreme Court has commanded:

Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance;  that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

466 U.S. at 689.

As to the second prong, the Supreme Court held:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to overcome confidence in the outcome.

466 U.S. at 694.  *See also Darden v. Wainright*, 477 U.S. 168, 184 (1986); *Wong v. Money,* 142 F.3d 313, 319 (6th Cir. 1998); *Blackburn v. Foltz*, 828 F.2d 1177, 1180-81 (6th Cir. 1987).  The merits of Issa's first ground for relief and others asserting ineffective assistance of counsel will be considered with these principles in mind.

Issa raised the instant claim as his fifth ground for relief in his state post-conviction proceedings.  (Appendix, Vol. 5 at 116-18.)  In support of his claim, Issa submitted his own affidavit which has no bearing on the instant claim and instead relates to his second ground for relief, as well

as a portion of the transcript of Linda Khriss' direct testimony at her own trial. (Appendix, Vol. 3 at 99, 106-80.) Khriss testified that she had never conspired with Issa to kill her husband. *Id*. at 154, 178. None of the prosecutor's cross-examination of Khriss was included in the trial transcript excerpt, however.

The post-conviction trial court found that the failure of Issa's trial counsel to call Linda Khriss to testify at his trial, or to introduce the substance of her testimony at her own trial through other means, was a strategic or tactical decision which insulated counsel from Issa's claim of ineffective assistance. (Appendix, Vol. 5 at 308.) When the court of appeals addressed the issue on appeal from the denial of Issa's petition for post-conviction relief, it observed that "[t]he decision whether to call a witness is generally a matter of trial strategy, and, absent a showing of prejudice, does not deprive a defendant of effective assistance of counsel." *State v. Issa*, No. C-000793, 2001 WL 1635592 at *4 (Ohio App. 1st Dist. Dec. 21, 2001) (unreported), *citing State v. Williams*, 74 Ohio App. 3d 686, 695, 600 N.E.2d 298 (8th Dist. 1991). Finding that Issa had failed to demonstrate prejudice from counsel's failure to call Linda Khriss as a witness, the court of appeals overruled Issa's claim. *Id*. Further appeal was not allowed by the Ohio Supreme Court. *State v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table).

Evidence developed at the evidentiary hearing in these habeas proceedings reinforces rather than contradicts the state court's decision. Lead counsel at Issa's trial, Elizabeth Agar, testified that after reading Linda Khriss' testimony in Khriss' own trial, she considered Khriss a "dreadful witness" and a "loose cannon" because of Khriss' outbursts during her trial. (Evid. Hrg. Tr., Doc. No. 112 at 131.) After talking to individuals who had interviewed some of Khriss' jurors, Agar learned that the jurors did not find credible Khriss' testimony that she had not hired Issa to harm her

husband. *Id.* at 134, 142. Rather, they returned a not guilty verdict for Khriss because the prosecutors had not proven beyond a reasonable doubt that Khriss intended her husband's death. *Id.* at 134. In addition, Agar's reading of the Khriss transcript and her conversations with prosecutors, others present at Khriss' trial, and Issa himself convinced her that Khriss was a seriously unstable person. *Id.* at 142. Agar testified that the decision not to call Linda Khriss as a witness at Issa's trial was purely strategic based on all of those considerations. *Id.* Co-counsel at Issa's trial, Terrance Landrigan, also stated in a deposition which was deemed read into the evidentiary hearing record (Doc. No. 112 at 2), that he and Agar did not think Khriss' testimony would be helpful or serve any useful purpose in Issa's trial. (Deposition of Terrance Landrigan, Doc. No. 60 at 19.) Landrigan also characterized the decision not to call Linda Khriss to the stand in Issa's case as one of strategy. *Id.* at 78. Issa's counsel on direct appeal also testified to Linda Khriss' instability, and the high risk that would have been involved in calling her as a witness in Issa's trial. (Testimony of Herbert Freeman, Evid. Hrg. Tr., Doc. No. 112 at 41.)

Issa's trial counsel were aware of the testimony Khriss gave in her own trial. They had spoken to individuals involved in Khriss' case and learned of her emotional outbursts during her trial. Neither considered Khriss a dependable, stable, or controllable witness, and they discussed whether to present her testimony in Issa's trial before they decided not to do so. (Evid. Hrg. Tr., Doc. No. 112 at 131, 142; Depositon of Terrance Landrigan, Doc. No. 60 at 19, 79.) The state court's characterization of Issa's trial counsel's decision not to call Linda Khriss as a witness for their client as one of strategy, therefore, is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). Consequently, Issa is not entitled to habeas corpus relief on his first ground for relief.

Issa's claim also contends that in the absence of calling Linda Khriss as a live witness in Issa's case, his trial counsel should have moved to admit a transcript of her testimony in her own trial into evidence in Issa's trial. Such a maneuver would not be possible unless Linda Khriss were declared unavailable. Ohio Evid. R. 804. Issa does not suggest, nor is this Court is willing to suppose a scenario where that might have come to pass, and no further time is devoted to the question of whether Issa's trial counsel could have accomplished what current counsel now suggests.[3]

Furthermore, it is not at all clear that Issa would have been helped by Khriss' testimony. Even if Khriss had testified and conducted her self somberly, her denial that she hired Issa to kill her husband would not have precluded the conclusion that Issa had paid and provided a weapon to Miles for the purpose of murdering Maher Khriss. Thus, Issa has not demonstrated that there is a reasonable probability that outcome of his trial would have been different had his trial counsel called Linda Khriss to testify. *See Strickland*, 466 U.S. at 694.

Issa has presented no evidence that his trial counsel's decision not to call Linda Khriss as a witness was anything other than a strategic decision based upon Khriss' conduct in her own trial, her testimony there, and their conversations with others involved in or present at Khriss' trial. In addition, he has failed to demonstrate prejudice from the alleged error. Consequently, the state courts' resolution of his claim is neither contrary to nor an unreasonable application of federal law, and Issa's first ground for relief should be denied.

---

[3]It would appear to have been impossible for trial counsel to demonstrate Linda Khriss' unavailability to testify since she showed up in the courtroom as a spectator to part of Issa's trial but was asked to leave by Issa's counsel. (Deposition of Terrance Landrigan, Doc. No. 60 at 18.)

**Second Ground for Relief**

In his second ground for relief, Issa contends the prosecutors in his case engaged in misconduct by striking a deal with Issa's defense counsel that neither side would call Linda Khriss as a witness.  (Petition, Doc. No. 62 at 14-17.)  Respondent argues the claim is without factual support, and meritless as well.  (Return of Writ, Doc. No. 28 at 43-45.)

Issa raised his claim of prosecutorial misconduct as the sixth ground for relief in his state post-conviction petition.  (Appendix, Vol. 5 at 119-20.)  The trial court misconstrued Issa's claim as one contending ineffective assistance of trial counsel.  (Appendix, Vol. 5 at 308.)  Likewise, the state court of appeals also failed to distinguish Issa's prosecutorial misconduct claim from his ineffective assistance of trial counsel claim.  *State v. Issa*, No. C-000793, 2001 WL 1635592 at *4 (Ohio App. 1st Dist. Dec. 21, 2001) (unreported).  The Ohio Supreme Court declined jurisdiction over Issa's subsequent appeal.  *State v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table).  Thus, although Issa presented his claim of prosecutorial misconduct to the state courts, none addressed it on its merits, which requires this Court to address the claim *de novo*.  *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007).

The Sixth Circuit has articulated the relevant standard for habeas claims of prosecutorial misconduct as follows:

> On habeas review, claims of prosecutorial misconduct are reviewed deferentially.  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  To be cognizable, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Id*. (citation omitted).  Even if the prosecutor's conduct was improper or even "universally condemned," *id*., we can provide relief only if the statements were so flagrant as to render the entire trial fundamentally unfair.  Once we find that a statement is improper, four factors are considered in determining whether the impropriety if flagrant:  (1) the likelihood that the remarks would mislead the jury

or prejudice the accused, (2) whether the remarks were isolated or extensive, (3) whether the remarks were deliberately or accidentally presented to the jury, and (4) whether other evidence against the defendant was substantial. *See Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000).

*Bowling v. Parker*, 344 F.3d 487, 512-13 (6th Cir. 2003). In addition, an examination of alleged prosecutorial misconduct is performed in the context of the trial as a whole. *United States v. Beverly*, 369 F.3d 516, 543 (6th Cir. 2004), *citing United States v. Young*, 470 U.S. 1, 12 (1985) and *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999).

Thus, the first question for this Court to answer is whether the prosecutor's conduct was improper. Here, however, there is no proof of the factual allegations upon which Issa's claim rests. The only material Issa has submitted in support of his claim is his own uncross-examined affidavit appended to his state post-conviction petition. (Appendix, Vol. 3 at 99.) There, Issa stated that when he asked his attorneys why Linda Khriss was not called to testify, they responded that they had made an agreement with the prosecutors that neither side would call Khriss as a witness, and the prosecution also agreed not to use Khriss' statement in Issa's trial. *Id.* At the evidentiary hearing in these proceedings, neither of Issa's trial counsel were asked about the alleged agreement between themselves and the prosecutors respecting the possibility that Linda Khriss might be called as a witness, or the admission of any previous statements she had made. The closest either came to discussing any such agreement was Landrigan's rather vague recollection of a conversation in chambers where the prosecutor stated that if the defense pursued a certain issue or line of questioning at trial, then the prosecution would seek to introduce portions of the Khriss transcript that defense counsel felt were damaging to Issa's case. (Deposition of Terrance Landrigan, Doc. No. 60 at 75.) The prosecutor expressed confidence that the trial court would permit him to

introduce the transcript excerpts, and Landrigan stated that he and Agar decided the prosecutor correctly predicted how the court would rule on the evidentiary question. *Id*.

Issa's affidavit, uncross-examined as it is, and with no other evidence to corroborate the allegations it contains, is insufficient to establish the factual predicate of his claim here. In addition, the in-chambers discussion Landrigan mentioned in his deposition includes no acknowledgment of any reciprocal agreement between defense counsel and the prosecution to forego calling Linda Khriss as a witness in Issa's case. Instead, the conversation alerted defense counsel to an undesirable effect likely to flow from defense counsel's intended strategy, a strategy Issa's counsel modified in time to avoid the anticipated damage. Because Issa has not supported his claim with evidence sufficient to warrant the remedy he seeks, his second ground for relief should be denied.

**Third Ground for Relief**

In his third ground for relief Issa contends his trial counsel rendered ineffective assistance by failing to adequately investigate or obtain experts to investigate Issa's history, character, and background in preparation for the mitigation phase of his trial. (Petition, Doc. No. 62 at 17-21.) Specifically, he claims his trial counsel failed to perform an adequate mitigation investigation; failed to call available mitigation witnesses, namely Issa's family members other than the two who did testify in mitigation; admitted Issa's mother was biased in favor of her son; failed to prepare a mitigation witness; and failed to present evidence respecting Issa's life through his two ex-wives. Respondent initially argued Issa's claim was procedurally defaulted (Return of Writ, Doc. No. 46), but this Court concluded otherwise in its Report and Recommendations respecting procedural default and statute of limitations issues (R&R, Doc. No. 134 at 3-6), and neither party has objected

to that finding (Respondent's Objections, Doc. No. 137; Petitioner's Objections, Doc. No. 138). Respondent also argues that Issa's claim is meritless, however. (Return of Writ, Doc. No. 28 at 47-50.) Issa vigorously disputes Respondent's assessment of his claim. (Traverse, Doc. No. 41-1 at 29-39.)

Issa's primary contention is that his trial counsel should have developed mitigation evidence that would have "Americanized" him for the jury. (Traverse, Doc. No. 41-1 at 31, 38.) Such "Americanization" could have been presented through Issa's former wife, her family members, Issa's former employers, and Issa's second wife and her family member. *Id*. at 38. A large part of the evidence Issa claims his counselors should have presented, however, is found in affidavits appended to his state post-conviction petition; affidavits that are uncross-examined, and contain virtually nothing but hearsay. (Affidavits of Pamela Swanson, Appendix, Vol. 3 at 197-202, 205-210.) Such evidence is of low quality and carries little weight. In addition, this Court granted Issa permission to "call to testify at the evidentiary hearing any person who (1) provided an affidavit for the Post-Conviction Petition (2) purporting to state testimony which would have been offered in mitigation," but denied Issa's request to present the testimony of one of his jurors because such testimony is inadmissible under Fed.R.Evid. 606(b). (Decision and Order Granting in Part and Denying in Part Petitioner's Motion for an Evidentiary Hearing, Doc. No. 78 at 6-7.) Later, Issa proposed to take a perpetuation deposition of his first wife, Bobbie Foreman (Motion for Perpetuation Deposition, Doc. No. 98), but his request was denied because he had failed to explain whether an attempt had been made to assure her presence at the evidentiary hearing (Decision and Order Denying Without Prejudice Petitioner's Motion to Take a Perpetuation Deposition, Doc. No. 99). Issa never renewed his request, nor did he call Foreman to testify at the evidentiary hearing.

In the end, none of Issa's family members, friends, or former in-laws testified at the evidentiary hearing. Consequently, any evidence they could have given in the mitigation phase of his trial is before this Court only through uncross-examined affidavits containing hearsay of what they would have testified to. There is one exception. Betty Fisher, Issa's second wife's grandmother, submitted an affidavit in Issa's post-conviction proceedings in which she stated that Issa was kindhearted, and that he paid for and delivered her medications to her when he was married to her granddaughter. (Appendix, Vol. 3 at 190-91.) Fisher was not called to testify at Issa's evidentiary hearing, however. Issa's own affidavit, submitted to the state courts in his post-conviction proceedings, is also uncross-examined and carries only slightly more weight than those made up of hearsay. (Affidavit of Ahmed Fawzi Issa, Appendix, Vol. 3 at 100-5.)

The Court notes that in his post-conviction proceedings in the state court, Issa also submitted the affidavit of Dr. Mahdi Alosh who apparently participated in translating telephone conversations between Laney Hawkins and Pam Swanson, both of the Ohio Public Defender's Office, and Issa's Jordanian family members in March of 1999. (Appendix, Vol. 4 a6 10-11.) Later, Hawkins presented Alosh with the "affidavits" of several Issa family members which were written in English. *Id*. There is no way of knowing from the record whether those "affidavits" were the product of the telephone calls Alosh mentioned. For whatever reason, and rather counterintuitively, Hawkins asked Alosh to translate the family members' English affidavits into Arabic. *Id*. Consequently, the "affidavits" in English are the original "affidavits" for present purposes. Not one of the "affidavits," whether in English or the Arabic translations, have been notarized in any way recognizable to this Court. Thus, as evidence they are worthless, particularly given the circumstances of their creation as described by Alosh.

This Court cannot grant habeas corpus relief on the weak evidence Issa has presented. Because Issa has failed to produce reliable evidence that valuable mitigation testimony was erroneously omitted by his attorneys' error, and because he has not shown prejudice from any such error, he has not demonstrated entitlement to habeas corpus relief. Thus, to the extent that he claims his attorneys provided ineffective assistance by failing to "Americanize" him for the jury, his third ground for relief should be denied.

Issa also contends his mother was inadequately prepared to testify in the mitigation phase of his trial. (Petition, Doc. No. 62 at 18.) To demonstrate what additional information could have been presented through Mrs. Issa had she been adequately prepared, however, Issa relies almost exclusively on the English and Arabic "affidavits" just discussed. *Id.* at 18-19. He also cites to two jurors' affidavits in an attempt to show prejudice from his attorneys' failure to adequately prepare Mrs. Issa. (Petition, Doc. No. 62 at 18; Traverse, Doc. No. 41-1 at 36-38.) As noted above, however, the jurors' affidavits are inadmissible under Fed. R. Evid. 606(b). Finally, Issa cites his own affidavit in support of his claim. (Petition , Doc. No. 62 at 19.)

No evidence as to how Mrs. Issa's mitigation phase testimony would have been different had she been adequately prepared was presented at Issa's evidentiary hearing. One of Issa's trial attorneys acknowledged that she did not prepare the jury for Issa's mother's appearance at the trial clothed in traditional garments, or for Mrs. Issa's need to testify through a translator (Evid. Hrg. Tr., Doc. No. 112 at 129), but that relates to the attorney's preparation of the jury, not the witness. Even if the Court were to assume Issa's trial counsel erred by inadequately preparing Mrs. Issa for her testimony, Issa cannot demonstrate prejudice without presenting the evidence that would have been brought out had his mother been adequately prepared. This, he has not done. Consequently, Issa

has not demonstrated that his trial counsel were ineffective in their preparation of Mrs. Issa for her testimony in the mitigation phase. To that extent, Issa's third ground for relief should be denied.

Next, Issa claims his trial counsel failed to conduct an adequate mitigation investigation into his history, background, and character which resulted in an incomplete mitigation presentation. (Petition, Doc. No. 62 at 19-21.) Issa cites the affidavit of Dorian Hall, a mitigation specialist, in support of his claim.[4] (Petition, Doc. No. 62 at 19-20; *see* Appendix, Vol. 3 at 192-96.) Hall's affidavit establishes her credentials as an expert on mitigation and comments on the development of mitigation evidence generally and in Issa's case specifically. (Appendix, Vol. 3 at 192-96.) The United States Supreme Court has never recognized a constitutional right to effective assistance of a mitigation specialist, however, and Hall is not qualified to render an opinion on the quality of legal representation Issa received from his trial attorneys, as she is not a lawyer. For those reasons, and because Hall's opinion was submitted to this Court in uncross-examined affidavit form, the opinions she expressed therein are excluded from this Court's consideration.

Issa also cites the state post-conviction affidavits of Betty Fisher and Pamela Swanson in support of his argument. (Appendix, Vol. 3 at 190-91, 197-200.) As noted above, Betty Fisher stated that Issa paid for and brought her medication when he was married to his first wife, Fisher's granddaughter Bobbie Foreman. *Id.* at 190. Issa's trial counsel's failure to discover and present that evidence, however, does not establish that counsel ceased to function as the counsel guaranteed by the Sixth Amendment to the United States Constitution. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel presented evidence of Issa's life in Kuwait; the family's move to Jordan; his father's absence from the family due to his employment obligations; Issa's move to the United

---

[4]Although Issa's request to present Dorian Hall's testimony at the evidentiary hearing was granted, he withdrew her as a witness during those proceedings. (Evid. Hrg. Tr., Doc. No. 119 at 74.)

States to pursue his education; his father's death and the resulting sacrifices Issa made to help his family in Jordan, including his decision to forego his own education so that his brothers could pursue theirs; the family's complete disbelief that Issa could be involved in the murders; and his good and quiet nature. (Trial Tr. at 1546-71.) That Issa may have bought and delivered medicine to an elderly in-law on one or more occasions would have added little to the mitigation side of the scales. Furthermore, the information in Pamela Swanson's affidavit that Issa claims would have been useful to his mitigation case is entirely hearsay evidence, and uncross-examined hearsay at that. It is therefore useless for purposes of evaluating Issa's ineffective assistance of counsel claim.

The state court of appeals rejected Issa's claim when it was presented in his post-conviction proceedings. *State v. Issa*, No. C-000793, 2001 WL 1635592 at *3-4 (Ohio App. 1st Dist. Dec. 21, 2001)(unreported). Rather than finding the affidavits Issa cites as support for his claim were of limited evidentiary value, however, the court noted that "[t]his is not a situation where counsel failed to present any mitigation at all or to engage in any meaningful preparation." *Id*. at *4. Rather, the court found the information contained in the affidavits was merely cumulative to the evidence actually presented in the mitigation phase, or that it presented an alternative theory of mitigation. *Id*. The court concluded that Issa had not demonstrated his counsel's ineffectiveness and that post-conviction relief was unwarranted. Even if this Court were to credit the evidence Issa has submitted in support of his ineffective assistance of trial counsel claim with the weight apparently given it by the state court of appeals, the state court's resolution of the claim is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1).

For all of these reasons, Issa has failed to demonstrate that he is entitled to habeas corpus

relief on his ineffective assistance of trial counsel claim. Accordingly, his third ground for relief should be denied.

**Fourth Ground for Relief**

Issa's fourth ground for relief is indistinguishable from part of his third, above. Here, he argues his trial counsel were ineffective when they failed to call as mitigation witnesses Betty Fisher, Issa's first and second wives, a former employer, and various of Issa's family members and former in-laws. (Petition, Doc. No. 62 at 22-28.) Issa relies on the same affidavits as he did in arguing his third ground for relief, and has no more success this time. *Id*. at 22. For the same reasons discussed above, therefore, Issa's fourth ground for relief should be denied.

**Fifth Ground for Relief**

In his fifth ground for relief, Issa contends his trial counsel provided ineffective assistance during the mitigation phase of his trial by failing to present expert testimony relating to cultural issues he claims were relevant to his life experiences. (Petition, Doc. No. 62 at 28-31.) Respondent argues that the state court's decision on the merits of the claim was in concert with, not contrary to, clearly established federal law (Return of Writ, Doc. No. 28 at 55-57).

Issa raised the instant claim as his seventh claim for relief in his state post-conviction proceedings. (Appendix, Vol. 5 at 121-23.) The trial court rejected the claim, finding counsel's decision not to call a cultural expert in mitigation one of strategy, and determining that counsel were not ineffective for failing to present what amounted to an alternative theory of mitigation. *Id*. at 308-9. The court of appeals subsequently affirmed the trial court, concluding that the failure of counsel

to present "nothing more than an alternative mitigation theory" did not constitute ineffective assistance. *State v. Issa*, No. C-000793, 2001 WL 1635592 at *4 (Ohio App. 1st Dist. Dec. 21, 2001) (unreported).

Although Issa's claim is one involving his trial counsel's failure to obtain a cultural expert, in his traverse, he argues first that counsel should have employed a professional translator to assist in communication with Issa's family members. (Traverse, Doc. No. 41-1 at 47-48.) He cites to his own state post-conviction affidavit, where he stated his cousin's translations were faulty, in support of his argument. *Id.* He also quotes mitigation specialist Dorian Hall's post-conviction affidavit where she opines that the use of a qualified translator would have facilitated communication between the defense team and Issa's family members. *Id.* at 48. Jim Crates, a mitigation specialist who actually worked on Issa's case in preparation for trial, stated in his post-conviction affidavit that it "might have been a good idea" to employ a professional translator to communicate with the family members. *Id.*

Nothing in those affidavits, however, identifies any single instance of a mistranslation by Issa's cousin. Issa contends his cousin's translations were incorrect, but he claims elsewhere in his petition for habeas corpus relief that he is deserving of a new trial because his lack of fluency in English rendered him incompetent to stand trial. (*See* Thirteenth Ground for Relief, Petition, Doc. No. 62 at 68-69.) Thus, little weight can be given his assessment of his cousin's translations. In addition, Dorian Hall has no personal knowledge of whether Issa's cousin's translations were accurate as she was not present when the translations were performed, nor does she claim to be fluent in Arabic. (Affidavit of Dorian Hall, Appendix, Vol. 3 at 192-96.) Crates testified at the evidentiary hearing in these proceedings that the female relative in Jordan who translated for him

in his dealings with the Jordanian family members was "certainly not fluent," but that she spoke English well enough so that he could get his point across to them. (Evid. Hrg. Tr., Doc. No. 119 at 19.) Nevertheless, he felt it was "nonsense" to have a family member translate. *Id.* at 36. Crates could not point to any specific incident that caused him to think the translation was less than comprehensive, other than his observation that Issa's mother and brother did not seem to know what was going on in Issa's case when they arrived in the United States. *Id.* at 20-21.

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686. Here, Issa offers not a single instance of any demostrably incorrect translation between the defense team and Issa's relatives, nor does he provide any convincing evidence that Crates' suspicions of faulty translations were anything more than that, mere suspicions. Without more, Issa has demonstrated neither attorney error nor prejudice therefrom. Thus, interpreting this ground for relief as complaining of mistranslation, it is unavailing and should be denied.

Issa's next argument concerns defense counsel's failure to discover a "tribal truce" that was apparently entered into between the Issa and Khriss families in Jordan. (Traverse, Doc. No. 41-1 at 49-51; *see* Appendix, Vol. 3 at 181.) Issa contends that the "tribal truce" explains his mother's lack of emotion during her testimony at his trial, and goes so far as to suggest that the threat to other family members in Jordan contained in the "tribal truce" caused her to temper her support for her son in his attempt to avoid the death penalty. *Id.* at 49. In support of his argument, Issa presented the testimony of Dr. Fatima Agha Al-Hayani, an expert in Islamic and Muslim family law, at his evidentiary hearing. (Evid. Hrg. Tr., Doc. No. 119 at 75-112.) She testified that Islam provides

three options when a murder occurs: (1) the victim's survivors may forgive the murderer and his family, (2) the murderer's family may pay "blood money" to the victim's family, or (3) the victim's family may commit a reciprocal killing. *Id*. at 90. She further explained that the "tribal truce" sets forth an agreement whereby the Khriss family has agreed to let the courts determine guilt and punishment, with the caveat that if Issa were to be found guilty but sentenced to life imprisonment rather than death, the Khriss family reserved their right to "blood money" from the Issa family. *Id*. at 92. Al-Hayani speculates that if Issa's jurors had known that the Khriss family was willing to accept a life sentence and "blood money," it may have made a difference in their sentencing recommendation. *Id*. at 95-96. Nowhere does Al-Hayani suggest that Issa's mother or brother were fearful of retribution in the form of a reciprocal killing in Jordan should Issa receive a life sentence rather than death.[5] In fact, this Court finds no credible evidence to support Issa's contention that the "tribal truce" contained a threat of death against Issa's family members in Jordan in the event of a life sentence for Issa, much less that it actually influenced his mother's or brother's testimony during the mitigation phase of his trial.[6] To the extent Issa contends otherwise, his fifth ground for relief should be denied.

Finally, Issa contends that an understanding of the cultural milieu in which he was raised was important to the jury's sentencing recommendation, and that his attorneys provided substandard

---

[5]This Court has previously found Sara Issa's "affidavit" of insignificant evidentiary value, but it is interesting to note that in it, Mrs. Issa states that the "tribal truce," or, as she calls it, the "mutually beneficial contract with the Kreiss [sic] family," took away her family's fear of retribution rather than generated it, as Issa contends. (*See* Appendix, Vol. 4 a 33.)

[6]In spite of Issa's argument that during her testimony, his mother "had to live under the threat that her extended family would be harmed if she was successful in convincing the American jury to recommend a sentence other than death," he seems to acknowledge that "[t]he terms of the ["tribal] truce["] dictate that the Issa family owes the Khriss family monetary compensation . . . unless [Issa] is acquitted of the charge or put to death." (Traverse, Doc. No. 41-1 at 49, 50 n.14.)

representation in failing to present that evidence through a cultural expert. (Traverse, Doc. No. 41-1 at 50-53.) In support, Issa cites to the state post-conviction affidavit of Janice Ort, a psychologist, who stated that during her interviews with Issa, it became apparent that his cultural history merited "further investigation." (Appendix, Vol. 3 at 11.) She further stated that she believed Issa's assimilation into American culture was a significant factor in his psycho-social history. *Id.* Issa also cites James Crates' post-conviction affidavit where Crates states that he "would have liked to have seen a cultural expert testify," and that, had he known of the "tribal truce" at the time of trial, he would have encouraged defense counsel to obtain the services of a cultural expert.[7] (Appendix, Vol. 4 at 3.)

Neither of those affidavits provide this Court with any indication of what meaningful mitigation evidence could have been brought out through a cultural expert. For that, the Court turns to the evidentiary hearing testimony of Dr. Fatima Agha Al-Hayani.

It is difficult to give much credence to Al-Hayani's testimony, however. Her field of expertise is in Islamic law as it relates to divorce, custody, and support issues, not criminal trials, much less mitigation issues in capital cases. (Evid. Hrg. Tr., Doc. No. 119 at 80-81, 101.) Al-Hayani testified that a cultural expert could have been used by the defense in a variety of ways, much of which is not relevant to the claim at hand. For instance, she testified that a cultural expert could have "sensitized" the defense counsel and jurors to prejudices against Muslims, encouraging

---

[7]Crates' testimony at the evidentiary hearing in these proceedings was equivocal as to when he learned of the "tribal truce." First he testified that he learned of the agreement the night before the mitigation case began, suddenly making cultural issues prominent and problematic. (Evid. Hrg. Tr., Doc. No. 119 at 33.) In cross-examination, however, he testified that he did not learn of the "tribal truce" until he spoke to Dorian Hall during the preparation for Issa's post-conviction petition. *Id.* at 64. Incidentally, trial counsel Agar characterized any information she had about the agreement prior to trial as "rumor," and denied that she learned of it prior to the start of Issa's mitigation hearing. (Evid. Hrg. Tr., Doc. No. 112 at 112, 118.)

the lawyers to refer to Mrs. Issa's traditional clothing as "Islamic dress" rather than "robes." (Evid. Hrg. Tr., Doc. No. 119 at 97-99.) Such testimony has little to do with Issa's psycho-social development in Jordan or his assimilation into American culture, however. She also expounded upon the Arab cultural prohibition against women speaking out or showing emotion in public, the absence of juries in Jordan and Kuwait, prejudice against Arabs and Muslims in Detroit courts,[8] and, in her opinion, the unsatisfactory performance of the certified, court-appointed translator in Issa's case. (Evid. Hrg. Tr., Doc. No. 119 at 85-87, 102-3, 106-7.) None of those subjects are relevant to the current claim, either, although they may have some relevance to ineffective assistance of trial counsel claims Issa asserts in other grounds for relief.

Issa's claim is that had his trial counsel presented a cultural expert's testimony in the mitigation phase of his trial, there is a reasonable probability that the outcome of his trial would have been different. *See Strickland*, 466 U.S. at 694. Al-Hayani testified that because Issa's father was Palestinian, Issa suffered the consequences of the Palestinians being driven from their land to another country where they could not be citizens. (Evid. Hrg. Tr., Doc. 119 at 83-84.) No further details of what those consequences might have been, or what impact they may have had on Issa were presented, however. Al-Hayani suggested that other possible mitigating factors in Issa's case were the absence of violent behavior on his part in the past and his poor command of the English language. *Id*. at 97. Issa's trial counsel, however, testified that there was at least one charge of

---

[8]Al-Hayani states she reviewed, among other things, the affidavit of Jack Shaheen, which was submitted to the state post-conviction court (Appendix, Vol. 3 at 253-62), and purports to describe anti-Arab/Muslim stereotypes and biases both in American culture generally, and in specific instances in Issa's trial. Shaheen claims to have studied the way Arabs and Muslims are portrayed in popular culture for two decades, and to have lived in the Arab culture for two years, but provides no *curriculum vitae*. His conclusions relate to the potential for juror bias rather than the value of Issa's cultural background to his mitigation case, and his affidavit was never notarized. Consequently, this Court will not consider the substance Shaheen's affidavit, directly or indirectly through Al-Hayani, in making its recommendation on Issa's fifth ground for relief.

domestic violence against Issa in the past, and that she had no trouble communicating with Issa. (Evid. Hrg. Tr., Doc. No. 112 at 97-98, 101.)  Co-counsel Landrigan also stated in his deposition that Issa communicated well with him.  (Deposition of Terrance Landrigan, Doc. No. 60 at 35, 78.) Furthermore, Issa's attorney on direct appeal, Norman Aubin, testified that he never had need of a translator to assist in his communication with Issa, either.  (Evid. Hrg. Tr., Doc. No. 120 at 39.) Both trial counsel expressed concern about Issa's past criminal record being brought out in court. *Id*. at 58.  (Evid. Hrg. Tr., Doc. No. 112 at 98, 149.)  Thus, of the two additional mitigating factors Al-Hayani believed might have benefitted Issa, his lawyers contradicted one and pointedly kept out of evidence the other for strategic reasons.

Al-Hayani also testified that Issa never put forth much effort to assist with his mitigation case because he had "given up" and he "had no faith in the justice system" based upon some unspecified experiences he had before coming to the United States.  (Evid. Hrg. Tr., Doc. No. 119 at 103.)  She also testified that Issa believed the jurors were racially prejudiced against him.  *Id*. at 104.  Al-Hayani based those conclusions on what she had read of the trial record and post-conviction affidavits, including Issa's, and on interviews she had done in the course of her work in Detroit, Michigan.  *Id*.  She opined that Issa had not made the transition from the Jordanian system of justice to the American system where one is presumed innocent until proven guilty.  *Id*.  Trial counsel Agar, who naturally was in regular contact with Issa throughout his trial, testified in the evidentiary hearing that she found Issa to be culturally assimilated into American culture, and that his attitudes seemed "pretty western," especially compared to those of his family members.  (Evid. Hrg. Tr., Doc. No. 112 at 100.)  Al-Hayani, on the other hand, never spoke personally with Issa or anyone else involved in his state court trial, and so the information upon which she based her opinion respecting

Issa's understanding of the justice system in America apparently comes from her reading of the uncross-examined affidavits filed in the state post-conviction proceedings. (Evid. Hrg. Tr., Doc. No. 119 at 101.) Consequently, Agar's testimony has more credibility than Al-Hayani's. Moreover, while Agar conceded that Issa's reluctance to put on a strong mitigation case "might have been culturally based" (Evid. Hrg. Tr., Doc. No. 112 at 99), a possibility does not amount to a fact. Similarly, Issa's belief that his jurors harbored prejudices against him, whether based on race, nationality, or any other arbitrary characteristic, does not demonstrate the actual existence of the prejudices. Al-Hayani's testimony that Issa's belief in the jurors' prejudices, if explained to the jurors, would have made Issa more sympathetic to the jurors (Evid. Hrg. Tr., Doc. No. 119 at 104), makes no sense. Jurors are unlikely to react sympathetically or mercifully to being accused of racism, particularly where there is no evidence of prejudice. Moreover, trial counsel testified at the evidentiary hearing that the decision not to emphasize Issa's nationality was precisely to avoid arousing any prejudices on the part of the jurors. (Evid. Hrg. Tr., Doc. No. 112 at 129.)

Some of the information Al-Hayani testified should have been presented through a cultural expert was or could have been presented through other mitigation witnesses. For instance, she suggested that Issa's immigration to the United States and his father's death could have been presented through a cultural expert. (Evid. Hrg. Tr., Doc. No. 119 at 88.) But that information was testified to by Issa's brother and mother, no doubt in far more personal and humanizing terms than possible through an expert witness. (Trial Tr. at 1549, 1551, 1561, 1566-68.)

"The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy." *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005). Issa's trial counsel presented evidence of Issa's early life in Kuwait and Jordan, his close family ties,

his father's struggle to assure that his children obtained better educations than he had, Issa's good performance in school while in Jordan, his move to the United States to pursue his education, his father's death shortly thereafter, Issa's sacrificing his own educational goals so he could work and help his family financially instead, his loving and gentle nature, and the family's disbelief that Issa could be involved in murder.  (Trial Tr. at 1546-71.)  Finally, Issa's brother testified that he did not want to see him executed, and his mother asked the jurors for compassion.  (Trial Tr. at 1563, 1570.)  Trial counsel made a strategic decision not to present evidence that would emphasize Issa's culture of origin because of the perceived risk that jurors might associate it with terrorism.  (Evid. Hrg. Tr., Doc. No. 112 at 129.)  Furthermore, the cultural evidence Issa claims should have been presented was merely an alternative theory of mitigation, as the state court found, and it was discarded by Issa's trial counsel for that reason.  *See State v. Issa*, No. C-000793, 2001 WL 1635592 at *4 (Ohio App. 1st Dist. Dec. 21, 2001)(unreported).

In the end, the evidence Issa claims should have been presented through a cultural expert at his mitigation hearing was either presented through other sources, irrelevant insofar as the instant claim is concerned, or was excluded by his trial counsel for strategic reasons.  Even if that were not so, he has failed to present reliable evidence that creates a reasonable probability that the outcome of his mitigation hearing would have been different.  *See Strickland*, 466 U.S. at 694.  Finally, Issa has failed to demonstrate that the state court's determination that the cultural evidence Issa claims should have been presented was anything other than an alternative mitigation theory was contrary to or an unreasonable application of federal law.  *See* 28 U.S.C. § 2254(d)(1).  For those reasons, Issa's fifth ground for relief should be denied.

**Sixth Ground for Relief**

In his sixth ground for relief, Issa claims that the admission into evidence of Andre Miles'

statements to Bonnie and Joshua Willis about the murders of Maher and Ziad Khriss were hearsay

from an available witness, and that their admission violated Issa's Sixth Amendment right to

confront the witnesses against him. (Petition, Doc. No. 62 at 31-34.) Respondent quotes extensively

from the state court's analysis and ultimate rejection of Issa's claim, and argues it is neither contrary

to nor an unreasonable application of federal law. (Return of Writ, Doc. No. 28 at 58-66.) Issa

disputes that argument. (Traverse, Doc. No. 41-1 at 53-62.)

Initially, a distinction must be made between Issa's claim that admission of Miles' statements

to the Willises violated a state evidentiary rule, and his claim that admission of the statements

violated Issa's rights under the Confrontation Clause of the Sixth Amendment to the United States

Constitution. A claim contending a state court violated a state evidentiary rule is not cognizable on

habeas corpus review. *Bey v. Bagley*, 500 F.3d 514, 519 (6th Cir. 2007); *see also Estelle v. McGuire*,

502 U.S. 62, 67-68 (1991) (stating "it is not the province of a federal habeas court to reexamine

state-court determinations on state-law questions"); *Coburn v. Howes*, 100 Fed.Appx. 328, 329,

2004 WL 613084 at **1 (6th Cir. Mar. 24, 2004)(unreported) (observing that "[f]ederal habeas

corpus relief is only warranted where a violation of a state's evidentiary rule results in the denial of

fundamental fairness and, therefore, a violation of due process"), *citing Cooper v. Sowders*, 837 F.2d

284, 286 (6th Cir. 1988). Issa does not here, and did not in the state court, claim that the admission

of Miles' statements through other witnesses violated fundamental fairness or his due process rights

under the federal constitution. Thus, whether the statements were erroneously admitted hearsay

evidence is a question solely of state law, and one which this Court need not address. Accordingly,

the Court confines its review to Issa's Confrontation Clause issue.

As Respondent notes, Issa raised the Confrontation Clause claim as his second proposition of law on direct appeal to the Ohio Supreme Court. (Appendix, Vol. 2 at 75-79.) In denying the claim, that court reasoned as follows:

> We now turn to [Issa's] contention that the admission of Bonnie['s] and Joshua's testimon[ies] regarding Miles's confession violated his right to confront the witnesses against him as guaranteed by the United States and Ohio Constitutions. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *State v. Madrigal* (2000), 87 Ohio St.3d 378, 384, quoting *Maryland v. Craig* (1990), 497 U.S. 836, 845. Although the hearsay rules and the Confrontation Clause are generally designed to protect similar ideals, the two are not equivalent. *Idaho v. Wright* (1990), 497 U.S. 805, 814. In other words, the Confrontation Clause may bar the admission of evidence that would otherwise be admissible under an exception to the hearsay rule. *Id.* . . .

> In *Lilly v. Virginia* (1999), 527 U.S. 116, . . . (plurality opinion), the lead opinion recognized that the type of hearsay statement challenged herein, *i.e.*, an out-of-court statement made by an accomplice that incriminates the defendant, is often made under circumstances that render the statement inherently unreliable. For example, when a declarant makes such a statement to officers while he is in police custody, the declarant has an interest in inculpating another so as to shift the blame away from himself. In that situation, a declarant will often admit to committing a lesser crime and point to an accomplice (the defendant) as the culprit in a more serious crime. While the statement is technically against the declarant's penal interest, it is also self-serving and, for that reason, particularly deserving of cross-examination when used as evidence against the defendant. *Id.* at 131-132 and 138. Because this type of statement is inherently unreliable, the lead opinion stated that, in order to satisfy the Sixth Amendment, the circumstances surrounding the making of the statement must make the declarant's truthfulness so clear that "'the test of cross-examination would be of marginal utility.'" *Id.* at 136, quoting *Idaho v. Wright*, 497 U.S. at 820.

> . . .

Applying *Lilly* and *Madrigal*,[9] to this case, it is clear that in order to determine whether the admission of evidence concerning Miles's confession violated [Issa's] confrontation rights, we must examine the circumstances under which the confession was made. Unlike the declarants in *Lilly* and *Madrigal*, Miles was not talking to police as a suspect when he made the out-of-court statement. Miles's confession was made spontaneously and voluntarily to his friends in their home. Moreover, Miles had nothing to gain from inculpating [Issa] in the crime. In fact, by stating that [Issa] had hired him to kill Maher, Miles was admitting a capital crime, *i.e.*, murder for hire. Furthermore, Miles's statement was clearly not an attempt to shift blame from himself because he was bragging about his role as the shooter in the double homicide.

We therefore find that the circumstances surrounding the confession did "'render the declarant [Miles] particularly worthy of belief.'" *Madrigal*, 87 Ohio St. 3d at 387, quoting *Wright*, 497 U.S. at 819. Our decision herein is buttressed by Chief Justice Rehnquist's separate opinion in *Lilly*, in which he noted that in a prior case, the [C]ourt "recognized that statements to fellow prisoners, *like confessions to family members or friends*, bear sufficient indicia of reliability to be placed before a jury without confrontation of the declarant." (Emphasis added.) *Id.*, 527 U.S. at 147. (Rehnquist, C.J., concurring in the judgment). Accordingly, we hold that the admission of Bonnie's and Joshua's testimon[ies] concerning Miles's confession did not violate the Confrontation Clause.

*State v. Issa*, 93 Ohio St. 3d 49, 59-61, 752 N.E.2d 904 (2001)(parallel citations omitted).

The Sixth Amendment of the federal constitution provides that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Pointer v. Texas*, 380 U.S. 400 (1965), the Supreme Court deemed that provision applicable to state criminal prosecutions through the Fourteenth Amendment's Due Process Clause.

_____

[9]On habeas review in the United States District Court for the Northern District of Ohio, Judge Gwin determined that "the Ohio Supreme Court's finding that admission of [Madrigal's co-defendant's] statements violated the Confrontation Clause is not contrary to or an unreasonable application of federal law." *Madrigal v. Bagley*, 276 F. Supp. 2d 744, 769 (N.D. Ohio 2003), *aff'd Madrigal v. Bagley*, 413 F.3d 548 (6th Cir. 2005). After extensive analysis, however, Judge Gwin concluded that the state court's determination that the violation was harmless error was contrary to federal law and he granted habeas relief on Madrigal's Confrontation Clause claim. *Madrigal*, 276 F.Supp.2d at 769-77.

At the time of Issa's trial, the governing law respecting Confrontation Clause issues was set forth in *Ohio v. Roberts*, 448 U.S. 56 (1980). There, the circumstances were somewhat different from those in Issa's case, as the prior statements of the unavailable witness in *Roberts* were from a person who had been called to testify by the defense at a preliminary hearing prior to trial. *Id.* at 58. A transcript of that testimony was later introduced at trial to rebut an assertion made by the defendant during his own testimony. *Id.* at 59. The Supreme Court identified two separate restrictions imposed by the Confrontation Clause on the range of admissible hearsay: (1) "the Sixth Amendment establishes a rule of necessity," which means that "the prosecution must either produce, or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant"; and (2) once the witness' unavailability has been demonstrated, the out-of-court statements must possess "indicia of reliability." *Id.* at 65-66. Because of the similar values intended to be protected by the hearsay rules and the Confrontation Clause, reliability may be found where the evidence falls within a "firmly rooted hearsay exception." *Id.* at 66. In other cases, the evidence may be admitted if it possesses "particularized guarantees of trustworthiness." *Id.* After noting the vigorous intellectual discussion that had been taking place respecting the Confrontation Clause prior to *Roberts*, the Court stated that no commentator had demonstrated that the Court's prevailing analysis was in conflict with the Framer's intentions concerning the Confrontation Clause, and indicated its intention to stay the course. *Id.*

Twenty-four years later, and after Issa's trial, the Court reversed course. In *Crawford v. Washington*, 541 U.S. 36, 42-68 (2004), the Court distinguished "testimonial" statements from "nontestimonial" statements, and held that *Roberts* does not apply to "testimonial" statements, and that the Confrontation Clause itself does not apply to "nontestimonial" statements. After *Crawford*,

then, the threshold question in a Confrontation Clause analysis is whether the statements claimed to have violated the clause are "testimonial" in nature. *United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004).

The Supreme Court, however, did not define the terms "testimonial" and "nontestimonial." Some guidance may be gleaned from the Court's definition of "testimony: as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51, *quoting* 2 N. Webster, An American Dictionary of the English Language (1828). In addition, the Court observed that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. In the absence of a comprehensive definition of "testimonial" statements from the Supreme Court, the Sixth Circuit Court of Appeals has favored the following definition: "The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004); *United States v. Martinez*, 430 F.3d 317, 329 (6th Cir. 2005).

According to *Crawford*, "the Framers would not have allowed admission of a testimonial statement of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." 541 U.S. at 53-54. In doing so, the Court relieved the trial courts of the burden of determining whether out-of-court statements bore sufficient "indicia of reliability" to justify their admission into evidence. As noted above, the Court also concluded that "nontestimonial" statements are outside the contemplation of the Confrontation

Clause altogether, and that their admissibility is instead determined by resort to the states' evidentiary rules respecting hearsay. *Id*. at 68.

*Crawford*, however, is relevant to Issa's claim only if its holding is retroactively applicable. In *Whorton v. Bockting*, 549 U.S. 406, 127 S.Ct. 1173, 1184 (2007), the Court held that although *Crawford* announced a "new rule" of criminal procedure, it did not fall within the *Teague v. Lane*, 489 U.S. 288 (1989), exception for "watershed" rules that would make the new rule applicable retroactively. Therefore, *Roberts* still guides this Court's analysis of Issa's Confrontation Clause claim.[10]

Under *Roberts*' first prong, it must be determined whether the prosecution either produced, or demonstrated the unavailability of the declarant whose statement it wished to use against Issa. *Roberts*, 448 U.S. at 65-66. It is noted that unavailability for Confrontation Clause purposes is not synonymous with unavailability in the hearsay context. For instance, both the Federal and Ohio hearsay rules define "unavailablility" in relevant part as a declarant's persistent refusal to testify concerning the subject matter of his or her prior statement "despite an order of the court to do so." Fed. R. Evid. 804(a)(2); Ohio R. Evid. 804(A)(2). For Confrontation Clause purposes, however, "unavailability" requires only that the prosecutorial authorities had to have made a good-faith effort to obtain the declarant's presence at trial. *Barber v. Page*, 390 U.S. 719, 724-25 (1968). *Accord California v. Green*, 399 U.S. 149, 161-62 (1970); *Berger v. California*, 393 U.S. 314, 314-15

---

[10]The Court observes, however, that even if *Crawford* governed Issa's case, his claim would fail. *Crawford* itself recognized that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not," effectively distinguishing comments made to friends and family members from the "testimonial" statements to which the Confrontation Clause applies. 541 U.S. at 51; *see also Gendron v. Lafler*, No. 05-CV-74787-DT, 2007 WL 2005057 at *6 (E.D. Mich. July 10, 2007)(stating that "[t]estimonial statements do not include remarks made to family members or acquaintances, *citing Crawford*, 541 U.S. at 51-52, 56; *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005); *United States v. Stover*, 474 F.3d 904, 912-13 (6th Cir. 2007)). As nontestimonial statements, Miles' confession to the Willises would be subject to the state's hearsay rules, but not the Confrontation Clause. *Crawford*, 541 U.S. at 68.

(1969). Thus, there is no requirement that a court order the declarant to testify for the declarant to be found unavailable in the Confrontation Clause context.

In Issa's case, the prosecutors subpoenaed Andre Miles to testify at trial, and he appeared, but persistently refused to testify. (Trial Tr. at 938-45.) Therefore, the prosecution went well beyond making a good-faith effort to obtain Miles' presence at Issa's trial, they actually obtained his presence. Miles' subsequent refusal to testify is what rendered him unavailable for Confrontation Clause purposes.

The second prong of *Roberts* requires the Court to consider whether Miles' out-of-court statements possessed "indicia of reliability" necessary for their admission into evidence *Id*. at 65-66. A decade before *Roberts*, the Supreme Court had articulated four "indicia of reliability which have been widely viewed as determinative of whether a statement may be placed before the jury though there is no confrontation of the declarant." *Dutton v. Evans*, 400 U.S. 74, 89 (1970)(plurality). The *Dutton* factors are as follows:

> (1) whether the hearsay statement contained an express assertion of past fact, (2) whether the declarant had personal knowledge of the fact asserted, (3) whether the possibility that the statement was based upon a faulty recollection is remote in the extreme, and (4) whether the circumstances surrounding the statement make it likely that the declarant fabricated the assertion of fact.

*Id*. at 88-89; *see also Anthony v. DeWitt*, 295 F.3d 554, 563-64 (6th Cir. 2002)(employing the *Dutton* factors to determine the reliability of a declarant's out-of-court statements).

In *Anthony*, the Sixth Circuit applied the *Dutton* factors to out-of-court statements which "were made shortly after the crime within the confines of the husband-wife relationship, were uttered voluntarily, and were against [the declarant's] penal interest." *Id*. at 560. The court found that the declarant's statements included express assertions of past fact based on the declarant's

personal knowledge acquired at the scene of the murder, and that there was no realistic likelihood that the declarant's recollection was faulty because the statements were made on the evening of the murder. *Id*. at 563-64. The court also concluded that it was unlikely that the facts asserted by the declarant were false since he voluntarily made the statements to a family member. *Id*. at 564. The court held that the declarant's statements in *Anthony* did not violate the Confrontation Clause.

Applying the *Dutton* factors to Issa's claim compels the same result. First, like the declarant in *Anthony*, Miles' statements to the Willises contained express assertions of past fact detailing his agreement with Issa to murder Maher Khriss in exchange for money, his acquisition of the murder weapon from Issa, his murder of Maher and Ziad Khriss, and his disposal of the murder weapon in the Willises' backyard. (Trial Tr. at 1100-08, 1167-70.) Second, Miles had personal knowledge of the facts he asserted because he was, for the most part, describing his own participation in the murders. *Id*. Third, the likelihood that Miles' recollection was faulty is remote because he described the events to the Willises the day after the murders. *State v. Issa*, 93 Ohio St. 3d 49, 52, 752 N.E.2d 904 (2001). Fourth, it is unlikely Miles fabricated the facts because he made them voluntarily to two people who described their relationships with Miles as "like a big brother" (Testimony of Bonnie Willis, Trial Tr. at 1087), and as "friends for about four years" (Testimony of Joshua Willis, Trial Tr. at 1163). Bonnie also testified that Miles had lived with her, her brother, and her mother on two occasions, each lasting for a couple of months, *id*. at 1087, 1194, and Joshua stated he saw Miles "just about every day" during their friendship, *id*. at 1163. In addition, both Willises testified that Miles made his statements to them in the privacy and comfort of Bonnie Willis' bedroom. *Id*. at 1100-01, 1168-69. Miles' statements were also against his penal interest, as he admitted to a murder for hire, *id*. at 1100-08, 1167-70, and rather than attempting to shift

blame or divert attention to another, Miles' attitude was one of a braggart about his role in the murders, *id.* at 1137.

The differences between Anthony's and Issa's circumstances are insignificant. First, in *Anthony*, the declarant's statements were made to his own wife, whereas in Issa's case, Miles confessed to Bonnie and Joshua Willis, two young people with whom he had lived, and who described their relationship with Miles as brotherly or very close. Even if not a blood relation, the Willises were unquestionably perceived by Miles as allies. "[S]tatements made to a family member or perceived ally, in confidence, have previously been deemed sufficiently trustworthy" so that they are admissible in spite of the absence of an opportunity to confront the declarant. *Anthony*, 295 F.3d at 564, *citing United States v. Tocco*, 200 F.3d 401, 416 (6th Cir. 2000), and *Bruton v. Phillips*, 64 F.Supp.2d 669, 680 (E.D. Mich. 1999). Second, while the declarant in Anthony made his statements on the same day as the murder, Miles did not confide in the Willises until the next day. It is impossible to make any outcome-determinative distinction between the lapses in time in the two cases, however. Thus, the results of *Anthony* compel the same result in Issa's case.

Under the law as it existed at the time of Issa's trial and direct appeal, the state court's decision respecting Issa's Confrontation Clause claim was neither contrary to nor an unreasonable application of federal law as articulated by the United States Supreme Court, as discussed above. For all of those reasons, Issa's sixth ground for relief should be denied.

**Seventh Ground for Relief**

In his seventh ground for relief, Issa contends his convictions are not supported by sufficient evidence and that they are against the manifest weight of the evidence. (Petition, Doc. No. 62 at 34-

36.) Issa's argument relies upon the success of his first, tenth, and eleventh grounds for relief. As it is recommended that each of those grounds be denied as meritless, the same follows for Issa's claims in the instant ground for relief.

**Eighth Ground for Relief**

In his eighth ground for relief, Issa claims his trial counsel provided ineffective assistance in the mitigation phase because they did not present the testimony of jailers who observed Issa in confinement as he awaited trial. (Petition, Doc. No. 62 at 37-38.) Respondent acknowledges the claim has been preserved for habeas corpus review, but argues it is nevertheless meritless. (Return of Writ, Doc. No. 28 at 73-75.) In his traverse, Issa contends that but for two incidents during his nine-month incarceration prior to trial, he had no disciplinary actions taken against him, and that he was prejudiced by his attorneys' failure to bring that information to the attention of the jury. (Doc. No. 41-1 at 71-74.)

As Respondent has noted, Issa presented the instant claim to the state court as his sixteenth claim for relief in his petition for post-conviction relief. (Appendix, Vol. 5 at 148-50.) The post-conviction trial court rejected the claim, finding the evidence Issa claims should have been presented in the sentencing phase presented nothing more than an alternative theory of mitigation. (Appendix, Vol. 5 at 309.) The court of appeals subsequently affirmed denial of Issa's claim, reasoning that Issa had failed to present evidence from outside the record to support the claim as is required in post-conviction proceedings in Ohio. A petitioner in a post-conviction proceeding must present sufficient documentary evidence outside the record to show entitlement either to the relief requested, or to an evidentiary hearing at which such evidence may be developed. *State v. Jackson*, 64 Ohio St. 2d 107,

111-12, 413 N.E.2d 819 (1980). The rule in *Jackson* is an adequate and independent state ground

for procedural default purposes. *Sowell v. Bradshaw*, 372 F.3d 821, 830 (6th Cir. 2004), *citing*

*Lorraine v. Coyle*, 291 F.3d 416, 426 (6th Cir. 2002). Consequently, Respondent could have argued

that Issa's claim is procedurally defaulted because the state court of appeals relied on an independent

and adequate state procedural rule when it overruled his assignment of error. No such argument has

been made, however, freeing this Court to address Issa's claim *de novo*. "If deference to the state

court is inapplicable . . ., we 'exercise our independent judgment' and review the claim *de novo*."

*McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *quoting Hain v. Gibson*, 287 F.3d 1224, 1229

(10th Cir. 2002).

Issa argues that valuable mitigation evidence was omitted from his trial because his trial

counsel failed to investigate, discover, and present evidence of his alleged good behavior while

incarcerated awaiting trial. (Petition, Doc. No. 62 at 37-38; Traverse, Doc. No. 41-1 at 70-74.) The

state court of appeals correctly observed that Issa did not present any evidence from outside the

record to support his claim in post-conviction. (Appendix, Vol. 5 at 148-50.) Nor has Issa presented

any evidence in these proceedings upon which this Court might find his claim to be viable. The

exhibits from his evidentiary hearing do not contain any affidavits from any correctional officers or

officials who were willing to testify to Issa's alleged good behavior during incarceration. Nor were

Issa's trial counsel questioned about their reasons for not presenting Issa's conduct during

incarceration as mitigation evidence in the penalty phase of his trial. Consequently, all this Court

has to rely on in considering Issa's claim is his own word that he had only two disciplinary actions

taken against him during the time he was held between his arrest and his trial. Even if the Court

were to take Issa at his word, which is not even an option in habeas corpus, presenting evidence of

"good behavior" while admitting two disciplinary actions would have been of questionable value in the mitigation phase of the trial.

Because Issa has not supported his claim with evidence upon which this Court might make a determination respecting the alleged ineffectiveness of his trial counsel, his eighth ground for relief should be denied.


**Ninth Ground for Relief**

In his ninth ground for relief, Issa contends his appellate counsel provided ineffective assistance during his direct appeal, citing ten instances in which he claims his counsel were ineffective. (Petition, Doc. No. 62 at 38-61.) In this Court's Report and Recommendations on procedural default and statute of limitations issues, it concluded that Issa's claim was made in an amendment to his petition falling outside the AEDPA's one-year statute of limitations, on the authority of *Mayle v. Felix*, 545 U.S. 644 (2005). (R&R, Doc. No. 134 at 25-28.)

Issa has objected to this Court's recommendation that his ninth ground for relief be denied on statute of limitations grounds. (Petitioner's Objections, Doc. No. 138.) He contends that because he was without counsel for more than ten months after the AEDPA statute of limitations began to run, he is entitled to equitable tolling of the limitations period. *Id.*

The United States Supreme Court has not decided whether the AEDPA's statute of limitations is subject to equitable tolling. *Lawrence v. Florida*, 549 U.S. 327, 127 S.Ct. 1079, 1085 (2007). Where the parties agree that the doctrine applies, however, the Court has assumed so as well. *Id.* The Sixth Circuit Court of Appeals has held, however, that "the [AEDPA's] one-year limitation period is a statue of limitation subject to the doctrine of equitable tolling." *Dunlap v.*

*United States*, 250 F.3d 1001, 1007 (6th Cir. 2001).

Upon the Ohio Supreme Court's April 17, 2002, denial of Issa's appeal from the state court of appeals' denial of his petition for post-conviction relief, the clock began to run on Issa's one-year time limit for filing a petition for habeas corpus in the federal court. *State v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table). The first indication this Court had of Issa's intent to file a petition seeking habeas corpus relief was when the Ohio Public Defender's Office filed notice of such intent, an application to proceed *in forma pauperis*, and a motion for appointment of counsel on February 18, 2003,about two months before the statute of limitations would preclude filing of the petition. (Doc. Nos. 1, 2, and 3.) Issa's motion to proceed *in forma pauperis* was granted on February 28, 2003, and on that date counsel was also appointed to represent Issa in his habeas corpus proceedings. (Doc. No. 4.)

Appointed counsel explains that he did not receive the Ohio Public Defender's files on Issa's case until April 9, 2003, leaving him eight days to examine the ten banker's boxes of documents, identify grounds for relief, and prepare the petition for habeas corpus relief. (Petitioner's Objections, Doc. No. 138 at 3.) Despite those overwhelming obstacles, counsel was able to file what he terms a "shell" habeas petition which consisted of twenty-three grounds for relief. (Doc. No. 8.) Nevertheless, within a month and a half, habeas counsel discovered reasons to believe that Issa was provided ineffective assistance of counsel by his state appellate counsel. He requested and was granted leave to return to the state court to pursue an application to reopen his direct appeal while his habeas case was held in abeyance. (Doc. No. 15.) Pursuant to this Court's permission, Issa amended his petition to include his ineffective assistance of appellate counsel claim on January 30, 2004. (Doc. No. 26.)

First, the Court notes that "[p]arties cannot raise new arguments or issues on objection that were not presented to the Magistrate Judge." *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998). Respondent asserted the statute-of-limitations defense in her Return of Writ (Doc. No. 28 at 76-77), but Issa never argued entitlement to equitable tolling in his response (Traverse, Doc. No. 41-1 at 75-76). Instead, Issa quotes this Court's order granting his motion to amend his petition to add a different claim wherein the Court stated that

> [A]mendment of a pleading relates back to the date of the original pleading if "the claim or defense arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. . . [.]" The transaction in question, of course, is Petitioner's conviction and sentence of death. His claim relating to Ohio App. R. 26(B) unquestionably arises out of that transaction and therefore the amended petition will relate back to the date the original Petition was filed.

(Doc. No. 25 at 2.) For reasons stated in the original Report and Recommendations, Issa's argument was rejected. (Doc. No. 134 at 25-28; *see also* Doc. No. 132.) Since Issa never argued that he should be entitled to equitable tolling in his traverse, he cannot do so now through his objections. *Waters, supra*.

Issa cites *Pace v. DiGuglielmo*, 544 U.S. 408, 416 (2005), as approving the technique of filing a "protective" habeas petition and returning to the state court to exhaust a state remedy, then amending the petition to include the newly exhausted claim. (Petitioner's Objections, Doc. No. 138 at 4.) The procedure suggested by *Pace*, however, does not negate *Mayle*'s requirement that the newly-exhausted claim "relate back" to the original timely petition. In fact, *Pace*'s reliance on *Rhines v. Weber*, 544 U.S. 269, 278 (2005), presumes that a "protective" petition is one that is filed prior to expiration of the limitations period and includes the unexhausted claim or claims, rendering *Mayle*'s analysis of the term "relation back" essentially irrelevant in that situation. *See Pace*, 544

U.S. at 416.  Issa correctly notes that this Court has previously stated that there was no need for him to amend his petition to include the ineffective assistance of appellate counsel claim prior to his return to the state courts to exhaust the claim.  (Petitioner's Objections, Doc. No. 138 at 4-5, 8.)  Practically, however, Issa would be in no better position had the Court required him to amend his habeas petition before returning to the state courts.  By that time, the statute of limitations for filing his habeas corpus petition had run, and the amended claim would be out of time for the same reasons explained in this Court's discussion of *Mayle* in the original Report and Recommendations.  (Doc. No. 134 at 25-28.)

The United States Supreme Court has held that to be entitled to equitable tolling, a habeas petitioner must show that (1) he has been diligently pursuing his rights, and (2) some extraordinary circumstance stood in they way of his filing within the AEDPA's one-year limitations period. *Lawrence v. Florida*, 549 U.S. 327, 127 S.Ct. 1079, 1085 (2007).  After *Lawrence*, however, the Sixth Circuit has continued to evaluate claims of entitlement to equitable tolling using the five-factor test it first set out in *Andrews v. Orr*, 851 F.2d 146 (6th Cir. 1988), and reaffirmed after the AEDPA's passage in *Dunlap v. United States*, 250 F.3d 1001 (6th Cir. 2001).  *See Allen v. Bell*, No. 05-6910, 2007 WL 2962586 (6th Cir. Oct. 10, 2007); *Craig v. White*, No. 05-1821, 2007 WL 1192408 (6th Cir. Apr. 23, 2007).

The five-factors of the *Dunlap* test are as follows:  (1) the petitioner's lack of notice of the AEDPA's filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) the diligence exercised in pursuing his rights; (4) the absence of prejudice to the respondent, and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim. 250 F.3d at 1008.  Issa does not argue that he was without notice of or unaware

of the AEDPA's filing requirements, either actually or constructively, so the first, second, and fifth factors are not in contention. The fourth factor's relevance to Issa's case is not apparent until he has demonstrated that one of the *Dunlap* factors might warrant equitable relief. *Allen v. Yukins*, 366 F.3d 396, 401, 403 (6th Cir. 2004).

Issa's argument respecting the remaining diligence factor is essentially that the Ohio Public Defender's Office, which represented him in his state post-conviction proceedings, the completion of which triggered the running of the AEDPA's statute of limitations, prevented the appointment of habeas counsel until two months before his petition was due. (Petitioner's Objections, Doc. No. 138 at 2-4.) In a copy of an April 22, 2002, letter to the Consul of the Jordanian Embassy, assistant Ohio public defender Richard Vickers acknowledged that the public defender's office had taken on the responsibility of requesting counsel to be appointed for Issa in his federal habeas corpus proceedings. (Doc. No. 138-2 at 1.) The request was not made to the federal court until February of 2003, however, depriving counsel who was ultimately appointed of approximately ten months that could have been used to prepare Issa's habeas corpus petition. Instead, appointed counsel had less than two months to do so.

There is no doubt that notice of intent to file the habeas petition, the request to proceed *in forma pauperis*, and the request that counsel be appointed for the federal proceedings should have been filed at the earliest possible moment to ensure that habeas counsel and Issa had benefit of the full one-year limitations period in which to prepare and file Issa's habeas petition. That appointed counsel presented as thorough and well-constructed petition as he did considering the very limited time he had to prepare it is a tribute to his unquestionable dedication and efficiency. *Lawrence*, however, rejected the notion that a habeas petitioner should be entitled to equitable tolling because

of his attorney's omissions. 127 S.Ct. 1085. In addition, "the Eleventh Circuit has opined that ineffective assistance of counsel likely would not be grounds for equitable tolling." *Warren v. United States*, 71 F.Supp.2d 820, 823 (S.D. Ohio 1999) *citing Lee v. United States Postal Serv.*, 774 F.2d 1067, 1069 n.3 (11th Cir. 1985). "Attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence . . . ." *Howell v. Crosby*, 415 F.3d 1250, 1252 (11th Cir. 2005). No evidence has been presented to this Court suggesting that Issa made any inquiries to the Ohio Public Defender's Office about his case even though he was aware that that office was going to assist him in filing his case in the federal court. (Petitioner's Objections, Letter to Issa from Ohio Public Defender's Office dated April 22, 2002, Doc. No. 138-2 at 2.)

For all of the reasons above, the Magistrate Judge concludes that Issa is not entitled to equitable tolling respecting the addition of his ninth ground for relief to his habeas petition outside the AEDPA's one-year statute of limitations period. Consequently, as this Court recommended before, and recommends again here, Issa's ineffective assistance of appellate claim should be denied.


**Tenth Ground for Relief**

In his tenth ground for relief, Issa contends that Ohio's procedure for litigating a claim of ineffective assistance of appellate counsel is unconstitutional. (Petition, Doc. NO. 62 at 62-63.) In this Court's Report and Recommendations on procedural default and statute of limitations issues (Doc. No. 134 at 29), Issa's tenth ground for relief was found to have relied upon law that has since been overruled, *see Lopez v. Wilson*, 426 F.3d 339, 352 (6th Cir. 2005); *Morgan v. Eads*, 104 Ohio St. 3d 142, 146-47, 818 N.E.2d 1157 (2004). In addition, this Court observed that *Lopez* also

established that the application to reopen process in Ohio "does not give rise to any federal constitutional right cognizable on habeas," *Lopez*, 426 F.3d at 354, and that Ohio had no constitutional obligation to create the application to reopen a direct appeal procedure at all, *Lopez*, 426 F.3d at 351, *citing Coleman v. Thompson*, 501 U.S. 722, 756 (1991). Neither party has objected to this Court's determination. (Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1.) As Issa's claim is not cognizable in habeas corpus, it should be denied.


**Eleventh Ground for Relief**

In his eleventh ground for relief, Issa contends his death sentence is disproportionate, arbitrary, and capricious, and consequently unconstitutional under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. (Petition, Doc. No. 62 at 63-64.) Respondent argues that Issa presents an issue of state law that is not cognizable in habeas corpus, and that the Ohio courts' rejection of his claim is neither contrary to nor an unreasonable application of federal law. (Return of Writ, Doc. No. 28 at 98-104.) As one would expect, Issa contests Respondent's arguments. (Traverse, Doc. No. 41-1 at 121-26.)

Issa presented his proportionality claim to the state supreme court as his seventh proposition of law on direct appeal. (Appendix, Vol. 2 at 96-97.) That court rejected Issa's argument that his death sentence was disproportionate when compared to Linda Khriss' acquittal and Andre Miles' life sentence. *State v. Issa*, 93 Ohio St. 3d 49, 72, 752 N.E.2d 904 (2001). Instead, the court reasoned, Issa's sentence need only be compared to other cases in which a death sentence was imposed for murder for hire. *Id*.

Issa's proportionality arguments can be quickly dismissed. He contends that a comparison

of his sentence to other cases in which a death sentence was imposed is constitutionally insufficient unless it also includes similar cases in which the death sentence was not imposed. (Traverse, Doc. No. 41-1 at 125-26.) It has long been recognized by the United States Supreme Court that there is no federal constitutional requirement for proportionality review in capital cases. *Pulley v. Harris,* 465 U.S. 37, 42-44 (1984). The Sixth Circuit Court of Appeals has observed that "[b]y statutorily incorporating a form of comparative proportionality review that compares a defendant's death sentence to others who have also received a sentence of death, Ohio's death penalty regime actually adds an additional safeguard beyond the requirements of the Eighth Amendment." *Getsy v. Mitchell*, 495 F.3d 295, 306 (6th Cir. 2007). Thus, the Ohio Supreme Court's rejection of Issa's claim that Ohio's death penalty scheme is unconstitutional because it permits comparison only to other cases in which the death penalty has been imposed was in concert with rather than contrary to federal law.

Issa's claim that his sentence should be compared to the outcomes in his co-defendants' cases is likewise unavailing. There is no constitutional requirement that separately tried co-defendants' sentences be consistent with one another. *Getsy*, 495 F.3d at 307. Consequently, as troubling as it is that Issa received a death sentence while Linda Khriss was acquitted and Andre Miles, who was the actual shooter, received only life imprisonment, that result is not contrary to or an unreasonable application of federal law. Accordingly, Issa's eleventh ground for relief should be denied.

**Twelfth Ground for Relief**

In his twelfth ground for relief, Issa returns to mine again the vein of his trial counsels'

performance in the mitigation phase of his trial.  Issa contends that by failing to communicate with and direct the investigation of the mitigation specialist, his trial counsel's representation was rendered ineffective.  (Petition, Doc. No. 62 at 65-68.)  As an example of counsel's inadequate representation, Issa states that the mitigation specialist was unaware of the "tribal truce" until just days before the beginning of the mitigation phase of Issa's trial.  *Id*. at 65.  Issa also argues that an insufficient investigation was conducted into his life in Hamilton County, which would have been a rich source of mitigation evidence.  *Id*. at 66.  Respondent relies upon the state court of appeals' determination that Issa failed to demonstrate prejudice from counsel's alleged errors.  (Return of Writ, Doc. No. 28 at 105-7.)

Even if Issa's claims that his trial counsel failed to effectively direct the mitigation investigation are accurate, *Strickland* requires that he also demonstrate prejudice.  466 U.S. at 694.  Although his failure to do so in the state court was the basis for the Ohio court of appeals' rejection of his claim, Issa makes no attempt to prove prejudice here.  The only record reference Issa makes, aside from one to a juror's affidavit which is barred from consideration by the *aliunde* rule, is the affidavit of Jim Crates, the mitigation specialist obtained by Issa's trial counsel.  (Petition, Doc. No. 62 at 65.)  There, Crates states that "[a] great impediment to mitigation was the fear of retribution" (Appendix, Vol. 3 at 203), and yet the state court found that not one of the other post-conviction affiants stated they were cowed from testifying at the mitigation phase by the fear of retribution, *State v. Issa*, No. C-000793, 2001 WL 1635592 at *5 (Ohio App. 1st Dist. Dec. 21, 2001) (unreported).  Crates also states in his affidavit that it was his "impression" that if Issa was on death row, no retribution would be taken against the Issa family members remaining in Jordan, and that he "would have liked to see a cultural expert testify" (Appendix, Vol. 3 at 203), but Crates'

impressions and desires are not evidence, and they are certainly not a sufficient basis upon which to conclude that the state court's decision respecting Issa's ineffective assistance of trial counsel claim was contrary to or an unreasonable application of federal law.

The state court found Issa had not demonstrated prejudice from his trial counsel's alleged errors in communicating with and guiding the mitigation specialist in his investigation. Issa has presented no evidence from which this Court could conclude that the state court's determination was contrary to federal law. Accordingly, Issa's twelfth ground for relief should be denied.


**Thirteenth Ground for Relief**

In his thirteenth ground for relief, Issa claims his death sentence should be reversed because he was incompetent to assist his trial counsel in preparing for his capital case due to his limited understanding of the English language. (Petition, Doc. No. 62 at 68-69.) Although Respondent asserted a procedural default defense with respect to Issa's claim (Return of Writ, Doc. No. 28 at 108-9), this Court found that the state courts had misapplied the state procedural rule of *res judicata* to Issa's claim, and that habeas corpus review of the claim was consequently not precluded (R&R, Doc. No. 134 at 6-8). Respondent objected to this Court's conclusion (Doc. No. 137 at 3-4), contending that raising a claim of ineffective assistance of counsel due to their failure to assert his incompetence to stand trial constitutes raising the underlying competency claim itself. It does not. *White v. Mitchell*, 431 F.3d 517, 526 (6th Cir. 2005). Thus, this Court is in a position to address Issa's claim *de novo*. *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir. 2005); *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001).

Respondent also disputed the merits of Issa's claim, arguing that Issa was both linguistically

and culturally competent to stand trial. (Return of Writ, Doc. No. 28 at 110-12.) In his traverse, Issa responds to both arguments. (Doc. No. 41-1 at 132-37.) He contends there is no evidence that he understood the "culture and customs of the American legal system." *Id.* at 133. In habeas corpus, however, it is not the absence of evidence contradicting a petitioner's claim that makes the case; rather, it is affirmative proof that the claim is meritorious that demonstrates entitlement to relief.

"It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." *Medina v. California*, 505 U.S. 437, 439 (1992). Issa likens his case to that in *Pate v. Robinson*, 383 U.S. 375 (1966), where the defendant's "mental alertness and understanding" during discussions with the trial judge was not enough justification to ignore the uncontradicted testimony of the defendant's "history of pronounced irrational behavior." *Id.* at 385-86. Issa urges this Court to view his alleged incompetence in the English language as the equivalent of the *Pate* defendant's irrational behavior. (Traverse, Doc. No. 41-1 at 133.)

The difference between Issa's situation and the defendant's in *Pate*, however, is that there was significant evidence in *Pate* that the defendant's psychological competence to stand trial was questionable. As the Supreme Court noted, "[t]he uncontradicted testimony of four witnesses called by the defense revealed that [the defendant] had a long history of disturbed behavior." *Pate*, 383 U.S. at 378. Issa, however, presents no reliable evidence of his alleged incompetence due to his inability to understand English that might contradict the state court's suggestion that Issa's comprehension of the English language was demonstrated by his unsworn statement in the mitigation phase of his trial. *See State v. Issa*, 93 Ohio St. 3d 49, 67-68, 752 N.E.2d 904 (2001). In addition, Issa's trial counsel apparently found no reason to move for a competency hearing based

on Issa's claimed inability to communicate effectively in English. In fact, at the evidentiary hearing, evidence was presented showing that neither trial counsel had any trouble communicating with Issa in English during their representation of him, and that Issa in fact had at least a fair command of the English language. (Deposition of Terence Landrigan, Doc. No. 60 at 35, 78; Evid. Hrg. Tr., Doc. No. 112 at 101.) The mitigation specialist also testified at the evidentiary hearing that his communication with Issa was not hampered by Issa's English. (Evid. Hrg. Tr., Doc. No. 119 at 62.)

In his state post-conviction proceedings, Issa presented his own affidavit in which he claimed not to have understood some of the goings on at his trial, but in which he also deigned to criticize the court-appointed translator's performance during Issa's brother's and mother's testimonies. (Appendix, Vol. 3 at 104.) Issa also submitted educational records from 1984-85 and 1999 showing what appear to be passing grades in English language classes. (Appendix, Vol. 3 at 184-87.) Exactly how that information supports Issa's claim that he was incompetent to stand trial because he did not understand English well enough is a mystery.

Other than Issa's own uncross-examined affidavit, there is nothing in the record to support his claim that his lack of proficiency in English rendered him incompetent to stand trial. Accordingly, Issa's thirteenth ground for relief should be denied.

**Fourteenth Ground for Relief**

In his fourteenth ground for relief, Issa contends that prospective jurors' biases against Muslims and Arabs was not sufficiently explored in *voir dire* by his trial counsel, and that he was consequently deprived of the effective assistance of counsel in all phases of his trial. (Petition, Doc.

No. 62 at 69-72.) He also contends that his attorneys failed to take measures to "counterbalance the biases." *Id.* Respondent recites the state court's decision on the issue, and argues it comports with rather than contradicts federal law. (Return of Writ, Doc. No. 28 at 17.)

Issa did not present his claim to the state courts on direct appeal. Instead, he appropriately brought it to the state courts through his petition for post-conviction relief. (Appendix, Vol. 5 at 157-59.) The post-conviction trial court concluded that the basis for Issa's claim was factually wrong, and that trial counsel had questioned prospective jurors about biases against Muslims and Arabs. (Appendix, Vol. 5 at 310.) Issa appealed to the state court of appeals (Appendix, Vol. 7 at 116-54), which overruled Issa's claimed error reasoning as follows:

> In his twentieth claim for relief, Issa contended that trial counsel was [sic] ineffective for failing to adequately delve into the jury's biases and prejudices about Arabs and Muslims . . . . He acknowledged that the empanelled jurors all stated that they could follow the law. He maintained, however, that they had hidden biases that went undiscovered. The record demonstrates, however, that counsel did question potential jurors about potential biases against people of Issa's nationality. . . . [Issa] did not demonstrate that any particular juror was biased against him because of his nationality. Generalized assertions in an affidavit that American jurors in general have biases against Arabs are insufficient to demonstrate prejudice. Consequently, Issa failed to demonstrate ineffective assistance of counsel in this respect.

*State v. Issa*, No. C-000793, 2001 WL 1635592 at *5 (Ohio App. 1st Dist. Dec. 21, 2001) (unreported). Further review was declined by the Ohio Supreme Court. *State v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table). Consequently, it is the court of appeals' decision to which this Court must apply the AEDPA.

Issa's ineffective assistance of counsel claim fails because the underlying claim is without merit. Preliminarily, the Court notes that Issa has not argued that his attorneys were obligated under

state law to pursue questioning the jury venire on racial biases to any greater degree than they did. Instead, he relies on federal law in claiming his attorneys provided ineffective assistance, and in contending that he was entitled to more in-depth probing of the prospective jurors' racial attitudes in *voir dire*. Thus, the trio of United States Supreme Court cases governing Issa's claim is *Ham v. South Carolina*, 409 U.S. 524 (1973), *Ristaino v. Ross*, 424 U.S. 589 (1976), and *Turner v. Murray*, 476 U.S. 28 (1986).

In *Ham*, the defendant was a locally well-known black civil rights activist accused of marijuana possession, whose defense was that law enforcement was "out to get him" because of his activism and that he had been framed. *Ham*, 409 U.S. at 525. The trial judge refused to question the prospective jurors about racial prejudice in particular, although he did ask three general questions as to bias, prejudice, and partiality. *Id*. at 526. The state courts affirmed Ham's convictions, but the United States Supreme Court reversed, reasoning that under the facts shown by the record, Ham was permitted to have the prospective jurors interrogated on the issue of racial bias. *Id*. at 527. The Court further observed that state trial courts are not required to ask any particular questions or any particular number of questions, because the federal courts' supervision over state trials is not as close under the Sixth and Fourteenth Amendments as it is over federal trials where federal courts have more exacting supervisory authority. *Id*. at 527.

In *Ristaino*, the defendant, James Ross, Jr., was a black man convicted in a state court of violent crimes against a white security guard. 424 U.S. at 589-90. He, too, requested the trial court's permission to question prospective jurors specifically about racial prejudice in addition to the customary questions about general bias or prejudice. *Id*. at 590. Citing *Ham*, the Court stated that "[t]he Constitution does not always entitle a defendant to have questions posed during *voir dire*

specifically directed to matters that conceivably might prejudice veniremen against him." 424 U.S. at 594. The Court made clear that "*Ham* did not announce a requirement of universal applicability," but instead "reflected an assessment of whether under all of the circumstances presented there was a constitutionally significant likelihood that, absent questioning about racial prejudice, the jurors would not be as 'indifferent as (they stand) unsworne.'" *Id*. at 596, *quoting* Coke on Littleton 155b (19th ed. 1832). The Court rejected Ross' argument that where a violent crime was charged and the defendant and victim are of different races, motions to *voir dire* prospective jurors on racial prejudice must be granted. *Id*. at n.8. Similarly, requiring *voir dire* on racial prejudice because of the defendant's race alone was also disfavored by the Court. *Id*. "In our heterogeneous society, policy as well as constitutional considerations militate against the divisive assumption as a *per se* rule that justice in a court of law may turn upon the pigmentation of skin, the accident of birth, or the choice of religion." *Id*. In distinguishing Ham's circumstances from Ross', the Court noted that [t]he circumstances in *Ham* strongly suggested the need for *voir dire* to include specific questioning about racial prejudice," and that the mere fact that the victim and defendant were of different races was "less likely to distort the trial than were the special factors involved in *Ham*." *Ristaino*, 424 U.S. at 596-97. Tellingly, "Ross was unable to support his motion concerning *voir dire* by pointing to racial factors such as existed in *Ham* or others of comparable significance." *Ristaino*, 424 U.S. at 598.

Ten years after *Ristaino*, the Court clarified the circumstances under which *voir dire* of prospective jurors on racial bias is required in capital cases. In *Turner v. Murray*, 476 U.S. 28 (1986), the Court recognized that the discretion entrusted to the jury in a capital sentencing hearing "gives greater opportunity for racial prejudice to operate than is present when the jury is restricted

to factfinding." 476 U.S. at 37 n.8. The Court did not hold, however, that defendants are entitled to *voir dire* on racial matters in every capital case where race might conceivably be an issue. Instead, the Court noted that "a defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." 476 U.S. at 37.

Issa's claim, however, is not that the trial judge erred, but that his counsel were ineffective for not questioning the venire, or at least requesting to *voir dire* the venire, on possible bias against Muslims or Arabs. When presented with that question, the Seventh Circuit Court of Appeals has stated the following:

> Lear also argues that his trial lawyer rendered ineffective assistance to him by failing to take advantage of *Turner v. Murray*, 476 U.S. 28, 36-37, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986), which holds that "a capital defendant accused of an interracial crime is entitled to have prospective jurors informed of the race of the victim and questioned on the issue of racial bias." . . . We must ask whether this omission brought the lawyer's representation of Lear below minimum professional standards, and if so whether it is likely that the jury would not have imposed the death penalty. The Supreme Court made clear in *Turner* that the lawyer's failure to have the jurors informed of the victim's race and questioned about their feelings about interracial crime is not unprofessional, subpar representation per se. *Id*. at 37, 106 S.Ct. 1683. Indeed all the Court really held was that if the defense wants to quiz jurors on their reaction to the interracial character of the defendant's crime, the judge must permit this. Obviously there are tactical reasons why a lawyer would not want to direct the jurors' attention to the interracial character of the crime, and the Court recognized this. *Id*. Lear's lawyer testified that he thought he had dealt with the issue adequately by asking general questions about bias without focusing on race. Asking general questions about bias may have been a better method of eliciting reactions to the interracial character of the crime than playing up the interracial issue, especially since there is no suggestion that the crime had a racial *motive*. We are given no reason to doubt that the lawyer made the best tactical choice available to him in the tough circumstances that confronted him: a brutal murder and no real defense. . . . There is, in short, no reason to think counsel was ineffective. In any event no harm has been shown; it is exceedingly

unlikely that directing the venire's attention to the interracial character of Lear's conduct would either have disposed the jury that was selected to lenity or have altered the composition of the jury in a direction favorable to him.

*Lear v. Cowan*, 220 F.3d 825, 829 (7th Cir. 2000).  Thus, the United States Supreme Court's recognition of a capital defendant's right to *voir dire* prospective jurors on racial bias, when requested, *Turner*, *supra*, does not lead ineluctably to the conclusion that an attorney who fails to request such *voir dire* is ineffective.  *Lear*, 220 F.3d at 829.

Moreover, there is no interracial component to the murder of Maher Khriss.  Issa, Maher Khriss, Ziad Khriss, and Linda Khriss were all from Jordan.  Consequently, the circumstance that the Supreme Court found compelling in *Turner* is absent in Issa's case, and as was noted above, Issa's race alone does not necessitate *voir dire* of the venire on racial bias, either, *Ristaino*, 424 U.S. at 596 n.8.  In addition, nothing in the record suggests that the Khrisses were Muslim, of a different religion, or of any religion at all, and in the absence of evidence of that nature, this Court makes no assumption one way or the other.

Even if that were not the case, Issa has produced no evidence to demonstrate any racial or religious bias by any of the jurors who participated in his trial.  He cites to his counsel's *voir dire* of juror Kathleen Griffith, who stated that she had traveled to the Gaza Strip for two weeks.[11]  (Trial Tr. at 458-59.)  When asked about her feelings toward the people or the culture there, she stated it was "different," and that she had led a "sheltered life," but whether she agreed or disagreed with the way things were there, she had to respect their culture.  *Id.* at 459.  Griffith acknowledged that it was not her place to judge another culture, religious belief, or political belief.  *Id.*  It is difficult to see

---

[11]The irony of Issa's citation to Griffith's *voir dire* in the trial transcript to support of his claim that his counsel were ineffective for not questioning jurors on racial and religious bias is not lost on this Court.

how her statements could be evidence of prejudice when she explicitly stated the opposite.

Issa also references the post-conviction affidavit of Jack Shaheen, whom he identifies as "an expert on American biases toward Arabs and Muslims. (Petition, Doc. No. 62 at 70; Appendix, Vol. 3 at 253-262.) Aside from the uncross-examined nature of affidavits generally, Shaheen's affidavit is unaccompanied by his *curriculum vitae*, and was never notarized. As evidence, therefore, it is inadmissible.

Issa refers to his state post-conviction affidavit in which he expresses his own opinion that "Americans view Arabs as terrorists." (Appendix, Vol. 3 at 103.) Rather that proving the bias of Americans with that statement, however, Issa demonstrates his own preconceived notions of Americans by stereotyping them all as bigots.

In his deposition, trial counsel Terence Landrigan stated that he prepared for *voir dire* with respect to Issa's nationality by doing what he did in every case: he tried to be relaxed, communicate with the venire, and to get to know them as best he could. (Doc. No. 60 at 59.) He did not think nationality was a "big factor" in Hamilton County, *id.*, and Issa has produced no evidence to suggest the contrary. Trial counsel Elizabeth Agar testified at the evidentiary hearing in these proceedings that she and Landrigan chose not to focus on Issa's Arab culture in *voir dire* because they did not want to emphasize it. (Evid. Hrg. Tr., Doc. No. 112 at 150.) Thus, that decision was a strategic one.

To summarize, then, Issa's claim fails for several reasons. First, *voir dire* on racial prejudice or bias is not required by the federal constitution in the absence of "special circumstances" justifying such questioning. *Ham v. South Carolina*, 409 U.S. 524 (1973); *Ristaino v. Ross*, 424 U.S. 589 (1976); *Turner v. Murray*, 476 U.S. 28 (1986). Therefore, Issa was not entitled to the *voir dire* on racial bias. Second, even if he were entitled, it is not necessarily ineffective assistance for his

attorneys not to have requested such *voir dire*. *Turner*, *supra*. Third, even if Issa were entitled to *voir dire* the venire on racial bias, and even if his counsel erred in not requesting the same, Issa has not demonstrated prejudice from counsel's failure to do so. The state court's decision respecting Issa's claim is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court, and Issa is consequently not entitled to habeas corpus relief. His fourteenth ground for relief should be denied.

**Fifteenth Ground for Relief**

In his fifteenth ground for relief, Issa contends his federal constitutional rights were violated by state authorities when they failed to inform him of his right of access to the Jordanian consul under the Vienna Convention on Consular Relations after he had been arrested. (Petition, Doc. No. 62 at 72-76.) In its initial Report and Recommendations, this Court concluded Issa's claim is procedurally defaulted and that Issa had not demonstrated cause for and prejudice from the default. (Doc. No. 134 at 8-11.) Neither party has objected to this Court's conclusion. (Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1.) Even if Issa's claim were not procedurally defaulted, however, it would be unavailing under *Medellin v. Texas*, ___ U.S. ___, 128 S.Ct. 1346 (2008), *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), *Breard v. Greene*, 523 U.S. 371 (1998), and *United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001).[12] In either case, Issa's fifteenth ground for relief should be denied.

---

[12]Although the United States Supreme Court assumed without deciding that Article 36 of the Vienna Convention grants foreign nationals an individually enforceable right to request that their consular officers be notified of their detention, and an accompanying right to be informed by authorities of the availability of consular notification in both *Sanchez-Llamas* and *Medellin*, such does not constitute a "holding" of the Supreme Court, and consequently cannot form the basis for habeas corpus relief. *See Williams v. Taylor*, 529 U.S. 362, 412 (2000).

**Sixteenth Ground for Relief**

In his sixteenth ground for relief, Issa contends his trial counsel provided ineffective assistance by failing to obtain a firearms expert and an investigator, and by failing to move to suppress the evidence seized at Issa's home pursuant to a search warrant. (Petition, Doc. No. 62 at 76-78.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues that Issa has not presented any specific evidence that could have been presented at trial, the absence of which deprived him of a fair trial. (Return of Writ, Doc. No. 28 at 126-30.) Without referring to any evidence in the record, Issa maintains that his counsel's failure to present the speculative findings of an unnamed firearms expert and an unnamed investigator constituted ineffective assistance. (Traverse, Doc. No. 41-1 at 159-61.) His argument respecting the unsought suppression of the evidence seized at his home is merely that his counsel "failed to test the legitimacy of the search . . . by filing a motion to suppress the 7.62 caliber bullet found" pursuant to the search warrant. *Id*. at 161.

In addressing the merits of Issa's claim on direct appeal, the state supreme court held as follows:

> [Issa] argues that his trial counsel were deficient because they failed to request funds to hire investigators and a firearms expert to assist the defense. . . . [S]uch a motion would have been properly denied by the trial court because [Issa] would have been unable to make "a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." [*State v.*] *Mason*, 82 Ohio St. 3d 144 (1998), syllabus.
>
> . . .
>
> [Issa] contends that his trial counsel should have filed a motion to suppress the evidence of the 7.62 caliber bullet discovered during a search of his apartment. [Issa] gives no reason to suspect that the

search warrant that authorized this search could have been legitimately challenged. Here, because trial counsel did not file a motion to suppress, the record is silent as to the basis for the search warrant. However, when police executed the search of [Issa's] apartment on December 5, they had probable cause to do so. By that time, police had talked to Bonnie and Joshua [Willis] regarding [Andre] Miles' confession implicating [Issa], arrested Miles and obtained his confession, and recovered the murder weapon and ammunition clip.

Furthermore, the outcome of [Issa's] trial would have been the same even if the bullet found in [his] apartment had not been introduced as evidence, as more compelling evidence linked [Issa] to the murder weapon, for example, [Dwyane] Howard's testimony that he saw [Issa] with the murder weapon shortly before the murders and Bonnie's and Joshua's testimony [sic] that Miles told them that [Issa] supplied him with the rifle.

*State v. Issa*, 93 Ohio St. 3d 49, 68, 752 N.E.2d 904 (2001).

Had Issa brought the claim in the state post-conviction proceedings, he would have been in a position to supplement the record with documentation as to what evidence could have been but was not presented at trial due to trial counsel's alleged deficiencies. *See* Ohio Rev. Code § 2351.21. Issa did not do so, however. Nor did he present any such evidence at the evidentiary hearing or in any other manner in these proceedings. As was noted above, he does not refer to the record before this Court in arguing the current claim. As such, Issa has not provided this Court with any reason to doubt the correctness of the state supreme court's resolution of his claim. Since he has not demonstrated that the Ohio Supreme Court's decision is contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, Issa's sixteenth ground for relief should be denied.


**Seventeenth Ground for Relief**

In his seventeenth ground for relief, Issa contends that his indictment was "returned by an improperly constituted grand jury and upon inadequately presented evidence." (Petition, Doc. No. 62 at 79.) This Court has recommended denial of Issa's claim because it is procedurally defaulted and he has not demonstrated cause for and prejudice from the default. (R&R, Doc. No. 134 at 11-13.) Neither party has objected to this Court's conclusion. (Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1.) Even if the claim were preserved, however, Issa's claim would fail.

The United States Supreme Court has long recognized that "it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment issued by a grand jury . . . from which all persons of his race or color have, solely because of that race or color, been excluded by the State." *Hernandez v. Texas*, 347 U.S. 475, 477 (1954). That is not to say, however, that every official act which has a racially disproportionate impact is unconstitutional in the grand jury context. *Washington v. Davis*, 426 U.S. 229, 239 (1976). In *Castaneda v. Partida*, 430 U.S. 482 (1977), the Supreme Court articulated a three-part test for examining claims of racial bias in grand jury selection, which is as follows:

> [I]n order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrrperesentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the

statistical showing.   Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the state to rebut that case.

*Id*. at 494-95.  *See also Duren v. Missouri*, 439 U.S. 357, 363-70 (1979).  The Court has also

acknowledged that claims of racial discrimination in grand jury selection are cognizable in habeas

corpus.  *Rose v. Mitchell*, 443 U.S. 545, 556, 563-64 (1979).

Issa, however, failed to produce any evidence from which this Court could conclude that the

selection of his grand jury and foreman was tainted by racial discrimination.  In his petition, and

again in his traverse, he makes the unsupported statement that "[a]t the time of Mr. Issa's trial, the

percentages of African-American and other minorities registered to vote in Hamilton County was

less than the percentage of racial minorities composing the voting age population of Hamilton

County."  (Petition, Doc. No. 62 at 80; Traverse, Doc. No. 41-1 at 181.)  In an attempt to support

his claim that such disparities have existed throughout the history of Hamilton County, he cites to

the state post-conviction affidavit of Kimberlee Gray, wherein she states that she identified the race

of nineteen forepersons who served on grand juries in which capital indictments were returned.

(Traverse, Doc. No. 41-1 at 165; Appendix, Vol. 4 at 68-71.)  Gray's affidavit, however, does

nothing to support Issa's claim of bias in the grand jury selection process, nor does it amount to a

statistical study that compares the race of grand jury forepersons in capital cases in Hamilton County

to the racial makeup of the population of Hamilton County.  Nor does Gray's affidavit contain the

dates of the capital cases referred to, so any conclusion that the information she provides cannot be

considered as covering "a significant period of time," as required by *Castaneda*, *supra*.  Although

not cited by Issa, the Court notes that Gray's affidavit is followed in the record by over two hundred

pages of what appears to be lists of individuals who served on Hamilton County grand juries from

1985 to 1990. (Appendix, Vol. 4 at 72-203.) Assuming that material's relevance to the instant claim, none of those individuals are identified by race, making the documents useless with regard to Issa's claim of racial discrimination in grand jury selection. In addition, Issa produced no evidence of the historical or current racial demographics of Hamilton County, Ohio. Finally, there is a complete lack of evidence as to the race of the twelve jurors who served on Issa's jury. For all this Court knows, they may have perfectly matched the racial makeup of Hamilton County. Having been provided with no evidence with which to consider Issa's claim of grand jury and grand jury foreperson discrimination based on race, this Court would have recommended denial of Issa's seventeenth ground for relief even if he had preserved it for habeas review.

**Eighteenth Ground for Relief**

In his eighteenth ground for relief, Issa contends that prejudicial pretrial publicity deprived him of a fair trial and a fair sentencing determination. (Petition, Doc. No. 62 at 82-83.) This Court earlier recommended that Issa's claim be denied on procedural default grounds, and neither party has objected to that conclusion. (R&R, Doc. No. 134 at 13; Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1-16.) Even if the claim were amenable to habeas corpus review, however, Issa's claim would nevertheless fail because he does not cite to any evidence of publicity given his case in his petition or his traverse. (Petition, Doc. No. 62 at 82-83; Traverse, Doc. No. 41-1 at 183-86.) Consequently, there would be no basis upon which this Court could recommend habeas corpus relief.

**Nineteenth Ground for Relief**

In his nineteenth ground for relief, Issa contends constitutional error resulted from the flawed grand jury foreperson selection process in Hamilton County, Ohio. (Petition, Doc. No. 62 at 83-84.) This claim, too, was found to have been procedurally defaulted, and its denial was recommended by this Court in the initial Report and Recommendations, and neither party has objected to that determination. (Doc. No. 134 at 14-15; Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1.) For the same reasons given in this Court's discussion of Issa's seventeenth ground for relief, *supra*, the instant claim would be meritless even if it were preserved for habeas corpus review. Accordingly, this Court would recommend denial of Issa's nineteenth ground for relief even if it were preserved for habeas corpus review.

**Twentieth Ground for Relief**

In his twentieth ground for relief, Issa contends his constitutional right to a fair trial was violated by the trial court's failure to provide funds for an investigator to assist in his defense. (Petition, Doc. No. 62 at 84-86.) Respondent advanced a procedural default defense (Return of Writ, Doc. No. 28 at 142), but this Court has concluded that the state court did not "clearly and expressly" state its reliance on an independent and adequate state procedural rule when the claim was presented there, and that without such reliance, the claim is not procedurally defaulted for habeas corpus purposes. (R&R, Doc. No. 134 at 15-17.)

Respondent has objected to this Court's determination, contending that the Ohio Supreme Court's discussion of the merits of Issa's claim did not negate its "conclusion" that the claim was waived on procedural grounds. (Respondent's Objections, Doc. No. 137 at 4-5.) Respondent's argument is beside the point. The problem is not the state court's discussion of the merits of Issa's

claim, or any effect that discussion might have on the procedural "conclusion" that preceded it. The problem is that the state court did not clearly and expressly rely upon the state procedural rule, a prerequisite to any consideration of whether a subsequent discussion of the claim's merits has affected a procedural default in the state court. Thus, Respondent has not persuaded this Court that it erred in finding Issa's twentieth ground for relief preserved for habeas corpus review was erroneous. Accordingly, the claim's merits will be addressed.

Issa argues that his defense was hamstrung by the lack of funds to obtain an investigator who might have been able to determine the manufacturer of the murder weapon, interview witnesses including Linda Khriss, gather evidence from the Willis residence, and take photographs that could have been used to impeach the testimony of the Willises. (Petition, Doc. No. 62 at 85.) When he presented the claim to the Ohio Supreme Court on direct appeal (Appendix, Vol. 2 at 99), he was of course prohibited from supplementing the record with the evidence he now claims his trial counsel should have discovered with the help of an investigator.[13] Ohio R. App. Proc. 9(A), 16(A)(3). Confined to the record as it was, the state court concluded that even if Issa's attorneys had requested funds for an investigator, the trial court would have been justified in denying the request. *State v. Issa*, 93 Ohio St. 3d 49, 63, 752 N.E.2d 904 (2001).

Issa never mentions the state court's opinion in his argument, nor does he contend it is contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d). Furthermore, Issa has not presented this Court with a reason to think the name of the gun manufacturer is relevant to his conviction or sentence, that the named and unnamed witnesses he claims should have been interviewed would have provided

---

[13]In these proceedings, Issa has not claimed to have raised the instant issue in his state post-conviction proceedings, where he would have been permitted to supplement the record with support for his argument.

information helpful to his defense, or that photographs would have been useful, and how they would have been useful, in impeaching the Willises' testimonies. Instead, he presents this Court with conjecture, absent any reference to a place in the record where support for his claim might be found. Without such support, it is impossible for this Court to conclude that Issa is entitled to habeas corpus relief. Accordingly, his twentieth ground for relief should be denied.


**Twenty-first Ground for Relief**

In his twenty-first ground for relief, Issa contends he was denied a fair trial as a result of the admission of gruesome, inflammatory, and cumulative photographs at trial. (Petition, Doc. No. 62 at 86-87.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues that the state supreme court's rejection of Issa's claim is consistent with rather than contrary to federal law. (Return of Writ, Doc. No. 28 at 146-50.)

The Ohio Supreme Court discussed Issa's claim at length when he presented it on direct appeal. *State v. Issa*, 93 Ohio St. 3d 49, 64-65, 752 N.E.2d 904 (2001). That court compared several photographs admitted at trial and concluded that they were not cumulative or repetitive, and also found their probative value to be greater than the danger of material prejudice to Issa. *Id*. at 65. From the Ohio court's comments about the photographs, it is clear that the images were a part of the record and that the state court had them available for viewing. This Court does not have that advantage, as the photographs are not a part of the record in these proceedings. Thus, this Court is unable to evaluate the state court's findings with regard to the relative gruesomeness, repetitiveness, or cumulative nature of the photographs. Moreover, Issa does not explain how the state court's findings and conclusions are contrary to or an unreasonable application of federal law.

Because Issa has failed to demonstrate entitlement to habeas corpus relief, therefore, his twenty-first ground for relief should be denied.

**Twenty-second Ground for Relief**

In his twenty-second ground for relief, Issa contends the Ohio requirement that mitigating factors must be proved by a preponderance of the evidence before they may be weighed against aggravating circumstances prevents the jury from considering relevant mitigating evidence. (Petition, Doc. No. 62 at 87-89.) Respondent admits the claim is preserved, but argues it is meritless. (Return of Writ, Doc. No. 28 at 151-53.) Issa admits that the same claim has been rejected by the United States Supreme Court in *Delo v. Lashley*, 507 U.S. 272, 275-77 (1993), but states it is presented to preserve it for further review. (Petition, Doc. No. 62 at 88; Traverse, Doc. No. 41-1 at 195.) As this Court has no authority to grant habeas corpus relief where the state court's resolution of a claim is neither contrary to nor an unreasonable application of federal law as determined by the United States Supreme Court, and since Issa recognizes such law does not presently support his position, *see Walton v. Arizona*, 497 U.S. 639, 649-50 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584, 609 (2002), his twenty-second ground for relief should be denied.

**Twenty-third Ground for Relief**

In his twenty-third ground for relief, Issa contends he was deprived of a fair trial by the trial court's erroneous instructions to the jury. (Petition, Doc. No. 62 at 89-93.) This Court has determined that Issa's claim has been procedurally defaulted, and that he failed to demonstrate cause

for the default or prejudice therefrom. (R&R, Doc. No. 134 at 17-20.) Neither party has objected to this Court's conclusion. (Respondent's Objections, Doc. No. 137 at 2; Petitioner's Objections, Doc. No. 138 at 1.) Accordingly, Issa's claim should be denied.

Even if Issa had preserved the issue for habeas corpus review, however, it would fail. Issa contends that the jury instructions in the penalty phase of his trial created an unconstitutional presumption in favor of a death verdict by providing the jurors with unfettered discretion in making a sentencing recommendation. (Petition, Doc. No. 62 at 89-93.) To support his claim in the state post-conviction court, he submitted an affidavit by Michael Geis dated September 7, 1994, well before Issa's trial in 1998. (Appendix, Vol. 3 at 217-52.) No *curriculum vitae* accompanies Geis' affidavit, nor are his qualifications to render an expert opinion included in the body of his affidavit. *Id*. The only indication of Geis' qualifications is his own identification of himself as a professor of linguistics at an unnamed college or university on the signature page of his affidavit. *Id*. at 252.[14] Furthermore, Issa did not seek to present Geis as a witness in these proceedings, so Geis' opinions respecting any presumption in favor of death verdicts contained in the Ohio Jury Instructions has not been subjected to cross-examination. For those reasons, Geis' affidavit would be entitled to little weight in this Court's consideration of Issa's claim, even if the claim were preserved for habeas corpus review.

Issa's twenty-third ground for relief is procedurally defaulted without excuse, and meritless; it should be denied.

---

[14]It is noted that Issa identifies Geis as a professor of linguistics at The Ohio State University (Petition, Doc. No. 62 at 89), but writing so in a habeas corpus petition does not constitute proof of the assertion, nor does Geis' title alone, even if accurate, establish him as an expert under the *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), criteria.

**Twenty-fourth Ground for Relief**

In his twenty-fourth ground for relief, Issa contends Ohio's statutory definition of "reasonable doubt" is an inadequate standard with which to impose a death sentence. (Petition, Doc. No. 62 at 93-97.) The parties agree that the claim is preserved for habeas corpus review. (Petition, Doc. No. 62 at 96-97; Return of Writ, Doc. No. 28 at 158.) The claim, however, is indistinguishable from identical or similar claims repeatedly considered and rejected by the Sixth Circuit Court of Appeals. *White v. Mitchell*, 431 F.3d 517, 533-34 (6th Cir. 2005); *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001); *Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001). Consequently, Issa's twenty-fourth ground for relief should be denied.

**Twenty-fifth Ground for Relief**

In his twenty-fifth ground for relief, Issa contends the Ohio death penalty statutory scheme is unconstitutional for a myriad of reasons. (Petition, Doc. No. 62 at 97-111.) Respondent acknowledges the claim is preserved for habeas corpus review, but argues it is meritless. (Return of Writ, Doc. No. 28 at 160-77.)

When Issa raised the instant claim as his fifteenth proposition of law on direct appeal, the Ohio Supreme Court found that each of the arguments Issa made had been rejected in its previous decisions. *State v. Issa*, 93 Ohio St. 3d 49, 69, 752 N.E.2d 904 (2001). The court summarily overruled Issa's claim. *Id.*

Issa first contends that Ohio's statutory scheme allows unfettered prosecutorial discretion in determining whether to capitally indict a defendant which, he argues, violates the prohibitions against arbitrary, discriminatory, and mandatory death sentences, citing *Furman v. Georgia*, 408

U.S. 238 (1972), and *Woodson v. North Carolina*, 428 U.S. 280 (1976). (Petition, Doc. No. 62 at 98.) The Supreme Court of the United States held in *Gregg v. Georgia*, 428 U.S. 153, 199 (1976), that such "'discretionary stages' do not implicate the concerns expressed in *Furman*." *Wickline v. Mitchell*, 319 F.3d 813, 824 (2003), *see also Buell v. Mitchell*, 274 F.3d 337, 367-68 (6th Cir. 2001) (rejecting claim that Ohio's death penalty statutory scheme creates a mandatory death penalty and allows trial courts to apply the death penalty in an arbitrary, capricious, and discriminatory manner).

Next, Issa argues that the death penalty is neither the least restrictive nor the most effective means of deterring crime. (Petition, Doc. No. 62 at 99.) The only federal law Issa cites in support of his argument is *Shelton v. Tucker*, 364 U.S. 479 (1960), which he states stands for the proposition that "where fundamental rights are involved, personal liberties cannot be broadly stifled when the end can be more narrowly achieved." *Id.* at 488. That case is inapposite, however, as it involved school teachers' First Amendment right to association rather than the Fourteenth Amendment's Due Process Clause. There is no federal constitutional requirement that death be the least restrictive or the most effective means of deterring crime before it may be imposed. Instead, "in rejecting an argument that capital punishment is not the least restrictive or most effective means of furthering societal interests, the Supreme Court recognized that retribution, deterrence, and incapacitation of dangerous offenders are legitimate societal interests supporting capital punishment." *Jamison v. Collins*, 100 F. Supp. 2d 647, 760 (S.D. Ohio 2000), *citing Gregg v. Georgia*, 428 U.S. 153, 183-86 (1976).

Issa also contends the Ohio statutory scheme is unconstitutional because it does not require the prosecutor to demonstrate the absence of mitigating factors. (Petition, Doc. No. 62 at 100.) The United States Supreme Court has never stated such a requirement is necessary under the Eighth

Amendment, however. *See Jamison*, 100 F. Supp. 2d at 764.

Next, Issa argues that Ohio's scheme is unconstitutional because the statutory mitigating factors are vague. (Petition, Doc. No. 62 at 100.) Federal review of vagueness claims such as Issa's is quite deferential due to the insusceptibility of the proper degree of definition to a mathematically precise determination. *Tuilaepa v. California*, 512 U.S. 967, 973 (1994). A mitigating factor "is not unconstitutional if it has some 'common-sense core of meaning . . . that criminal juries should be capable of understanding.'" *Id.*, *quoting Jurek v. Texas*, 428 U.S. 262, 279 (1976)(White, J., concurring in judgment). Issa attacks the statutory mitigating factors as a whole, and does not specify precisely how any factor is lacking in a "common-sense core of meaning." Consequently, he has not demonstrated that the mitigating factors set forth in the Ohio death penalty statutory scheme are unconstitutionally vague.

Issa contends Ohio's death penalty statutes fail to provide juries with adequate guidelines with which to consider and weigh the aggravating circumstances against the mitigating factors. (Petition, Doc. No. 62 at 100-1.) On the authority of *Tuilaepa v. California*, 512 U.S. 967, 978-80 (1994), Issa's argument fails.

Issa next argues that Ohio's scheme is unconstitutional because it requires proof of the aggravating circumstances in the guilt phase of a capital trial. (Petition, Doc. No. 62 at 101.) His claim should be denied on the authority of *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988).

Likewise, Issa's contention that Ohio's death penalty scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial (Petition, Doc. No. 62 at 102), fails on the authority of *Corbitt v. New Jersey*, 439 U.S. 212, 223 (1978).

Next, Issa argues that Ohio's catch-all mitigating factor set forth in Ohio Rev. Code § 2929.04(A)(7) unconstitutionally permits the sentencer to convert what should be mitigating evidence into a non-statutory aggravating circumstance. (Petition, Doc. No. 62 at 103.) In *Johnson v. Texas*, 509 U.S. 350, 368 (1993), however, the United States Supreme Court stated that "the fact that a juror might view the [mitigating] evidence . . . as aggravating, as opposed to mitigating, does not mean that the rule of *Lockett* [*v. Ohio*, 438 U.S. 586 (1978)] is violated." Instead, "as long as the mitigating evidence is within 'the effective reach of the sentencer,' the requirements of the Eighth Amendment are satisfied." *Johnson*, 509 U.S. at 368, *quoting Graham v. Collins*, 506 U.S. 461, 475 (1993).

Issa's next contention is that the Ohio death penalty scheme does not fulfill the constitutional requirement of narrowing the class of individuals eligible for the death penalty. (Petition, Doc. No. 62 at 104.) On the authority of *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988), Issa's claim should be denied. The same is true of Issa's claim that defendants found guilty of felony-murder are treated more harshly than murderers who kill with prior calculation and design. (Petition, Doc. No. 62 at 105-6.) Along those same lines, Issa argues that Ohio's statutory scheme is unconstitutional because the aggravating circumstance set forth in Ohio Rev. Code § 2929.04(A)(7) merely repeats an element of the offense of aggravated murder, automatically qualifying a the offender for a death sentence. (Petition, Doc. No. 62 at 105.) That argument should be rejected on the authority of *Tuilaepa v. California*, 512 U.S. 967, 917-72 (1994), and *Lowenfield*, *supra*.

Next, Issa contends that Ohio's death penalty statutes are unconstitutional because a statutory aggravating circumstance subsumes a mitigating factor, skewing the weighing of the mitigating factors and aggravating circumstances toward a death sentence. (Petition, Doc. No. 62 at 107-8.)

The Sixth Circuit Court of Appeals has found that same argument meritless. *Cooey v. Coyle*, 289 F.3d 882, 927-28 (6th Cir. 2002).

Issa also argues that the Ohio scheme is unconstitutional because it does not require the sentencer to identify or articulate the existence of mitigating factors and aggravating circumstances. (Petition, Doc. No. 62 at 109-10.) Responding to the same claim in a different case, our sister court in the Northern District stated as follows:

> While the Supreme Court does "require that the record on appeal disclose to the reviewing court the considerations which motivated the death sentence in every case in which it is imposed," *Gardner v. Florida*, 420 [sic] U.S. 349, 361 (1977), there is no actual criterion stating the trial judge must identify and articulate the specific factors used to formulate the decision. Furthermore, Ohio Revised Code § 2929.03(F) requires that a trial judge make a written finding as to the existence of specific mitigating factors and aggravating circumstances, and why the aggravating circumstances outweigh the mitigating factors. By making a record of these determinations, the appellate court is able to make an "independent determination of sentence appropriateness." *State v. Buell*, 22 Ohio St.3d 124, 137, 489 N.E.2d 795 (1986), cert. denied, 479 U.S. 871, 107 S.Ct. 240, 93 L.Ed.2d 165 (1986). Thus, no constitutional infirmity exists.

*Otte v. Houk*, No. 1:06CV1698, 2008 WL 408525 at *49 (N.D. Ohio Feb. 12, 2008)(slip copy). Issa's claim suffers the same fate.

Issa also makes the familiar argument that Ohio's statutory scheme providing for proportionality review is constitutionally flawed because the comparison includes only other cases in which the death penalty was imposed, not those in which a lesser sentence resulted. (Petition, Doc. No. 62 at 109-10.) Proportionality review is not constitutionally required, however, *Pulley v. Harris*, 465 U.S. 37, 50-51 (1984), and the Sixth Circuit has observed that states consequently have "great latitude in defining the pool of cases used for comparison." *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001). Issa has not demonstrated that Ohio's proportionality review in capital cases

is contrary to or an unreasonable application of federal law as established by the United States Supreme Court.

Having found none of Issa's claims respecting the constitutionality of Ohio's death penalty statutes meritorious, his twenty-fifth ground for relief should be denied.


**Twenty-sixth Ground for Relief**

In his twenty-sixth ground for relief, Issa contends his trial counsel provided ineffective assistance when they failed to conduct an adequate mitigation investigation. (Petition, Doc. No. 62 at 111-12.) Specifically, Issa claims his trial counsel should have presented the testimonies of Johnny Floyd, Rayshawn Johnson, and Gary Hughbanks, all inmates who could have testified that Andre Miles implicated Issa in the murder to get even with Issa after a disagreement. *Id*. Respondent acknowledges the claim is preserved for habeas corpus review, but argues it is nevertheless without merit. (First Amended Return of Writ, Doc. No. 35 at 2-7.)

Issa raised his claim in his state post-conviction proceedings as his twenty-third claim for relief. (Appendix, Vol. 5 at 164-65.) The post-conviction trial court concluded that the decision to call a witness is one of trial strategy, and that Issa's counsel were not ineffective for failing to present Johnson's and Hughbanks' testimonies at Issa's trial. (Appendix, Vol. 5 at 311.) On appeal, the state court of appeals resolved the claim as follows:

> In his twenty-third claim for relief, Issa contended that counsel was [sic] ineffective for failing to present the testimony of two inmates who were Miles's cellmates. They stated in their affidavits that they would have testified that Miles had told them that he had implicated Issa in the murder plot as revenge for an earlier disagreement. The decision whether to call a witness involves trial strategy, and, absent prejudice, the failure to call a witness does not constitute ineffective assistance of counsel. In this case, counsel presented the testimony

-79-

of another witness who testified to the same facts. The presentation
of additional witnesses on the issue would have been cumulative, and
Issa did not demonstrate that the failure to call these witnesses
prejudiced the defense. Accordingly, he failed to demonstrate
ineffective assistance of counsel.

*State v. Issa*, No. C-000793, 2001 WL 1635592 at *6 (Ohio App. 1st Dist. Dec. 21, 2001)

(unreported). The Ohio Supreme Court later declined jurisdiction over Issa's further appeal. *State*

*v. Issa*, 95 Ohio St. 3d 1422, 766 N.E.2d 162 (2002)(table). Thus, to warrant habeas corpus relief,

Issa must demonstrate that the state court of appeals' decision was contrary to or an unreasonable

application of federal law as determined by the United States Supreme Court. 28 U.S.C. §

2254(d)(1).

Issa's counsel presented the testimony of Johnny Floyd in the guilt phase of Issa's trial.

(Trial Tr. at 1387-1401.) Floyd testified that he had been incarcerated with Miles while Miles' case

was pending, and that Miles told him he wanted to "get back" at Issa because of a prior dispute. *Id*.

at 1388-89. Because Floyd testified, and because the substance of his testimony at trial is precisely

what Issa now contends should have been presented, his counsel were not ineffective. Issa's

argument that counsel failed to bolster Floyd's testimony in the penalty phase with the testimonies

of Johnson and Hughbanks is unavailing. (*See* Traverse, Doc. No. 41-1 at 208.) The jury had

already determined that Floyd's testimony was either not credible or not worthy of significant

weight, or both, as is apparent from their guilty verdict on all counts in the first phase of Issa's trial.

There is no reason to believe that the jury would have accepted as true and weighty evidence in the

penalty phase what they had already rejected in the guilt phase.

At the evidentiary hearing in these proceedings, Issa presented Rayshawn Johnson's

testimony. (Evid. Hrg. Tr., Doc. No. 112 at 56-67.) Johnson was also incarcerated with Miles while

Miles was awaiting trial on the Maher and Ziad Khriss murder charges. *Id*. at 57. Johnson testified

that Miles admitted to having murdered the Khriss brothers, and said he wanted to implicate Issa and

Linda Khriss because "he didn't want to go down by himself." *Id*. at 58. Although Johnson stated

he had no independent recollection of receiving it, he identified a letter purportedly written to him

by Miles, which Johnson understood to be saying that Miles believed he should be on death row

himself rather than Issa. *Id*. at 60, 65-66.

That Miles did not want to "go down by himself" does not necessarily mean that his

confession implicating Issa was in any way false. It could just as well mean that he did not intend

to take responsibility for killings that were not entirely his own doing without the involvement of

any others. In other words, Miles' statement to Johnson does not suggest that Miles acted alone.

Similarly, assuming the authenticity of the letter about which Johnson testified at the evidentiary

hearing, Miles' statement that he should be on death row rather than Issa could very well mean that

Miles felt he was the more culpable given Issa's role as the middleman, and Miles' own role as the

actual killer. As such, even if Johnson's testimony and the letter had been produced at trial, it is

highly unlikely they would have affected the outcome of Issa's trial.[15]

Issa also faults his trial counsel's representation for their failure to produce Gary Hughbanks'

testimony. (Petition, Doc. No. 62 at 112.) Hughbanks submitted an affidavit in Issa's state post-

conviction proceedings in which he states he was housed with Miles when Miles was awaiting trial.

In it, he describes a conversation with Miles in which Miles described what happened on the night

of the Khrisses' murders. (Appendix, Vol. 5 at 93-94.) Hughbanks stated that Miles told him he

---

[15]It is noted that the letter purporting to be from Miles to Rayshawn Johnson is undated, but from its contents, was written after Issa's trial was completed. (Evid. Hrg. Petitioner's Exhibit 4 (marked "Plaintiff's Exhibit 4).) Therefore, the letter itself would not have been available to Issa's trial counsel during their representation of Issa.

had made a plan to rob Maher Khriss, and that he had shot and killed both Khriss brothers. *Id*. The

only mention of Issa in Hughbanks' affidavit are Hughbanks' statements that "Miles blamed his

incarceration on Issa, and he thought that Issa spoke to someone about the crime," and "I had spoken

briefly with Ahmed [sic] Issa while I was in jail . . . ." *Id*. Putting aside the uncross-examined

nature of Hughbanks' affidavit, and assuming the truth of the matters asserted therein, testimony

consistent with the substance of the affidavit would not have affected the outcome of Issa's penalty

phase hearing. Miles did not tell Hughbanks that Issa was not also involved, or that Issa's role in

the murders was less than what the jury had already determined it to have been in the guilt phase of

the trial. Thus, Issa's counsel were not ineffective for failing to present Gary Hughbanks' testimony

in the penalty phase of Issa's trial.

Issa has not demonstrated trial counsel error or prejudice resulting from their failure to

present the testimonies of Johnny Floyd, Rayshawn Johnson, and Gary Hughbanks at trial, nor has

he persuaded this Court that the state court's rejection of his claim in post-conviction is contrary to

or an unreasonable application of federal law as determined by the United States Supreme Court.

Accordingly, his twenty-sixth ground for relief should be denied.

It should be noted that Respondent has challenged this Court's statement in its initial Report

and Recommendations (Doc. No. 134), that Respondent had not raised a statute of limitations

defense with regard to Issa's twenty-sixth ground for relief. (Respondent's Objections, Doc. No.

137 at 12-14.) The Court's statement is true. Respondent argues, however, that mention of a

possible but ultimately eschewed statute of limitations defense in her response to Issa's request to

amend his petition for a second time to include his twenty-sixth claim counts as actually raising the

defense. (Respondent's Objections, Doc. No. 137 at 12-14, referencing Respondent's Reply to

Petitioner Issa's Motion for Leave to File His Second Amended Petition for Writ of Habeas Corpus, Doc. No. 32 at 2-3.) In addition, Respondent explains that this Court's order for additional briefing on the effect of *Mayle v. Felix*, 545 U.S. 644 (2005) (Doc. No. 131), was limited to an earlier amendment to the petition and precluded addressing the case's effect on Issa's twenty-sixth claim. (Doc. No. 137 at 12-13.) There was a good reason for that. This Court has never been inclined to order additional briefing on the effect of a new and binding case interpreting a statute of limitations issue where no statute of limitations defense has been advanced. In noting that she had considered and rejected a statute of limitations defense respecting Issa's twenty-sixth ground for relief, and by expressly stating she did not oppose allowing Issa to amend his habeas petition to include the claim (Doc. No. 32), Respondent waived her opportunity to claim that the statute of limitations barred Issa's twenty-sixth claim. In other words, advising the Court that she considered and rejected a defense is not the same as asserting the defense. Moreover, defenses are raised in pleadings, not in responses to motions or objections.

**Twenty-seventh Ground for Relief**

In his twenty-seventh ground for relief, Issa contends his appellate counsel were ineffective because one of them labored under a conflict of interest caused by his appointment to represent Andre Miles in his appeal while the lawyer also represented Issa. (Petition, Doc. No. 62 at 113-15.) Respondent advanced procedural default and statute of limitations defenses (Second Amended Return of Writ, Doc. No. 73 at 2-5), but both were rejected in this Court's previous Report and Recommendations (Doc. No. 134 at 20-23, 29-31).

Respondent has objected to this Court's conclusions respecting procedural default of Issa's

claim and its timeliness. (Doc. No. 137 at 5-12.) Respondent argues that the procedural rule upon which the state court relied in rejecting Issa's application to reopen his direct appeal in which he presented the instant claim was firmly established and regularly followed in Ohio courts at the time the rule was applied in Issa's case. (Respondent's Objections, Doc. No. 137 at 7-9.) Respondent cites *Monzo v. Edwards*, 281 F.3d 568, 577-78 (6th Cir. 2002) and *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005) *rev'd on other grounds Bradshaw v. Richey*, 546 U.S. 74 (2005), for the proposition that whether a state procedural rule was firmly established and regularly followed so as to preclude habeas corpus review in the federal courts is determined by examining the state of the rule at the time it was applied in the habeas petitioner's case. (Respondent's Objections, Doc. No. 137 at 7.) This Court does not disagree with that proposition, but the recommendation that Issa's twenty-seventh ground for relief should survive Respondent's procedural default defense is not contrary to either *Monzo* or *Richey*. Moreover, those cases are not in conflict with *Franklin v. Anderson*, 434 F.3d 412 (6th Cir. 2006), as Respondent suggests.

In *Monzo*, the defendant's application to reopen his direct appeal was filed on May 8, 1998, and denied by the state court the following month. 281 F.3d at 574, 578. In *Richey*, the application to reopen the direct appeal was filed in April 1994, and the court of appeals' denial of the application was affirmed by the Ohio Supreme Court in August 1995. 395 F.3d at 671; *State v. Richey*, 73 Ohio St. 3d 523, 653 N.E.2d 344 (1995). Thus, the state courts applied the state procedural rule respecting applications to reopen a direct appeal in both *Monzo* and *Richey* at a time that *Franklin* recognized the Ohio Supreme Court had been regularly enforcing the rule's timeliness requirements. *Franklin*, 434 F.3d at 420 (citing nine cases in which the rule's timeliness requirements were enforced, spanning the years between 1995 and 2000). Beginning in 2000,

however, the Ohio Supreme Court stopped consistently enforcing the timeliness requirements and began addressing the merits of the claims asserted in applications to reopen direct appeals, many times in spite of the intermediate courts of appeals' rejection of the claims on timeliness grounds. *Id*. at 420-21 (citing nineteen Ohio Supreme Court decisions from 2000 to 2004 in support). In 2004, the state supreme court enforced the timeliness requirement in three cases cited by the Sixth Circuit. *Id*. at 421. Issa filed the application to reopen his direct appeal in early 2005, shortly after the Ohio Supreme Court began to enforce the timeliness provision, and the state court denied it on June 29, 2005. (R&R, Doc. No. 134 at 21.) After several years of not enforcing the timeliness requirement, however, beginning to enforce it again in three cases is insufficient to establish the rule as one that is firmly established and regularly followed for procedural default purposes.

Furthermore, Respondent ignores this Court's determination that Issa's return to the state court to pursue reopening his direct appeal was futile from the beginning, as the state's rules respecting reopening appeals does not contemplate or provide for second or successive applications. *State v. Issa*, 106 Ohio St. 3d 1407, 830 N.E.2d 342 (2005)(table.) Thus, even were this Court to agree with Respondent's arguments on the untimeliness of Issa's application, the futility of his return to the state courts would still permit habeas corpus review of his claim. See 28 U.S.C. § 2254(c). Since Issa's claim arose during the pendency of these federal habeas corpus proceedings, and he had no available procedure with which to pursue the claim in the state courts, (R&R, Doc. 134 at 20-23), this Court may address the claim *de novo*, *id* at 23.

Respondent also takes issue with this Court's recommendation that Issa's twenty-seventh ground for relief not be dismissed as untimely under the AEDPA's one-year statute of limitations. (Respondent's Objections, Doc. No. 137 at 10-11.) Respondent argues that since Issa's twenty-

seventh ground for relief does not share an essential predicate with any ground asserted in his original habeas petition, the doctrine of "relation back" does not apply, making the claim untimely under *Mayle v. Felix*, 545 U.S. 644 (2005). Respondent misconstrues this Court's recommendation, however. The doctrine of relation back was not relied upon in the Court's discussion of Respondent's statute-of-limitations defense. Instead, the Court observed that 28 U.S.C. § 2244(d)(1) allows that the statute of limitations for filing a habeas claim does not begin until the date on which the factual predicate upon which the claim is based could have been discovered through the exercise of due diligence. Thus, there is no requirement that such a newly discovered claim share a common core of operative facts with any claim asserted in an original habeas petition in order for the new claim to "relate back" to the original petition since the new claim need not relate back at all.

Respondent also contends Issa failed to exercise due diligence to discover his appellate counsel's alleged conflict by failing to perform a search of the public record to discover his counsel's representation of co-defendant Miles. Had Issa done so, Respondent argues, he could have filed his conflict of appellate counsel claim within the original one-year limitations period. (Respondent's Objections, Doc. No. 137 at 11.) As was noted in this Court's Report and Recommendations on Procedural Default and Statute of Limitations Issues, Respondent did not dispute Issa's assertion that he had only learned of his appellate counsel's alleged conflict on March 23, 2005, in the her Second Amended Return of Writ , nor did she accuse Issa of failing to exercise due diligence to discover the conflict. "Parties cannot raise new arguments or issues on objection that were not presented to the Magistrate Judge." *United States v. Waters*, 158 F.3d 933, 936 (6th Cir. 1998). That the General Order of Reference for the Dayton location of court permits the Magistrate Judges to reconsider decisions or reports and recommendations when objections are filed

has no bearing on the prohibition against raising new arguments in objections. Consequently, Respondent has waived the argument that Issa failed to exercise due diligence with regard to his ineffective assistance of appellate counsel claim.[16] Thus, this Court may consider Issa's claim *de novo*.

As noted above, Issa did return to the state courts to litigate his conflict of interest claim and although that attempt was futile, he explained his appellate counsel's alleged conflict as follows:

> On February 16, 2005[,] the deposition of Herbert E. Freeman occurred. At that deposition, Attorney Freeman, who handled Ahmad Issa's direct appeal from his capital conviction in Hamilton County [,] Ohio [,] to this court [sic], indicated that he had his file from the appeal in his basement and that habeas counsel was welcome to it. The file was obtained on March 23, 2005; the file was [B]ates stamped and inspected.
>
> Included in the file of Attorney Freeman was a letter to his co-counsel on Issa's direct appeal, [B]ates number 201 and 202 . . . .
>
> The letter includes the following statement: Enclosed please find a photocopy of the rough draft of the "Statement of Facts" from the appellate brief of Andre Miles. You will recall that he was a codefendant to Mr. Issa, although he was tried separately. I AM SENDING IT TO YOU, BECAUSE I AM LEAD COUNSEL APPEALING MILES' CASE IN THE COURT OF APPEALS (HE WAS THE "SHOOTER," BUT HE AVOIDED THE DEATH PENALTY). IT WILL BE IN MANY WAYS VIRTUALLY THE SAME AS THE TESTIMONY ELICITED AGAINST MR. ISSA. (Emphasis added.)

(Supplemental Appendix, Doc. No. 139 at 32.) Issa argues that appellate counsel's conflict amounts to an "alternative explanation" for the deficient representation provided on direct appeal, which is illustrated by his ineffective assistance of appellate counsel claim, appearing in his habeas petition

---

[16]That is not to say that the Court agrees with Respondent that habeas counsel should have searched the public record for Issa's appellate counsel's alleged conflict. As this Court has no reason to address that question, it is left for another day.

as his ninth ground for relief, *supra*.  (Petition, Doc. No. 62 at 115.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The Supreme Court has held that the right to the assistance of counsel extends beyond conviction to a defendant's first appeal of right.  *Evitts v. Lucey*, 469 U.S. 387, 396 (1985).  In addition, the right to the assistance of counsel means the right to effective counsel.  *Cuyler v. Sullivan*, 446 U.S. 335, 344 (1980).  An attorney who labors under a conflict of interest does not provide effective representation as contemplated by the Sixth Amendment.  *Holloway v. Arkansas*, 435 U.S. 475, 481-84 (1978).

In *Holloway*, the United States Supreme Court reaffirmed that an attorney's representation of multiple criminal co-defendants does not violate the Sixth Amendment unless it gives rise to a conflict of interest.  *Id*. at 482.  To establish such a violation, a defendant must demonstrate that "an actual conflict of interest adversely affected his lawyer's performance."  *Sullivan*, 446 U.S. at 348.  In *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002), the Supreme Court modified the test articulated in *Sullivan*, recognizing that the term "actual conflict" encompasses adverse effect.  As the Sixth Circuit Court of Appeals observed, however, although *Mickens* changed the terminology, the substance of the *Sullivan* test survives, and demonstration of a choice by counsel caused by the conflict of interest is still required.  *McFarland v. Yukins*, 356 F.3d 688, 705-6 (6th Cir. 2004).  The mere possibility of conflict "is insufficient to impugn a criminal conviction."  *Sullivan*, 446 U.S. at 350.

The Supreme Court has held that when a defendant or his counsel timely objects to joint representation of clients with antagonistic interests and the court fails to investigate the conflict, a

defendant is entitled to automatic reversal without a showing of prejudice. *Holloway*, 435 U.S. 489(?). Issa never brought to the state court of appeals' attention his appellate counsel's simultaneous representation of Miles in Miles' direct appeal, however. (See Evid. Hrg. Tr., Doc. No. 112 at 46-48.) Thus, Issa cannot benefit from *Halloway*'s automatic reversal rule. *Mickens*, 535 U.S. at 168; *McFarland*, 356 F.3d at 702.

In order to demonstrate an adverse effect resulting from his appellate counsel's alleged conflict of interest, then, Issa must show that his counsel decided to forego claims of error in his case that would have been inconsistent with counsel's duty to Miles, and that the decision was not part of a legitimate strategy, judged under the deferential review of counsel's performance prescribed in *Strickland v. Washington*, 466 U.S. 668 (1984). *See McFarland*, 356 F.3d at 706. Even where an attorney omits "some course of action that undoubtedly would have been advantageous to the defendant, there is no proof of adverse effect if there is some other adequate explanation for the omission." *Id*. at 707, *citing Moss v. United States*, 323 F.3d 445, 470 (6th Cir. 2003). The Sixth Circuit has considered counsel's decisions evidence of disloyalty where the choices made by counsel worked to one defendant's detriment and another's benefit, and there was no other explanation for the decisions. *McFarland*, 356 F.3d at 707, *citing United States v. Boling*, 869 F.2d 965, 972 (6th Cir. 1989); *United States v. Hall*, 200 F.3d 962, 966-67 (6th Cir. 2000).

Issa has utterly failed to meet his burden. Rather than demonstrating with specificity how his appellate counsel's choices in handling his direct appeal worked to his detriment and Miles' benefit, he characterizes his appellate counsel's alleged conflict as an "alternative explanation" for the ineffective assistance of his appellate counsel identified in the ninth ground for relief of his petition for a writ of habeas corpus. (Petition, Doc. No. 62 at 38-61, 113-15.) By characterizing the

alleged conflict as an "alternative explanation" for appellate counsel's ineffectiveness, however, Issa essentially eviscerates his claim because the law requires that there be no other adequate explanation for the choices counsel made. *McFarland*, 356 F.3d at 707. That counsel's conflict might be an alternative explanation for his choices admits that there is at least one other explanation for the decisions he made. Thus, Issa has failed to show that his appellate counsel provided ineffective assistance on direct appeal due to a conflict of interest which resulted in choices that adversely affected Issa's appeal. Accordingly, Issa's twenty-seventh ground for relief should be denied.

## CONCLUSION

Having considered each of Issa's twenty-seven grounds for relief and found none that were timely, preserved, and meritorious, Issa's petition for a writ of habeas corpus should be denied.

November 5, 2008.

s/ **Michael R. Merz**
Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).

J:\Death Penalty\Issa\Amended R&R on Merits.wpd