UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Ahmad Issa,                              :      Case No. 1:03-cv-280
                                         :
        Petitioner,                      :
                                         :
vs.                                      :
                                         :
Margaret Bagley, Warden,                 :
                                         :
        Respondent.                      :

**ORDER**

Petitioner, Ahmad Issa, was convicted by an Ohio jury of aggravated murder.

After the penalty phase trial, the jury recommended that he receive the death penalty.

The trial court engaged in its own analysis of the sentencing factors, and ultimately

agreed with the jury's recommendation. Issa's direct appeal and post-conviction

proceedings challenging the conviction and his sentence were unsuccessful. Issa now

seeks a writ of habeas corpus on a variety of grounds.

**FACTS OF THE CASE**

The Ohio Supreme Court set forth the following facts in its opinion rejecting

Issa's direct appeal:

> At approximately 1:30 a.m. on November 22, 1997, Andre Miles, armed with a high-powered assault rifle, confronted brothers Maher and Ziad Khriss in a parking lot in front of Save-Way II Supermarket in Cincinnati, Ohio ("Save-Way") and demanded money. As Maher and Ziad put money on the ground and pleaded for their lives, Miles shot and killed them.
>
> After investigating the shootings, Cincinnati police concluded that Miles had been hired to kill Maher. The police theorized that Maher's wife, Linda Khriss, had offered to pay ... Ahmad Fawzi Issa to kill Maher. The

-1-

police believed that Issa then enlisted Miles to do the killing, supplied him with the weapon, and arranged the opportunity. Issa, Miles, and Linda were each charged with aggravated murder.

Prior to the murders, Maher and Linda Khriss owned and operated Save-Way. In addition to Maher and Linda, Renee Hayes, Souhail Gammoh, and Issa worked at the store. Bonnie Willis and her brother Joshua Willis, who were both teenagers at the time of the murders, lived with their mother approximately one block from Save-Way. Because they often shopped at Save-Way, they were familiar with the store employees. Miles had previously lived with the Willis family and was a close friend of Bonnie and Joshua.

In the two weeks preceding the murders, two witnesses saw Issa with a rifle in his apartment. On November 14, Dwyane Howard, Hayes's husband, went to Issa's apartment to wake him for work. Issa invited Howard in and showed him a military-style rifle. When Howard asked Issa what he was going to do with the rifle, Issa's only response was "a little sneer." After the murders, Issa called Howard and told him not to tell anyone that he had seen Issa with a gun. At Issa's trial, Howard identified the murder weapon as being identical to the rifle Issa had shown him. No more than two weeks before the murders, Issa's coworker and friend, Gammoh, while visiting at Issa's apartment, also saw Issa with a rifle.

A few days before the murders, Joshua went to Save-Way and saw Miles standing out in front of the store. Joshua and Miles started talking, and Miles told Joshua that Issa was going to pay him to kill somebody. Miles asked Joshua if he wanted to take part in the crime for half of the money. Joshua did not take Miles seriously and told him he was crazy. On November 20, the Thursday evening before the Saturday morning murders, Joshua told Bonnie about his conversation with Miles. Bonnie also did not believe that Miles would actually kill someone, because Miles "had a tendency to * * * talk big." That is, he talked "about doing a lot of things and never did it."

Linda, Maher, Gammoh, and Hayes worked late at Save-Way on the evening of November 21. At approximately 10:00 p.m., Miles arrived at the store and asked for Issa. Although Issa was scheduled to work at 10:00 p.m., he was not yet there. Linda drove to Issa's apartment to wake him, and then she returned to the store. Issa arrived around 11:15 p.m. Miles was waiting at the store, and when he arrived, Issa and Miles went outside together to talk.

Around midnight, Maher left Save-Way with a friend to check on another store that Maher owned. Maher left his truck in the Save-Way

parking lot and instructed Linda and Issa to put the keys to the truck near the right front tire and that Maher would come back later to get the truck.

At approximately 1:09 a.m. the Save-Way employees closed the store for the night. Issa put the keys near Maher's truck as he had been instructed. Issa's mother was visiting from Jordan and was with Issa at the store when it closed. Issa, his mother, and Gammoh left the store in Issa's car. Issa drove his mother to his apartment, and then he drove Gammoh home. When Issa dropped Gammoh off at approximately 1:20 a.m., he told Gammoh that he was going back home to check on his mother but that he might come back later and take Gammoh to a bar. Approximately twenty-five to thirty-five minutes later, Issa returned to Gammoh's apartment, and they went to a bar together. After Gammoh heard about the murders, he asked Issa where he went before he returned to Gammoh's apartment. Issa told Gammoh, "Don't tell the police. Tell them that we were together all the time."

At approximately 1:26 a.m. on November 22, Sherese Washington was driving near Save-Way when she heard gunshots. Frightened, she stopped her car and turned off the headlights. She then saw a man run from the Save-Way parking lot and down Iroll Street (the street on which Bonnie and Joshua lived). Sherese went home and called 911. Within four minutes of the shooting, Cincinnati police officers arrived at Save-Way and discovered Maher's and Ziad's bodies in the parking lot. Medical personnel arrived shortly thereafter but were unable to revive the Khriss brothers.

Near the bodies, crime-scene investigators for the Cincinnati Police found six 7.62 caliber rifle casings, a broken beverage bottle, and several $1 bills. A small crater in the blacktop near Ziad's body and a fresh gouge in the dirt near Maher's body were noted by officers as possibly having been made by gunfire. Officers also documented that three milk crates had been arranged like steps behind a dumpster in the parking lot. The police found this noteworthy because all the other items behind the dumpster were in disarray, and the police speculated that the perpetrator may have arranged these milk crates.

Dr. Lawrence Schulz, a deputy coroner for Hamilton County, performed autopsies on Maher and Ziad and testified as to his findings. Schulz found that a single bullet had struck the palm of Maher's left hand and traveled through the back of his hand and then entered his chest. The bullet then perforated Maher's lungs and his aorta, causing his death within a few minutes. Ziad had been shot in the palm of his right hand and twice in his left arm. Each bullet that struck his arm traveled through to his chest.

-3-

Joshua testified that around 5:00 p.m. on November 22, Miles called him and told him that he had killed Maher and Ziad and that he had put the gun in Bonnie and Joshua's back yard in a white plastic bag. He told Joshua not to touch the gun.

The following day, November 23, Miles came to the Willises' home. Bonnie and Joshua both testified regarding the conversation they had with Miles. Miles told them that Issa was going to pay him $2,000 for killing Maher but "since [Maher's] brother also got killed that night he had to throw in an extra $ 1,500." According to Miles, Issa had not paid him yet. Miles told the Willises that, on the night of the shooting, Issa gave Miles the rifle, which Miles described as an M-90. Miles then sat on milk crates behind a dumpster outside the store and waited for Maher to come back for his truck. When Maher returned with Ziad, Miles confronted them and demanded money. Maher and Ziad pulled money from their pockets, dropped it on the ground and pleaded with Miles not to shoot.

Miles said that when he reached down for the money, the gun went off and the beverage bottle that Maher was holding shattered. Then Miles said he "got trigger happy. He freaked. He shot them once. He might as well kill them." While Maher was "still squirming," Miles said, he shot him in the head, and then shot Ziad in the head. After that, Miles picked up the money they had thrown down, but said he left two $100 bills on the ground. Miles said that after the shooting he ran down Iroll Street, put the rifle in the Willises' back yard, and then met Issa in a nearby parking lot and Issa drove him home.

Bonnie and Joshua noticed that Miles was wearing new clothes "from head to toe." Miles said that he "had bought the new clothes with the money that he got from the two victims." While describing the killings, Miles showed "no remorse at all. He was actually bragging." Miles also told Bonnie and Joshua, "If anybody knows about this or tells, I'll kill them." Miles reiterated that the rifle was in a white plastic bag in their back yard and that neither Bonnie nor Joshua should touch it. Miles promised to come back and remove the gun. Both Bonnie and Joshua saw an object wrapped in a white bag in their back yard and Joshua described it as "shaped like a gun."

A few days later, Joshua went to Save-Way, and as soon as Issa saw him Issa asked, "Does anybody know?" Joshua said, "No, not that I know of." Joshua then told Issa, "You're going to have to come and get this gun. I don't want to put my family in this type situation." Although Joshua did not mention Miles, Issa replied, "Okay. I'll talk to Andre [Miles] and if Andre don't come and get it, I will." After a few days, Joshua noticed the white bag was still in his yard. Joshua again went to the store

and confronted Issa about it. Issa again promised Joshua that either he or Miles would remove the gun. Bonnie also went to the store and told Issa that the gun needed to be removed from their yard. Issa told her the same thing he had told Joshua. Issa also told Bonnie to "tell [Miles] not to come around the store because the police were investigating, that he would get in touch with him." A few days later, Miles removed the gun.

On November 25, while working at Save-Way, Hayes saw Linda hand Issa two $1,000 packets in cash and "some other money." The state theorized that this represented at least a partial payoff for the killing. The defense, on the other hand, attempted to show that this money was deposited in a Save-Way bank account later that same day. The bank deposit ticket entered into evidence, however, indicated that the money deposited in the Save-Way account on that day did not include $2,000 in cash. The defense suggested that Hayes had been mistaken regarding the amount she saw Linda give Issa.

On December 4, police learned that Miles had admitted to Bonnie and Joshua that he had committed the murders. Police arrested Miles that evening, and he confessed to the crime and sketched a map depicting where he had disposed of the murder weapon. Following the map, police recovered a MAK-90, 7.62 caliber, semiautomatic rifle. Expert testimony established that the rifle had fired the fatal bullet extracted from Maher's body, thus confirming it was the murder weapon. An attempt to determine who had purchased the weapon was unsuccessful.

In the same vicinity as the rifle, police found a banana-style magazine clip that fit the murder weapon. The clip contained twelve 7.62 caliber hollow-point rifle bullets. The same foreign manufacturer made all of the shells found at the crime scene and the bullets in the clip. There were no fingerprints on the rifle, the clip, or the ammunition.

On December 5, officers executed a search warrant on Issa's apartment and found a single live 7.62 caliber bullet in a nightstand drawer in Issa's bedroom. The manufacturer of this bullet was different from the manufacturer of the bullets found in the murder weapon's clip and from the casings found at the crime scene.

State v. Issa, 93 Ohio St.3d 49, 50-54, 752 N.E.2d 904 (2001).[1]

---

[1] The Court has substituted "Issa" for "appellant" throughout the above-quoted excerpt from the Supreme Court's opinion, and in subsequent excerpts included in this Order.

Issa was indicted by a Hamilton County grand jury for aggravated murder with two death penalty specifications, firearm use and murder for hire.  A jury returned a guilty verdict following a week-long trial.  After the penalty phase trial, the same jury recommended that the death penalty be imposed.  The trial court separately weighed the aggravating and mitigating circumstances, and imposed the death penalty.

## PROCEDURAL HISTORY

Issa appealed his conviction and his death sentence directly to the Ohio Supreme Court, raising fifteen propositions of law.  (Apx. Vol. II at 4-6 and 52-129.)  The Supreme Court rejected all of Issa's arguments.  As required by Ohio law, the Supreme Court independently reviewed and weighed the aggravating circumstances found by the jury against the mitigating factors Issa presented, performed its own proportionality review, and then affirmed both the conviction and the sentence in the opinion quoted above.

While his direct appeal was pending, Issa filed a post-conviction petition in the trial court, eventually raising twenty-three separate grounds for relief.  (Apx. Vol. V at 95-166, Third Amended Petition.)  The trial court considered and rejected each of Issa's grounds.  Issa appealed that order to the Ohio Court of Appeals, which also rejected his claims.  State v. Issa, 2001 Ohio 3910, 2001 Ohio App. LEXIS 5762 (Ohio App. 1st Dist., Dec. 21, 2001) (unreported) (Apx. Vol. VII, pp. 368-380).[2]  On April 17, 2002, the Ohio

---

[2]  The Ohio Court of Appeals initially reversed and remanded the trial court's denial of Issa's post-conviction petition, because the court failed to adequately explain its findings.  See Apx. Vol. VI at 287-290.  On remand, the trial court explained its conclusion that Issa's claims lacked merit, which was then affirmed by the Court of Appeals in the decision cited.

Supreme Court declined to review his post-conviction appeal, finding that it raised no substantial constitutional question. State v. Issa, 95 Ohio St.3d 1422, 766 N.E.2d 162 (2002) (table). Issa was represented by the Ohio Public Defender's Office during his state post-conviction proceedings.

The Public Defender's office wrote to Issa on April 22, 2002, days after the Ohio Supreme Court denied review, telling Issa that his file would now be handled by the Chief Habeas Corpus Counsel in that office. That attorney, Mr. Bodine, would be in contact with Issa to discuss the issue. The Public Defender also wrote to the Jordanian embassy in Washington, D.C., in response to an inquiry from the embassy concerning Issa's case. In that letter, the Public Defender informed the embassy that Mr. Bodine "will be working on Mr. Issa's case to ensure that his case is timely filed in federal court and that he has counsel appointed to represent him." (Doc. 138, Exhibits 1 and 2.) For reasons that remain unknown, it was not until February 18, 2003 that the Public Defender filed a notice of intent to file a habeas petition and a request for appointment of counsel in this Court. (Docs. 2 and 3)

Despite the extremely short time remaining on the applicable one-year statute of limitations, Issa's newly-appointed counsel timely filed a petition containing 23 grounds for relief on April 17, 2003. (Doc. 8) The petition was then held in abeyance while Issa returned to the state courts to litigate an application to reopen his direct appeal. (Doc. No. 15) On September 24, 2003, the Ohio Supreme Court denied Issa's application to reopen (Apx. Vol. II at 402), and this Court dissolved the stay. (Doc. No. 20)

Issa subsequently filed three amended habeas petitions (Doc. Nos. 26, 33, 62), and this case was again held in abeyance while he pursued a second application to

reopen his direct appeal in the Ohio Supreme Court. (Doc. 64) The Ohio Supreme Court denied Issa's application because he had filed beyond the state filing deadline, and because Ohio law does not permit the filing of second or successive applications to reopen a direct appeal. State v. Issa, 106 Ohio St. 3d 1407, 830 N.E.2d 342 (2005)(table). This Court's second stay was dissolved on July 7, 2005. (Doc. No. 68)

After granting Issa's motion for an evidentiary hearing (Doc. 78), the Magistrate Judge presided over three days of hearings on March 6 and 7, and June 13, 2006. Issa presented testimony from several witnesses, including his original trial and appellate counsel and an expert in Arabic-Muslim culture and law. After post-hearing briefing, the Magistrate Judge filed his initial Report and Recommendations on December 20, 2007 to address several procedural and statute of limitation arguments raised by Respondent. (Doc. 134) Both parties filed objections to that Report. (Docs. 137 and 138) The Magistrate Judge then filed a second Report to address those objections and the merits of what the Magistrate Judge concluded were Issa's non-defaulted claims. (Doc. 146)

Issa filed objections to the second Report. (Doc. 148) This Court previously considered Issa's first objection, that the Magistrate Judge exceeded his jurisdiction by issuing a report on the merits of Issa's claims. This Court concluded that Issa had waived any objection to the exercise of the Magistrate Judge's jurisdiction over this matter. (Doc. 150) However, this Court also held that it would review de novo Issa's objections to any of the Magistrate Judge's recommendations, as required by 28 U.S.C. §636(b)(1)(C). Issa stated that if this Court found that the Magistrate Judge had jurisdiction to issue his merits Report and Recommendations, he was not objecting to

-8-

the recommendations with respect to Grounds Two, Eight, Ten, Thirteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, Twenty-Two, Twenty-Three, Twenty-Four, Twenty-Five, and Twenty-Six. If the Court found that the Magistrate Judge exceeded his jurisdiction, however, Issa asked the Court to review all of his claims de novo.

## ANALYSIS

Standard of Review

Issa's petition is governed by the requirements of the Antiterrorism and Effective Death Penalty Act. Under the AEDPA, a federal court may not grant habeas corpus relief to a state prisoner unless it concludes that the state court's adjudication on the merits of the prisoner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). "A state court renders an adjudication 'contrary to' clearly established federal law when it 'arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Carter v. Mitchell, 443 F.3d 517, 524 (6th Cir. 2007), citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court unreasonably applies clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

In order to find that the state court's application of federal law is "objectively unreasonable," it must be more than simply incorrect.  "To conclude that a state court's application of federal law was unreasonable, the Court must decide that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'"  Jackson v. Bradshaw, 681 F.3d 753, 759 (6th Cir. 2012), quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011).

The doctrine of procedural default bars a petitioner from raising habeas claims that were not properly presented to and considered by the state court.  If a state court previously dismissed a state prisoner's federal claim because the prisoner failed to comply with a state procedural rule, a federal court ordinarily cannot consider the merits of that claim.  See Coleman v. Thompson, 501 U.S. 722, 729-731 (1991).  This doctrine bars habeas review of such claims if: (1) the petitioner failed to comply with a state procedural rule; (2) the state court clearly enforces that rule; (3) the rule is an adequate and independent state ground for denying review of the federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default.  Guilmette v. Howes, 624 F.3d 286, 290 (6th Cir. 2010 (en banc)(internal quotations omitted).

A petitioner can excuse a procedural default by showing cause and actual prejudice, or that the outcome in the case resulted in a fundamental miscarriage of justice that requires habeas relief.  Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986).  The cause and prejudice prong requires petitioner to establish a substantial "external" reason for his default.  He must demonstrate prejudice by showing that his trial was infected with constitutional error.  A fundamental miscarriage of justice is a rare occasion, and requires petitioner to demonstrate that the constitutional error was of

such magnitude that it likely resulted in his conviction despite his actual innocence.

That is, he must show that it is more likely than not that no reasonable juror would have

found him guilty beyond a reasonable doubt, or would have sentenced him to death

rather than imposing another available sentence.

     While the objections to the Magistrate Judge's recommendations concerning

Issa's First through Twenty-Seventh claims were pending, the Supreme Court decided

Cullen v. Pinholster, 563 U.S. 170 (2011).  The Magistrate Judge ordered supplemental

briefing on what impact that decision might have on this case, and issued a

supplemental Report (Doc. 157).  Noting the parties' differences with respect to the

ultimate impact that the case will have on federal habeas corpus proceedings, the

Magistrate Judge concluded that Pinholster rendered the decision to grant Issa an

evidentiary hearing erroneous.  He also found that Pinholster did not address what use

may properly be made of evidence developed during habeas proceedings if the federal

court determines that the state court's decision fails to satisfy the standards of 28

U.S.C. §2254(d)(1).  He further noted that since neither party suggested that Pinholster

requires a different analysis or result on any of Issa's claims, he declined to offer an

opinion on that issue.

     The Court agrees with the Magistrate Judge's observations.  In Robinson v.

Howes, 663 F.3d 819 (6th Cir. 2011), the Sixth Circuit noted that after Pinholster,

> ... a federal habeas court may not rely on evidence
> introduced for the first time in that court and reviewed by that
> court in the first instance to determine that a state court
> decision was 'contrary to' or an 'unreasonable application of'
> clearly established federal law. ...  However, if the claim was
> never 'adjudicated on the merits' in state court, the claim
> does not fall under 28 U.S.C. §2254(d) and Pinholster does

> not apply.  In such cases, a federal habeas court may order
> an evidentiary hearing, provided the threshold standards for
> admitting new evidence in federal district court are met, see
> 28 U.S.C. §2254(e)(2), and decide the habeas petition under
> pre-AEDPA standards of review.  See <u>Pinholster</u>, 131 S.Ct.
> at 1401 ('Section 2254(e)(2) continues to have force where
> 2254(d)(1) does not bar federal habeas relief. ... [N]ot all
> federal habeas claims by state prisoners fall within the scope
> of 2254(d), which applies only to claims 'adjudicated on the
> merits in State court proceedings.')

<u>Id</u>. at 823.

With these standards in mind, the Court addresses Issa's claims for relief.

### First Ground for Relief

Issa contends that his Sixth, Eighth and Fourteenth amendment rights were

violated because he received ineffective assistance of counsel during the guilt phase of

his trial.  He contends that trial counsel failed to call Linda Khriss as a witness, and he

asserts that her testimony would support a claim of actual innocence.  Issa raised this

claim as his fifth ground in his post-conviction petition.  The Ohio Court of Appeals

addressed the merits and held that counsel's decision whether or not to call a witness is

a strategic one that does not amount to ineffective assistance absent a showing of

prejudice.  Noting that Khriss' testimony could have been both helpful and harmful to

Issa's defense, the state court found that Issa did not demonstrate that counsel's

decision not to call Khriss resulted in actual prejudice.  (See Apx. Vol. VII at 376; <u>State</u>

<u>v. Issa</u>, 2001 Ohio 3910 at **11-12.)

The court also rejected his argument that in order to fully present this claim, he

should have been granted discovery.  The court noted that Ohio's post-conviction

statutes do not permit discovery "in the initial stages of the proceedings."  <u>Id</u>. at *12,

citing State v. Bies, 1999 Ohio App. LEXIS 3108 (Ohio App., June 30,

1999)(unreported). The court also noted that a postconviction claim may be dismissed

without hearing if the petition does not set forth sufficient facts demonstrating

substantive grounds for relief. State v. Issa, 2001 Ohio 3910, at *5. The Magistrate

Judge concluded that the state court's decision was not contrary to nor an unreasonable

application of federal law, and recommended denial of this claim.

Ineffective assistance of counsel claims are governed by the standards

articulated in Strickland v. Washington, 466 U.S. 668 (1984):

> A convicted defendant's claim that counsel's assistance was
> so defective as to require reversal of a conviction or death
> sentence has two components. First, the defendant must
> show that counsel's performance was deficient. This
> requires showing that counsel made errors so serious that
> counsel was not functioning as the "counsel" guaranteed the
> defendant by the Sixth Amendment. Second, the defendant
> must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were
> so serious as to deprive the defendant of a fair trial, a trial
> whose result is reliable. Unless a defendant makes both
> showings, it cannot be said that the conviction or death
> sentence resulted from a breakdown in the adversary
> process that renders the result unreliable.

Id. at 687. To demonstrate the required prejudice, Issa must show a reasonable

probability that the result of his trial would have been different. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id. at

694. In addition, the Strickland court cautioned that:

> A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time. Because of the difficulties
> inherent in making the evaluation, a court must indulge a

-13-

> strong presumption that counsel's conduct falls within the
> wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under
> the circumstances, the challenged action might be
> considered sound trial strategy.

Id. (internal quotations and citations omitted).

Linda Khriss was tried before Issa, and a separate jury acquitted her of
aggravated murder. Khriss testified in her own trial, and Issa offered an excerpt of her
direct testimony in his state post-conviction proceedings. (Apx. Vol. III at 106-180;
Exhibit 9 to Issa's post-conviction petition.) Khriss testified that her husband, Maher,
had been threatened by another man with whom Maher owned a convenience store.
According to Khriss, that man and Maher disagreed about the store's finances. A few
days before Maher was murdered, the man allegedly told Maher that he was "going to
show [him]" (meaning Maher). Earlier in the evening on the night of the murder, Maher
told Linda that if he died, he wanted to be buried next to his grandfather in Jordan.
Khriss did not understand why Maher made that comment to her. Khriss claimed that
Maher left the Safe-Way store to meet with this man later the same night, and had
called her about 1 a.m., telling her to close up their Safe-Way store and go home.
Maher also spoke to Issa during that call, and told him to leave Maher's truck keys by
the front tire in the store's parking lot. Khriss denied that she ever spoke to Issa about
having her husband killed, and denied giving him any money a few days after the
murders. She testified that Issa and another store employee helped her count store
receipts the night before she left for Jordan for Maher's funeral, but that the money was
going to be deposited into the store's bank account.

In early December, the Cincinnati police asked Khriss to come to the department

-14-

to talk about the murder investigation.  An officer showed her a photograph of Andre Miles and one of Issa, and told her the two were at the station and had told police "everything about you hiring them to kill your husband."  The officer said the police knew that Maher had abused Khriss.  Khriss vehemently denied this, and said that the officer wanted her to give a statement that she had asked Issa to hire someone to kill or at least beat up Maher.  The officer assured her that such a statement would not harm her. When the officer told her that making the statement would help them get the person who killed Maher, she agreed to make a tape recorded statement in order to "get a confession out of Issa."  After additional discussions with the officers, Khriss gave a statement that about two weeks before the murder, she had a fight with Maher, Issa was there, and Issa asked Khriss why she would let Maher do that to her.  Issa then offered his services to "take action" and she agreed to pay him $2,000.  She testified at her own trial that this statement to the police was a lie.

Issa claims in his own post-conviction affidavit that he was told by his defense attorneys that they had "made a deal" with the State, that neither side would call Khriss to testify during Issa's trial.  (Apx. Vol. III at 99, Exhibit 7 to Issa's post-conviction petition.)  He contends that Khriss was the only person who could corroborate his innocence and lack of involvement in Maher's murder.

Issa's chief trial counsel, Ms. Agar, testified at the evidentiary hearing in this case.  After Pinholster, it appears that this testimony is inadmissible in this proceeding; but assuming that the Court could consider her testimony, the Court finds that it actually bolsters the Ohio Court of Appeals' decision.  During her preparations for Issa's trial, she read the transcript of Khriss' trial testimony and spoke to Khriss' defense lawyer on

several occasions. Agar talked with the Khriss case prosecutors, to other people who had listened to Khriss testify in her case, and to people who interviewed the Khriss jurors. Agar did not speak directly with Khriss because she believed Khriss was a "dreadful witness," and "the world's worst loose cannon." (Doc. 112, Evid. Hrg. Trans. at 133.) Agar was concerned that Khriss would create an emotional scene at Issa's trial because she had done so during her own trial.

Agar was also concerned about presenting Khriss, even recognizing the potential benefit to Issa that might result, because Agar had been given information that Khriss' jury "did not believe her testimony", and believed that Khriss had in fact hired people to harm Maher, but not to actually kill him. Agar learned that the state had opposed giving any lesser-included offense instructions or jury verdicts in the Khriss trial, and chose to proceed solely on aggravated murder charges. The Khriss jury concluded that the state had not proved beyond a reasonable doubt that she intended to have her husband killed, and so they acquitted her. Agar testified that she could not present the same theory in Issa's case (that Khriss hired Issa only to beat up Maher, not to kill him) because of the firearm specification in Issa's indictment. Agar also spoke with Issa about Khriss. All of this information led Agar to her decision not to call Khriss as a witness because Khriss "was seriously emotionally unstable and might say anything." (Doc. 112, Evid. Hrg. Trans. at 144.) As the Ohio Court of Appeals concluded, Agar's decision was a tactical decision made upon information she gathered during the course of her investigation.

Issa's assertion that his trial lawyers made a "deal" with the prosecution concerning Khriss has no record support aside from Issa's untested affidavit, and is

directly contradicted by Agar's testimony. Issa also suggests that counsel was deficient in not using the transcript of Khriss' testimony during his trial. The record before this Court contains only an excerpt of that transcript, and none of the cross-examination by the prosecution. It would be speculative at best to assume that the entire transcript would be helpful to Issa, or that Khriss would have testified that Issa was actually innocent of any involvement in Maher's murder. There is no evidence that Khriss was an unavailable witness under the Ohio evidence rules at the time of Issa's trial, a pre-condition to any independent use of a transcript of her testimony.

Moreover, Agar understood that Khriss was willing to testify in Issa's trial, and Agar affirmatively decided not to use her as a witness; see Doc. 112, Evid. Hrg. Trans. at 133. Issa cites the testimony of Khriss' trial lawyer, David Scacchetti, who also testified in the evidentiary hearing in this case. Assuming this testimony is even admissible at this point, Scacchetti testified that if he had been representing Issa and learned that Khriss had been acquitted, he would have learned anything that he possibly could from Khriss' attorneys and would have called Khriss to testify. (See Doc. 120, Evid. Hrg. Trans. at 386-387; CM/ECF PAGEID 2476-2477.) The fact that two seasoned defense attorneys can reach different conclusions with respect to presenting evidence does not establish that Issa received ineffective assistance of counsel at his trial.

Strickland requires this Court to "indulge a strong presumption" that counsel's strategic decision, made after investigation and consideration, falls within the necessarily wide range of constitutionally competent legal representation. Ms. Agar's testimony fully supports the conclusion reached by the Ohio Court of Appeals, that her

decision not to call Khriss as a witness was a strategic one, made after due investigation and consideration.  Issa has not shown that the state court's decision on this issue was contrary to federal law.  The Court therefore denies Issa's first claim for relief.

**Second Ground for Relief**

Issa contends that intentional prosecutorial misconduct during his trial denied him his constitutional rights to due process and a fair trial.  This contention is premised on the alleged "deal" reached between the prosecutors and his attorneys to refrain from calling Linda Khriss as a witness during his trial.  He alleges that his lawyers were subject to "prosecutorial influence and overreaching, which is tantamount to misconduct" that infected his trial with unfairness amounting to a denial of due process. (Doc. 62, Third Am. Petition at 15, ¶¶ 66-67.)

This claim was raised in Issa's third amended post-conviction petition as his sixth ground for relief.  (Apx. Vol. V at 119-120.)  Both the post-conviction trial court and the Ohio Court of Appeals considered this claim together with Issa's ineffective assistance of counsel claim, which is raised here in his First Ground for Relief.  As the Magistrate Judge concluded, Issa clearly presented this issue as a separate claim for relief in his state petition, but the state courts did not expressly address it in the context of prosecutorial misconduct.  The Court agrees with the Magistrate Judge that this claim is reviewable on the merits.

Prosecutorial misconduct that could support habeas relief must be egregious, and must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Johnson v. Bell, 525 F.3d 466, 482 (6th Cir. 2008), quoting

-18-

Darden v. Wainwright, 477 U.S. 168, 181 (1986). Even if the prosecutor's challenged conduct was improper or even "universally condemned," relief is available only if the Court concludes that the misconduct was so flagrant as to render the entire trial fundamentally unfair. Bowling v. Parker, 344 F.3d 487, 512-513 (6th Cir. 2003), citing Darden. If conduct is found to be improper, four factors should be considered to determine whether the conduct was flagrant and warrants reversal: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." Bates v. Bell, 402 F.3d 635, 641 (6th Cir. 2005).

The only evidence relating to any alleged prosecutorial over-reaching in striking a "deal" with Issa's lawyers concerning testimony from Linda Khriss is Issa's own post-conviction affidavit. His assertion is directly contradicted by Agar's sworn testimony, which the Court can consider in this claim for relief. Issa's trial co-counsel Terrance Landrigan also confirmed Agar's testimony. He testified in his deposition taken in this proceeding that he believed there was much more risk putting Khriss on the stand than any potential help her testimony might offer. He recalled that Khriss "really kind of admitted to a certain conversation between her and Issa about harming her husband and I didn't like that part of it." (Doc. 60, Landrigan Deposition at 79.)

The only reference the Court has found to any discussion between Issa's trial counsel and prosecutors about the potential use of transcripts from the Khriss trial is that cited by the Magistrate Judge, in a passage from Mr. Landrigan's deposition. Landrigan recalled an in-chambers conference during the trial in which the state

indicated that, if the defense put on certain evidence or testimony, "then the State would have the ability to put a lot of damning stuff on the stand through the transcripts or the other trial material." (Doc. 60, Landrigan Deposition at 75.) Landrigan and Agar concluded that the state's position was correct. This vague reference, even combined with Issa's untested affidavit, is plainly insufficient to establish a claim of prosecutorial misconduct that violated any of Issa's constitutional rights. Issa's second ground for relief is therefore denied.

**Third, Fourth, and Fifth Grounds for Relief**

Issa's third, fourth and fifth grounds for relief each contend that he received ineffective assistance of counsel at the penalty phase of his trial. His third ground argues that trial counsel failed to conduct a constitutionally reasonable and adequate investigation into his background, history and character. The fourth ground alleges that a number of his family members were available to testify and were not asked to do so. He contends these witnesses were not cumulative, and would have "humanized" and "Americanized" him to the jury. His fifth ground argues that counsel was ineffective in failing to consult with and present a cultural expert to testify about Issa's Jordanian and Muslim background.

As a preliminary matter, in each of these claims, Issa relies in part on statements obtained from his trial jurors that were presented with his post-conviction petition. Issa notes that one juror was "holding out" on imposing the death penalty, and believed that the defense "did not do a good job" informing the jury about Issa's good character, background, and qualities. A second juror's impressions are described in Issa's post-conviction counsel's affidavit describing an interview with that juror. (Apx. Vol. III at 205-

206.)  The Ohio Court of Appeals held that all of these juror statements were incompetent evidence, barred by the aliunde rule of Ohio Evid. Rule 606(B).  For that reason, Issa's post-conviction trial court could not have considered these juror statements in ruling on his petition.  (See Apx. Vol. VII at 374.)  The same result applies here.  Fed. R. Evid. 606(B) precludes any reliance on juror assessments of counsel's trial performance, or on statements that jurors would have liked to learn more about Issa's background or family.

Regarding Issa's third and fourth claims of an inadequate investigation and presentation of mitigation witnesses, he argues that trial counsel failed to fully investigate his life and background, and failed to contact and present numerous family members to testify on his behalf.  As a result, he alleges that counsel failed to present crucial mitigating evidence on his behalf, particularly with respect to testimony from his mother Sarah.  (Doc. 62, Third Amended Petition at ¶¶76-79.)  He alleges that both his American wife and ex-wife, as well as the ex-wife's grandmother and an uncle, were all available to favorably testify.  Other family members living in Jordan were not contacted at all and did not testify.  He alleges counsel failed in their duty of effective representation by abandoning their investigation after obtaining only rudimentary knowledge about his history and background.  (Doc. 62 at ¶114.)   The Ohio Court of Appeals rejected these claims in Issa's post-conviction proceedings, finding that the affidavits of various family members contained evidence that was cumulative to that presented to the jury, or that simply presented an alternative mitigation theory.  The court noted that the case was not "a situation where counsel failed to present any mitigation at all or to engage in any meaningful preparation."  (Apx. Vol. VII at 375.)

-21-

Issa's state post-conviction petition included statements and affidavits from a number of individuals. Betty Fisher, grandmother to Issa's wife Bobbie Foreman, states that Issa was good to her and her family, that he was kind-hearted, and he helped her with her medical problems that left her bedridden. Trial counsel did not contact Betty Fisher. (Apx. Vol. III at 190-191.) Pamela Swanson, a mitigation specialist for the Ohio Public Defender's office, filed an affidavit concerning her interview with Ellen Evans, Issa's former wife. Evans told Swanson that Issa was well-loved in the community, and he was particularly close to Maher Khriss. Evans' daughters loved Issa and he treated them like angels. She described Issa as sensitive and kind, and incapable of committing a murder. (Apx. Vol. III at 197-200.) Ms. Swanson also interviewed Bobbie Foreman, who told Swanson that the local police officers and her own family did not like "Arabians" and that her family disapproved of her marriage to Issa. (Apx. Vol. III at 202.) Neither Evans nor Foreman proffered their own affidavit, however.

Mustafa (David) Shalash was Issa's former employer, and he knew Issa and the Khriss family. Mustafa did speak to Issa's trial lawyers and he testified at Linda Khriss' trial, but he was not asked to testify at Issa's trial. He stated that he does not believe Issa had anything to do with the murders. (Apx. Vol. III at 207-208.) Mike Wittamore is Bobbie Foreman's uncle and he knew Issa. Wittamore believed that Issa was a hard worker and that he loved Bobbie. He stated that Issa called him the day after the murders to reassure him that Issa was not involved in the crimes. (Apx. Vol. III at 209-210.) None of these individuals (save for Shalash) were contacted by Issa's lawyers and their affidavits state they would have testified on Issa's behalf if they had been asked to do so.

-22-

Issa's first amended post-conviction petition also attached affidavits from several family members in Jordan: his sister, Noha Issa (Apx. Vol. IV at 19); his cousin Ehssan Mohammed Abdel Fatah (Id. at 25); his sister Miriam Issa (Id. at 42); two statements from his mother Sarah Abdel Fatah Saad (Id. at 31 and  49); and his brother Jamal Fowzi Abdel Noor Ibrahheem Issa (Id. at 59).  These affidavits were apparently drafted by the public defender's staff based on telephone conversations between these family members, Ms. Swanson (the mitigation specialist), and attorney Hawkins.  The written English statements were then translated into Arabic by a certified translator, Dr. Alosh. (Apx. Vol. IV at 10-11, Alosh Affidavit.)  Setting aside the daunting authentication problems presented by these affidavits, the affidavits of Noha, Ehssan Mohammed and Miriam are quite general and are cumulative to testimony that was presented to the jury.

Issa's mother Sarah and his brother Jamal testified during the penalty phase of Issa's trial.  Sarah Issa came from her home in Jordan and arrived in Cincinnati shortly before she testified.  She met briefly with defense counsel before taking the stand.  She speaks no English, and her testimony was presented to the jury via a translator.  Sarah Issa lacks formal education, and her affidavit states that she was unacquainted with the American legal system, and in particular the reason she was testifying - to ask the jury to spare her son's life.  Sarah Issa was wearing a veil when she testified, and the jury had not been alerted to that fact before she appeared.

Jamal Issa also came from Jordan and testified at Issa's sentencing hearing.  His affidavit states that he was not told that he had to testify, as Issa's mitigation specialist had faxed a request to the family simply asking which members would "go to the United States."  Originally the family decided that Sarah, Jamal and Abdullah (another brother)

-23-

would come, but Abdullah was denied an exit visa.  Jamal met briefly with the attorneys before the hearing, and said that he and his mother were never asked questions about the crimes even though Sarah was in Cincinnati and staying with Issa at that time.

The affidavits of Sarah and Jamal do not appreciably add to the testimony they provided at Issa's trial, or establish that calling additional Jordanian family members would have altered the result.  Regarding testimony from Issa's American ex-wife's grandmother and uncle, Issa contends they should have been called to "Americanize" him and his Jordanian family.  Even assuming that "American" witnesses may have blunted in some fashion the presumed negative effect on the jury of the veiled appearance of Issa's mother, this is a highly speculative assumption and does not establish that the outcome of Issa's trial would have been different.  And in any event, the statements of these witnesses are untested.  Even assuming that trial counsel was deficient in failing to do additional investigation and not interviewing these individuals, Issa has not demonstrated any actual prejudice - that he would have received a sentence less than the death penalty if they had testified.

Recent Supreme Court decisions confirm that the state court's decision on these claims was not contrary to federal law.  In Bobby v. Van Hook, 558 U.S. 4 (2009), the Court vacated the Sixth Circuit's grant of habeas relief to petitioner Van Hook, which had been based on a claim of ineffective assistance of counsel for failing to conduct a more thorough mitigation investigation.  Even under pre-AEDPA review standards, the Court noted that "it was not unreasonable for his counsel not to identify and interview every other living family member... .  This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the

face, ... or would have been apparent from documents any reasonable attorney would have obtained." Id. at 19 (internal citations omitted).

In contrast is Porter v. McCollum, 558 U.S. 30, 130 S.Ct. 447 (2009), decided a few weeks after Van Hook.  There, the Court affirmed a district court's grant of habeas relief based on ineffective assistance of counsel at sentencing.  Porter killed his former girlfriend (and her new boyfriend) after he spent the night drinking with a friend.  His lawyer presented one mitigation witness, Porter's ex-wife, and read part of a deposition. This evidence consisted of descriptions about his behavior while intoxicated, and his good relationship with his son.  The lawyer told the jury that Porter was not "mentally healthy" and had "other handicaps," but no evidence of any of that was introduced.  At an evidentiary hearing in his state post-conviction proceeding, Porter presented extensive testimony about his abusive childhood, including that his father was very violent toward him and shot at him once for coming home.  His father also regularly assaulted his mother.  Porter enlisted in the Army at age 17 to escape his violent family, and served in the Korean War under extremely difficult conditions.  Porter was seriously injured twice, and received several commendations including two Purple Hearts.  Porter also suffered symptoms of serious post-traumatic stress syndrome.  At that hearing, a neuropsychologist testified that Porter suffered from brain damage that could cause impulsive, violent behavior.  That doctor also opined that Porter was substantially impaired in his ability to conform his conduct to law and suffered from an extreme mental disturbance, two of Florida's statutory mitigating circumstances.  The state courts denied post-conviction relief, but the district court granted his habeas petition, finding that his lawyer had done almost nothing to advocate on Porter's behalf.  The

court also found the deficiency prejudicial, concluding that the post-conviction state court had not properly considered the entirety of the evidence Porter had presented.

The Eleventh Circuit reversed, but the Supreme Court affirmed the district court's judgment.  It concluded that the lawyer "did not even take the first step of interviewing witnesses or requesting records."   Porter, 130 S.Ct. at 453.  When balanced against the weight of the evidence that was available, the Supreme Court found the decision not to investigate did not reflect reasonable professional judgment, in spite of the lawyer's claim that Porter had been uncooperative with him in preparing for trial.  And as to prejudice, the Court observed that this was not a case in which the additional evidence "would barely have altered the sentencing profile presented to the sentencing judge...".  Id. at 454 (quoting from Strickland, 466 U.S. at 700).  The Court concluded that the Florida Supreme Court's decision that Porter was not prejudiced was unreasonable, especially noting that the state court's decision essentially rendered  Porter's heroic military service inconsequential.

Taking these recent cases together, this Court concludes that Issa was not prejudiced by counsel's failure to investigate the additional family members or to call additional witnesses on his behalf.  The affidavits of the Jordanian family members are essentially cumulative to the testimony presented at his mitigation hearing.  Attorney Agar's evidentiary hearing testimony also supports the state court's conclusion on this claim.  Agar believed that "... being an Arab American citizen was a fairly strong negative, especially in a conservative county.  [Issa's] background did not supply us with a lot that was very helpful."  (Doc. 112 at 97.)  She described a conversation she had with Issa's brother to explain the reason for the mitigation hearing.  The brother told

Agar that if Issa committed the crime he should be executed, but that the family did not believe he had committed the murder. Agar thought this sort of testimony at the penalty phase would not be helpful to Issa. With regard to Issa's American wife, Agar discovered that she filed two domestic violence charges against Issa, and Agar reviewed the wife's affidavits that had been filed with those charges. Based on Agar's review, she concluded it would be unhelpful to call Issa's wife to testify due to the potentially harmful cross-examination from the state that would likely ensue. (Doc. 112 at pp. 99-102.) Even assuming that trial counsel was somehow deficient in failing to talk to all of the potential witnesses, Issa has not demonstrated any actual prejudice, that he would have received a sentence less than the death penalty if any or all of them had testified.

Issa's fifth ground for relief argues that his trial counsel failed to retain, consult with, and present testimony from a cultural expert. This expert, he asserts, could have explained to the jury certain factors concerning Issa's cultural orientation as a Jordanian national, and his assimilation (or lack thereof) into American culture. He also suggests this expert would have educated the jury about Jordanian/Muslim traditions, particularly concerning his mother's fully veiled appearance and her reticence about speaking in public. During his post-conviction proceedings, Issa submitted an affidavit from a clinical psychologist, Janice Ort, who stated that Issa's cultural background "merits further investigation" because his "assimilation into the American culture is a significant factor in his psycho-social history." (Apx. Vol. III at 11.) The Ohio Court of Appeals rejected this post-conviction claim, holding it did not establish ineffective assistance of counsel "... merely because it presents a new expert opinion that is different from the

theory used at trial.  This claim involved nothing more than an alternative mitigation

theory and did not provide substantive grounds for postconviction relief."  State v. Issa,

2001 Ohio 3910 at *13 (Apx. Vol. VII at 376-377).

Issa also suggests that a cultural expert could have educated the jury about the

issue of tribal customs of retribution.  He refers to a document entitled "Tribal Truce on a

Right."  (Apx. Vol. III, pp. 181-183.)  This document, dated September 12, 1998,

apparently memorialized an agreement reached between the families, or tribes, of

Maher and Ziad Khriss and the Issas.  It states that, after debates, "the family of the two

late deceased kindly offered a temporary tribal truce (Atwa) on a 'Right', till the case is

totally and finally adjudicated into within the jurisdiction of the competent courts in the

United States of America."  The agreement states that if Issa is convicted, the truce will

be renewed and "remaining tribal procedures" taken in Jordan.  If Issa is acquitted, the

truce would be void and not renewed.  It is signed by a number of individuals,

apparently members or representatives of the two groups.  This document was not

discovered by trial counsel or Issa's mitigation specialist until, at the earliest, just before

the mitigation phase of the trial.  The testimony is unclear about when the defense team

actually discovered the existence of this written document.

Jim Crates, Issa's trial mitigation specialist, stated in his post-conviction affidavit

that the truce raised an issue of retribution for the Khriss murders:

> From what I could gather from David Shalash, Issa's family
> and cousins in Jordan believed that as long as Ahmed
> remained on Death Row, there would be no retribution
> against them in Jordan by members of the Khriss family.  It
> was my impression that Ahmed Issa's family in Jordan
> believed that if Ahmed was released from prison, the
> 'payment' for his crime would be 'taken out of the hide' of

Ahmed's Jordanian family members by Jordanian members
of the Khriss family.

(Apx. Vol. III at 203.) Crates' "impression" is confirmed by some of Issa's family

members' post-conviction affidavits. For instance, Issa's mother Sarah asserted:

The Kreiss [sic] family believes that my son is guilty. They
wanted him to implicate Linda, as well. Nidal Kreiss sent a
threatening letter to Ahmed while he was at the jail in
Cincinnati. The letter told Ahmed that if Ahmed did not say
that Linda was involved, that you never can tell what will
happen to your brothers and sisters. This letter caused us to
go into hiding out of fear. Our family expected the Kreiss
family to act under the old custom of Retribution. An
intermediary for the Kreiss family approached our family for
money to be paid for the deaths of their loved ones. We did
not have such a large sum.

(Apx. Vol. IV at 33.) Miriam (Issa's sister) stated that she never felt personally

threatened, but that the Issa family

... sent an offer to pay the Kreiss family for their loss by way
of intermediaries who are notables of the community. ... My
family was afraid when we learned what had happened. In
the beginning, we did not know what the Kreiss family would
do. After the contract was drawn up, we could relax a little.

(Apx. Vol. IV at 43.) Miriam also mentions the letter from Nidal Kreiss to Ahmed. And

Jamal, Issa's brother who testified at the penalty hearing, stated in his affidavit:

The behavior of Nidal Kreiss, brother of the victims, is one of
the reasons that my family went into hiding after Ahmed's
arrest in the US. Nidal had threatened Ahmed, by letter, that
we, Ahmed's siblings would be killed if Ahmed did not
implicate Linda in the conspiracy. ... We were afraid of what
the Kreiss family would do. While there were no direct
threats made, we expected retribution.

(Apx. Vol. IV at 61.)

The Ohio Court of Appeals addressed this issue in Issa's seventeenth claim for

relief, claiming that counsel failed to adequately investigate the issue of "family retribution." The court concluded that Issa had not established prejudice: "[The evidence] would not have been admissible in the guilt phase, as it was irrelevant to the issue of whether Issa participated in a plot to kill Maher Khriss. ... As to the mitigation phase, not one family member stated in their affidavits that they would not have testified on Issa's behalf because of the fear of retribution. To the contrary, they all stated that if defense counsel had asked them, they would have testified." State v. Issa, 2001 Ohio 3910, at **14-15.

Issa contends that a cultural expert would have been able to explain this tribal custom of retribution, which in turn would have helped explain to the jury Sarah Issa's reticence in her testimony, and Issa's alleged "shyness" or lack of vigorous assistance to his lawyers. To support this argument, Issa presented testimony at the evidentiary hearing in this case from Dr. Fatima Al-Hayani, a professor of Middle Eastern studies with extensive experience in Islamic law and cultural traditions, especially in the domestic relations arena. (Doc. 113, Evid. Hrg. Trans. at 76-115.) Assuming that this testimony is admissible, it does not establish that Issa was prejudiced or that his counsel's performance was deficient under Strickland. Dr. Al-Hayani described some of the major differences in law and tradition that she believes should have been presented to the jury, to help them understand Issa and the appearance and demeanor of Issa's mother. The concept of a jury trial is unknown in Jordan and the Middle East generally. Women generally do not speak in public, particularly women like Sarah Issa, who is not educated and who did not work outside her home. Dr. Al-Hayani also testified that under Islamic law, Issa could not be convicted of murder because Miles - the actual

-30-

killer - would be precluded from testifying against Issa, and no other eye witnesses were available.  Islamic law requires eye witnesses in order to convict, and it forbids use of circumstantial evidence.  Given this law, she surmises that trial counsel's description of Issa as not forthcoming, or not fully engaged in assisting with his defense, is quite understandable as his background would strongly reinforce a belief that he could not be convicted of murder.

Agar testified that her experience with Hamilton County juries is that jurors do not trust "cultural experts."  She related an example of an expert who testified about battered woman syndrome on behalf of defendants accused of crimes against their abusive spouses.  Agar said that this expert stopped testifying in trials due to several adverse outcomes and the negative juror reactions to the testimony.  Agar also testified (and the record fairly demonstrates) that Issa spoke very good English and seemed very accustomed to American culture.  Dr. Al-Hayani, in contrast, never spoke to Issa or to others involved in his trial, so her opinions about Issa's language facility or his cultural assimilation are simply her assumptions.

Agar's testimony is consistent with that of Jim Crates, who testified that he suggested to counsel that a cultural expert be retained, and Agar told him that such an expert would be "too esoteric."  (Doc. 113, Evid. Hrg. Trans. at 31.)  Agar affirmatively decided not to emphasize Issa's nationality and Middle Eastern background, to avoid any possibility of awakening any juror bias or prejudice against him.  Issa argues that an expert's description of his background, his mother's reticence, or his father's untimely death, would have "made a difference."  But his brother and his mother testified about Issa's family and the move from Kuwait to Jordan, Issa's education and his effort to

support his family after his father died.  (Trial Trans. at 1546-1571.)   Having an "expert"
reiterate that information to the jury does not, in the Court's opinion, establish a
**reasonable** probability of a different outcome.

Dr. Al-Hayani also testified that the tribal truce could have been presented to
Issa's jury in a favorable way, especially the fact that the Khriss family would have
accepted a sentence of something less than death in lieu of receiving any retribution
(such as "blood money") from the Issa family.  (Doc. 113 at pp. 97-98.)  But the question
before the Court is not whether counsel "could have" presented this evidence; it is
whether the failure to do so establishes a reasonable probability of a different outcome.
Agar's testimony was quite clear that she decided not to employ a cultural expert and to
avoid emphasizing Issa's Jordanian heritage and background. Moreover, Agar was
aware of the retribution issue even before Linda Khriss' trial.  She testified that she
learned from someone (perhaps Issa's cousin who acted as the family translator) that if
Issa would testify against Linda Khriss, there would be no retaliation taken against
Issa's family.  Agar said that there were never any direct threats from the Khriss family
that she was told about.  Agar also stated that none of Issa's Jordanian family members
ever raised the subject prior to Issa's trial, and no one ever expressed any concern for
their personal or family safety.  (Doc. 112, Evid. Hrg. Trans. at  111-115.)  Agar's
testimony is confirmed by some of the family members' affidavits which described a fear
of retribution, but confirmed that no threats had been made against the family.  There is
simply no evidence that any family member did not assist Issa or his lawyers because of
a fear of retribution.

Evidence or expert testimony concerning the tribal custom of retribution, and its

purported effect on the demeanor of the Issa family witnesses, does not in the Court's view rise to the level of the sort of "potentially powerful mitigating evidence"[3] that any reasonable attorney would have discovered and would have introduced at Issa's trial. Nor does this evidence raise a reasonable probability that Issa's jury would have imposed a lesser sentence if they had been aware of this information. Counsel's tactical or strategic decisions concerning the presentation of mitigation evidence, including her decision not to present testimony from a cultural expert, are presumed to be within the realm of constitutionally-acceptable representation. Even giving Issa the benefit of the doubt that the failure to retain an expert simply to facilitate communications with the family was deficient performance, Issa has not demonstrated that the result of his trial would likely have been different. The state court's rejection of this ground for relief was therefore neither contrary to, nor an unreasonable application of, federal law as articulated in Strickland.

For all of the reasons discussed above, the Court therefore denies Issa's Third, Fourth and Fifth Grounds for relief based on ineffective assistance of counsel.

**Sixth Ground for Relief**

Issa's sixth ground for relief contends that the trial court violated his constitutional rights when the court admitted hearsay statements made by Andre Miles about Issa's involvement in Maher's murder. The trial court, over Issa's objections, permitted Bonnie and Joshua Willis to testify about Miles' statements to them about the murders.

---

[3] Bobby v. Van Hook, supra, 558 U.S. at 19.

-33-

Andre Miles was subpoenaed by the state to testify in Issa's trial.  Miles himself had not yet stood trial for the murders.[4]  He appeared at Issa's trial with his lawyer and refused to testify.  (Trial Trans. Vol. IV at 937-942.)  The following exchange took place between the trial court and Miles, outside the presence of the jury:

> THE COURT: All right.
> Mr. Miles, let me make this statement to you. You're here under subpoena to testify as a witness in this case.  You do have an obligation to testify if subpoenaed and you have been subpoenaed.
>
> I want to advise you, though, that you do not have to testify as to anything that may tend to incriminate yourself if called to the witness stand to testify. Okay?
>
> Now, with that caution in mind, I want to ask you again are you going to testify in this case?
>
> MR. MILES: I'm not going to testify.
>
> THE COURT: Why not?
>
> MR. MILES: Because I'm not going to testify.
>
> THE COURT: All right.  You just simply are refusing to testify, even though I'm informing you [that] you do have an obligation to testify, except to those things that might incriminate yourself?
>
> MR. MILES: Yes.
>
> THE COURT: All right.

(Trial Trans. Vol. IV at 942-943)

After this exchange, and at the state's request, the trial court declared Miles to be "unavailable"  under Ohio Evid. Rule 804(A)(2), defining an unavailable witness as one

---

[4] He was later convicted and sentenced to life imprisonment without the possibility of parole.  See State v. Miles, 2000 Ohio App. LEXIS 560 (Ohio Ct. App., Feb. 18, 2000), affirming his conviction and sentence.

who "persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so."  Following this ruling and again out of the presence of the jury, the state argued for the admission of Miles' recorded statement to the police in which he confessed to the murders.  The state presented the testimony of Officer Feldhaus concerning the circumstances of Miles' statement to the officers. During this hearing, however, the parties' focus shifted away from Miles' statements and towards Bonnie and Josh Willis, as the state also sought to admit their statements to the police and their testimony about statements Miles made to them.  The state then withdrew its motion to admit Miles' recorded statement to the police and his testimony in the Linda Khriss trial, reserving its right to renew those requests if the trial court denied admission of the Willises' testimony about Miles as statements of a co-conspirator. (Trial Trans. Vol. IV at 1002-1003.)

Bonnie Willis was then examined by the state and cross-examined by defense counsel (all without the jury present) about her statement to the police, her grand jury testimony, her testimony in the Khriss trial, and about what Miles told her and Josh about the murders.  (Trial Trans. Vol. IV at 1006-1067.)  Defense counsel had been given transcripts of all of Bonnie's statements, and the trial court specifically noted several inconsistencies in her testimony.  (Id. at 1029.)  At the close of her examination, the state argued that her testimony established the existence of a conspiracy, and that Miles told Bonnie Willis "... that he shot the two men.  And that would clearly be admissible as a statement against Andre Miles' interest.  That alone.  And then he gave further details, unspecified details, which led Bonnie Willis to go to Mike Issa and say, 'Get the gun out of my backyard.' [Issa] responded, 'If Andre doesn't get it, I will.  Who

else knows?'" (Trial Trans. Vol. IV at 1071.)  Issa's counsel argued that a conspiracy

had not been shown, and that any admission of Willis' testimony would violate Issa's

Confrontation Clause rights.

The trial court ruled on the dispute the next morning, noting that the state was

seeking to introduce the Willises' testimony as statements made in furtherance of a

conspiracy under Ohio Evid. Rule 801(D)(2)(c).  The trial court then held:

> ... Clearly, I think those statements established a conspiracy,
> and that the statements made by the co-defendant, Miles, to
> Josh Willis the day before the homicide in trying to recruit
> Willis are statements in furtherance of a conspiracy.
>
> Whether or not the statements made by the co-defendant,
> Miles, in regards to the disposing of the weapon, after the
> homicide being completed, the question whether these
> statements were made in furtherance of a conspiracy does
> not have to be answered by this Court.  Because of my
> following ruling, that's going to the co-defendant, Andre
> Miles's statement made to Josh Willis and Bonnie Willis,
> under the exception to the hearsay Rule 804(B)(3), Ohio
> Rules of Evidence [sic].

(Id. at 1082)  The court cited several cases discussing Rule 804(B)(3) and the

admission of statements that implicate the declarant's penal interests.  The court noted

that Miles was unavailable, and that the statements he made to the Willises were not

made in police custody: "They were made by him voluntarily.  They were made to

friends of his in their house.  There was no reason for Miles to make the statements if

they were not true.  There was no pressure on him to make the statements.  He was not

trying to shift blame."  Analyzing all of the surrounding circumstances, the court

concluded the statements were trustworthy and reliable, and therefore admissible under

Rule 804(B)(3).  (Id. at 1083-1084.)  Bonnie and Josh Willis then testified in front of the

-36-

jury about their conversations with Miles before and after the Khriss murders.

Issa contends that the admission of the Willises' testimony violated his Confrontation Clause rights, because he was deprived of the right to cross-examine the most important witness against him, Andre Miles, whose testimony directly tied him to the crime.  He also argues the admission of this testimony violated the Ohio hearsay rules, because the trial court erroneously treated Miles as an "unavailable" witness. Issa argues that the trial court never "ordered" Miles to testify, and thus Miles was "available" under the rule.

Issa raised this claim in his direct appeal to the Ohio Supreme Court as his second proposition of law.  The Supreme Court found that, despite the trial court's failure to explicitly "order" Miles to testify, the court had made it abundantly clear that Miles had a duty to do so, and Miles had persistently refused.  The Supreme Court concluded there was no error under the Ohio hearsay rule in finding Miles was an "unavailable" witness: "Furthermore, even if the court had expressly threatened contempt proceedings for refusal to obey a court order, the threat would undoubtedly have been unavailing, as Miles was soon to be tried for murder and the state had strong evidence against him."  State v. Issa, 93 Ohio St.3d at 59.  This determination is clearly one based on Ohio's evidentiary rule, and a challenge to it is not cognizable in federal habeas proceedings absent a denial of fundamental fairness and due process.  See, e.g., Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (a federal habeas court may not "reexamine state-court determinations on state-law questions").

The Ohio Supreme Court then addressed Issa's Confrontation Clause argument by observing that the central concern of that clause "... is to ensure the reliability of the

evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact[,]'" quoting State v. Madrigal, 87 Ohio St.3d 378, 384 (2000), and Maryland v. Craig, 497 U.S. 836, 845 (1990).  The court primarily relied on the plurality opinion in Lilly v. Virginia, 527 U.S. 116 (1999) to find that Issa's constitutional right to confront Miles was not violated.

In Lilly, the Supreme Court held that a defendant's right to confront his co-defendant at trial was violated when the co-defendant's statements to the police, implicating himself but also implicating the defendant in the most serious crimes with which the pair was charged, were admitted at trial after the co-defendant invoked his Fifth Amendment right not to testify.  The Supreme Court observed that characterizing all such statements as "against penal interest" and thus treating them as voluntary admissions, swept too broadly for meaningful constitutional review.  The Lilly plurality characterized statements like the one at issue in that case - evidence offered by the prosecution to establish the guilt of an alleged accomplice through the statement of the co-defendant/ declarant while in custody of the police - as "presumptively unreliable" even when the declarant may have also implicated himself.  Id. at 131.  A similar result on similar facts was reached by the Ohio Supreme Court in State v. Madrigal, 87 Ohio St.3d at 384.

In Issa's case, the Ohio Supreme Court specifically noted that Miles was not talking to the police at the time of the challenged statements.  The court noted:

> Unlike the declarants in Lilly and Madrigal, Miles was not talking to police as a suspect when he made the out-of-court statement. Miles's confession was made spontaneously and voluntarily to his friends in their home. Moreover, Miles had nothing to gain from inculpating [Issa] in the crime.  In fact,

-38-

> by stating that [Issa] had hired him to kill Maher, Miles was
> admitting a capital crime, i.e., murder for hire.  Furthermore,
> Miles's statement was clearly not an attempt to shift blame
> from himself because he was bragging about his role as the
> shooter in the double homicide.

State v. Issa, 93 Ohio St.3d at 61.  The Supreme Court concluded that these

circumstances did not render Miles' statements particularly unworthy of belief, citing in

particular Chief Justice Rehnquist's concurring opinion in Lilly, 527 U.S. at 147, that

generally, "confessions to family members or friends" bear sufficient indicia of reliability

that they are admissible without an opportunity to confront the declarant.

   While the Ohio Supreme Court did not cite Ohio v. Roberts, 448 U.S. 56 (1980),

Lilly is expressly based upon that case and others subsequent to Roberts setting forth

the Supreme Court's Confrontation Clause jurisprudence at the time of Issa's appeal.

Under Roberts, an unavailable witness's statement implicating a defendant is

admissible without violating the Confrontation Clause if the court finds the statement

bears "adequate indicia of reliability."  This test is satisfied if the evidence falls within a

"firmly rooted hearsay exception" or if it bears "particularized guarantees of

trustworthiness."  Ohio v. Roberts, 448 U.S. at 66.

   The Court has reviewed the challenged testimony of Bonnie and Joshua Willis,

and cannot conclude that the Ohio Supreme Court's decision on Issa's Confrontation

Clause challenge was **objectively unreasonable** at the time it was made.  Lilly was the

most recent opinion from the U.S. Supreme Court on the confrontation clause at the

time of the Ohio Supreme Court's decision.  Lilly's foundation was later questioned in

Crawford v. Washington, 541 U.S. 36 (2004), where the Supreme Court overruled Ohio

v. Roberts.  Crawford articulated a new rule for "testimonial" statements, and requires at

-39-

a minimum both the unavailability of the witness **and** a prior opportunity for cross-examination by the accused.  Crawford also held that non-testimonial statements do not fall within the Confrontation Clause's requirements.  Crawford does not apply retroactively, however.  See Whorton v. Bockting, 549 U.S. 406 (2007), and so Issa's claim is governed by the Roberts/Lilly standards.

The state subpoenaed Miles to testify, he was brought to the courtroom and appeared with counsel, but he refused to testify after the court instructed him to do so.  That was sufficient to satisfy the state's burden of establishing Miles' "unavailability" for purposes of the Confrontation Clause, which requires the state to make a good faith effort to produce the witness.  See Barber v. Page, 390 U.S. 719, 724 (1968), finding a constitutional violation because the state made **no** effort to secure the presence of the witness at the trial.  And under Roberts and Lilly, there are sufficient indicia of reliability surrounding the statements Miles voluntarily made to Bonnie and Joshua Willis.  They were his friends, he had lived with them for a time, and there is nothing in the record suggesting that he was under any compulsion to implicate Issa when he made the statements.  See Anthony v. DeWitt, 295 F.3d 554, 563-564 (6th Cir. 2002), cited by the Magistrate Judge in his Report, and finding no error in the admission of a wife's testimony about her husband's statements to her that implicated both the husband and the defendant in a murder earlier the same evening.  The Sixth Circuit held that "out-of-court statements that do not fit within a firmly rooted hearsay exception do not violate the Confrontation Clause if they possess 'particularized guarantees of trustworthiness.'" Id. at 563 (quoting United States v. Tocco, 200 F.3d 401, 416 (6th Cir. 2000)).  The

court applied the factors identified by the Supreme Court that are determinative of

trustworthiness:

> (1) whether the hearsay statement contained an express
> assertion of past fact, (2) whether the declarant had personal
> knowledge of the fact asserted, (3) whether the possibility
> that the statement was based upon a faulty recollection is
> remote in the extreme, and (4) whether the circumstances
> surrounding the statement make it likely that the declarant
> fabricated the assertion of fact.

Id. at 563 (quoting Dutton v. Evans, 400 U.S. 74, 88-89 (1970)).  The court found no

error in admitting the wife's testimony implicating the defendant, noting it was unlikely

the statements were fabricated because they were made voluntarily by the husband to

his wife in the privacy of their home.

       The same conclusion applies here: Miles admitted that he was hired to kill

Maher, a fact of which he no doubt had personal knowledge.  Miles called Joshua hours

after the murder, and told him the gun was in the Willises' backyard.  And the next

morning Miles came to the Willises' home and told them the additional details about the

murder.  There are no circumstances suggesting that Miles fabricated his story, or that

he was under some compulsion to implicate Issa when he made his statements.

       For all of these reasons, the Court concludes that the Ohio Supreme Court's

decision on Issa's Confrontation Clause challenge was not an unreasonable application

of then-existing federal law.  Issa's Sixth Ground for Relief is therefore denied.

**Seventh Ground for Relief**

       In this claim, Issa alleges that his conviction for aggravated murder is contrary to

the manifest weight of the properly admitted evidence, thereby violating his

constitutional due process rights.  His Third Amended Petition alleges that once the

court strikes the improper hearsay testimony of the Willises, and finds his trial counsel ineffective by failing to call Linda Khriss, and finds that his Vienna Convention rights were violated, there is insufficient evidence to support his conviction.  (Doc. 62 at ¶155)  Issa raised a sufficiency of the evidence claim in his direct appeal; the Ohio Supreme Court rejected it on the merits, noting the significant evidence apart from the Willises' challenged testimony that tied him to the murder.  State v. Issa, 93 Ohio St.3d at 66-67.

The Magistrate Judge recommended denying this claim because the grounds for relief upon which it depends also lack merit.  This Court has already rejected Issa's First and Sixth Grounds for Relief concerning the testimony of Linda Khriss and of the Willises; and as will be addressed in Issa's Fifteenth Ground for Relief discussed below, the Court rejects his Vienna Convention claim.  In his objections to the Magistrate Judge's recommendation, Issa argues that the state did not charge him with conspiracy, and therefore the admission of Miles' statements as a co-conspirator violated his rights.  He argues that he was convicted of a crime with which he was not charged, which violated his due process rights under Jackson v. Virginia, 443 U.S. 307 (1979).  The Court rejects this contention.

As is discussed in Issa's Sixth Ground for Relief concerning the admission of the Willises' testimony, the trial court initially stated that a conspiracy had been established.  But the court's ultimate ruling is clear that the admission of the Willises' testimony was premised upon Evid. Rule 804(B)(3), and not upon the co-conspirator rule.  The Court concludes that Issa has not shown that the Ohio Supreme Court's decision on that issue was contrary to federal law.   The Court therefore denied Issa's Seventh Ground for Relief.

**Eighth Ground for Relief**

Issa claims that his trial counsel failed to investigate evidence concerning his good behavior in the Hamilton County Jail while awaiting trial. He cites Skipper v. South Carolina, 476 U.S. 1 (1986) for the principle that the trial court may not exclude "the testimony of jailers" from the sentencing hearing. (Doc. 62 at 37.) Issa raised this claim in his post-conviction proceeding; the Ohio Court of Appeals rejected it because Issa failed to present any evidence outside the record. (Apx. Vol. V at 148-150.) Issa has presented no evidence to support this claim during this habeas proceeding, other than argument in his traverse brief.

Even assuming the truth of Issa's statement that he demonstrated good behavior during his time in the Hamilton County jail, his failure to produce any substantive evidence dooms this claim for habeas relief, as he has not demonstrated how the lack of this evidence actually prejudiced him. This ground for relief is denied.

**Ninth Ground for Relief**

Issa claims that he received ineffective assistance of appellate counsel on his direct appeal to the Ohio Supreme Court. He asserts eight instances of his appellate lawyer's failure to preserve claims of trial error by raising them during Issa's direct appeal to the Ohio Supreme Court. This claim was not included in Issa's state post-conviction petition. After filing his initial petition in this action on April 17, 2003, Issa's habeas counsel sought and was granted leave to pursue a Murnahan application to reopen his direct appeal before the Ohio Supreme Court. This case was stayed until the Ohio Supreme Court denied his application. The Magistrate Judge then granted leave to amend the habeas petition, and Issa added two grounds for relief: the Ninth

Ground, ineffective assistance of appellate counsel, and his Tenth Ground, claiming that Ohio law fails to afford a constitutionally meaningful and sufficient procedure for review of ineffective assistance of appellate counsel claims.  (See Doc. 26, Amended Petition filed January 30, 2004.)[5]

Respondent's return of writ argued that both the ninth and tenth grounds were time-barred by AEDPA's one-year statute of limitations.  Issa's traverse (Doc. 41, filed September 29, 2004, at 75-76) did not expressly present an equitable tolling argument, but quoted from and obviously relied on the terms of the Magistrate Judge's earlier order staying the case and granting him leave to amend his petition to raise a challenge to Ohio's Murnahan procedure.

On November 15, 2007, the Magistrate Judge sua sponte requested the parties to brief the potential impact of Mayle v. Felix, 545 U.S. 644 (2005) on its prior order granting leave to amend the petition following the unsuccessful Murnahan application. (See Doc. 131.)  Mayle generally held that for statute of limitations analyses, individual claims must be examined separately to determine whether they arise from the same core facts as timely filed claims, and rejected the contention  that "all" habeas claims necessarily arise from a petitioner's trial and conviction, and therefore arise from the same occurrence.  Issa argued that Mayle did not affect the court's ruling, but again Issa did not expressly present an equitable tolling argument.  (Doc. 132)  After briefing, the Magistrate Judge issued a December 20, 2007 Report and Recommendation

---

[5] Later on, Issa again returned to state court on a second Murnahan application, claiming that his appellate lawyer had an undisclosed conflict of interest; that claim is discussed infra, Issa's Twenty-Seventh Ground for Relief.

addressing several procedural issues, including Respondent's arguments concerning AEDPA's statute of limitations.  (Doc. 134)  The Magistrate Judge concluded that Mayle substantially narrowed the construction of the phrase "same conduct, transaction, or occurrence" used in Rule 15 with respect to amendments of habeas petitions, and whether amended claims may relate back to the original petition's filing date.  The Magistrate Judge then concluded that Issa's Ninth Ground for Relief does not arise from the same core facts as the claims raised in his original "shell" petition.  This was so even though his Ninth Claim for ineffective assistance of appellate counsel is premised on counsel's failure to appeal trial errors that Issa **did** raise in his shell petition.  While the AEDPA statute may be tolled for Murnahan re-opening proceedings, the application to reopen must itself be filed with the state court before the AEDPA statute runs.  And that had not occurred here.

Issa objected to the Magistrate Judge's report, noting that during the very first pretrial conference, Issa's habeas counsel informed the court that he had discovered an unexhausted claim (ineffective assistance of appellate counsel) in his review of the voluminous file that the Ohio Public Defender had finally provided to him only eight days prior to April 17, 2003 (AEDPA's one-year statute expiration date).  Issa's counsel sought a stay to seek reopening of his appeal in order to exhaust this claim, which the Magistrate Judge granted.  (Doc. 15)  The Murnahan application Issa actually filed raised eight separate assignments of error, all of which the Ohio Supreme Court summarily denied.  Issa argued that he reasonably believed that his amended petition (filed on January 30, 2004) properly preserved this ninth claim.  He argues that he had no reason to suspect otherwise until the Magistrate Judge sua sponte raised a concern

about Mayle, and that his suspicion was confirmed by the Magistrate Judge's first Report.  Based on all of these facts, Issa argued that this Court should apply equitable tolling to permit his claim to be reviewed.  The Magistrate Judge's final Report rejects Issa's tolling argument because it was not timely raised, and because ineffective assistance of habeas counsel - largely caused by the inexplicable and prejudicial delay of the Ohio Public Defender's Office - is not a basis for equitable tolling when a petitioner cannot establish his own diligence, citing Howell v. Crosby, 415 F.3d 1250, 1252 (11th Cir. 2005).

Issa objects to this conclusion.  He contends that at the least, the Magistrate Judge should have conducted an evidentiary hearing to determine if equitable tolling applies to this claim.  He asks this Court to remand this matter to the Magistrate Judge for that purpose.  He notes that he was effectively without counsel for most of the year that lapsed between the final decision of the Ohio Supreme Court, and the filing of his "shell" habeas petition in this case.  The letters that the Ohio Public Defender wrote to Issa and to the Jordanian Embassy, assuring them that the Public Defender would seek appointed habeas counsel, do not explain the procedure for doing so, and do not mention any concern about timeliness.  Despite the assurances in the letters, it was not until February 18, 2003 that the Public Defender's office filed a notice of intent to file Issa's petition and a motion to appoint counsel in this Court.  Although current counsel was appointed promptly, his pleas to the Public Defender for Issa's file went unheeded until eight days before the filing deadline, when he received ten bankers' boxes containing the record.  Issa argues that his situation is not an uncommon one among indigent defendants, and is worsened by the fact that he is a foreign national, and

-46-

unfamiliar with the American legal system and its specific requirements.

After the Magistrate Judge's Report was filed, the United States Supreme Court definitively held that the AEDPA statute of limitations is subject to equitable tolling in appropriate cases. Holland v. Florida, 560 U.S. 631 (2010). In its prior opinion in Lawrence v. Florida, 549 U.S. 327, 336 (2007), the Court assumed that the doctrine would apply if the petitioner demonstrated diligence in pursuing his claim, and some "extraordinary circumstance" prevented compliance with AEDPA's one-year limitations period. The Sixth Circuit had also recognized that the doctrine may apply in habeas proceedings; see Allen v. Yukins, 366 F.3d 396, 400 (6th Cir. 2004), and Dunlap v. United States, 250 F.3d 1001, 1008 (6th Cir. 2001), while stressing that application of the doctrine must be determined on a case-by-case basis. See Griffin v. Rogers, 399 F.3d 626, 635-636 (6th Cir. 2005)(internal citations omitted). Dunlap identified five factors the Court should consider: "(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim." Dunlap v. United States, 250 F.3d at 1008 (internal citation omitted).[6]

The Magistrate Judge concluded that the record lacked any evidence concerning Issa's diligence, and questioned whether extraordinary circumstances existed such that his own conduct was "reasonable" with regard to timely filing. Issa contends that he did not submit any evidence concerning his diligence because he assumed it was

---

[6] See also, Sherwood v. Prelesnik, 579 F.3d 581 (6th Cir. 2009), applying equitable tolling in habeas proceeding based on an intervening change in law.

unnecessary to establish the timeliness of his ineffective assistance of appellate counsel claim, based on the procedural history outlined above. At worst, Issa argues he is entitled to an evidentiary hearing to establish his entitlement to equitable tolling. He also cites White v. Schotten, 201 F.3d 743, 752 (6th Cir. 2000), where the court leveled harsh criticism on the performance of the Ohio Public Defender's Office in capital habeas cases: "... the public defender's office has repeatedly failed to preserve the right of criminal defendants to challenge the constitutionality of their convictions due to its disregard, whether intentional or because of inadequate funding and staffing, of filing deadlines and procedural barriers."

The Court has little doubt that Issa was prejudiced by the Ohio Public Defender's long and unexplained delay in seeking appointed counsel and in turning over the voluminous records pertaining to Issa's case. Because Issa is facing the ultimate penalty, the Court will assume out of an abundance of caution that Issa could show that he was reasonably diligent in pursuing his claims, and that equitable tolling would preserve his Ninth Ground for merits review. The letters from the public defender specifically assured him that a petition would be filed and he would be represented for that purpose. No reasonable suspicion arises from that letter, or from the letter to Issa's embassy, that Issa could not rely on that assurance. The Court will credit Issa's argument that he lacked knowledge of and familiarity with the American legal system, or any constructive knowledge of the fact of the one-year deadline.

To establish ineffective assistance of appellate counsel, Issa must first demonstrate a constitutional error that occurred during his trial. Then he must show that appellate counsel's failure to raise the issue on direct appeal caused prejudice. In

Mapes v. Coyle, 171 F.3d 408 (6th Cir. 1999), the Sixth Circuit summarized the major considerations relevant to this determination:

> (1) Were the omitted issues "significant and obvious"?
>
> (2) Was there arguably contrary authority on the omitted issues?
>
> (3) Were the omitted issues clearly stronger than those presented?
>
> (4) Were the omitted issues objected to at trial?
>
> (5) Were the trial court's rulings subject to deference on appeal?
>
> (6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> (7) What was appellate counsel's level of experience and expertise?
>
> (8) Did the petitioner and appellate counsel meet and go over possible issues?
>
> (9) Is there evidence that counsel reviewed all the facts?
>
> (10) Were the omitted issues dealt with in other assignments of error?
>
> (11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Id. at 427-428 (internal citations omitted). It is not enough for Issa to show that some trial error was not raised on appeal; he must demonstrate that the error and the failure to appeal that error resulted in a fundamentally unfair trial, or the imposition of an unconstitutional sentence.

(a) Trial Counsel's Failure to Use Andre Miles' Testimony From the Linda Khriss Trial.

Issa argues that his trial counsel's failure to use Miles' testimony from the Khriss trial, after Issa's trial judge determined that Miles was an unavailable witness, should have been raised as error in his direct appeal. Exhibit 11 from the evidentiary hearing is

-49-

an excerpt of Miles' cross-examination during the Khriss trial, but his complete testimony is not in the record before the Court.[7] In this excerpt, Miles denied telling Bonnie and Josh Willis about the murders, contradicting the Willises' testimony at Issa's trial. But Miles also testified that Issa had loaned Miles $1,500, and he said it was Issa who told him that Ziad and Maher would be returning to the Safe-Way store the evening of the murders. Miles said he had two conversations with Issa that evening, and that it was Issa who told him where the Khriss house was located. Miles also admitted that it was his "job for $15,000 to kill the owner of the store." (Evid. Hrg. Ex. 11 at 492.)

From this limited excerpt, the Court cannot ascertain if Miles' testimony in the Linda Khriss trial was so favorable to Issa's defense that the failure to use it amounts to ineffective assistance of counsel. While Miles apparently denied telling Bonnie and Josh about the murders, he also implicated Issa. It is unknown what Miles may have said on the subject in other parts of his testimony, and it would be pure speculation to assume that the rest of Miles' testimony contained nothing harmful to Issa's defense. It is highly doubtful that Issa's trial counsel could have used a limited portion of Miles' testimony, denying that he spoke to the Willises, without opening the door to additional excerpts from his testimony. The Court cannot conclude that trial counsel's failure to use Miles' testimony amounts to constitutional error, such that the failure to raise this

---

[7] Some portion of Miles' testimony was apparently proffered to the trial court by Issa's counsel, during argument concerning another witness, Johnny Floyd, and whether the state would be permitted to introduce Miles' statement to the police if Floyd testified. (Trial Trans. Vol. VI at 1354-56.) The trial court denied the admission of Miles' statement. Floyd then testified that while he and Miles were held at the county jail, Miles told Floyd that Issa had thrown Miles out of the store, and that Miles "wanted to get back at Issa." (Id. at 1389.)

issue on appeal was ineffective assistance of appellate counsel.

   (b)   Failure to Object to the Willises' Testimony Because Issa Was Not
         Indicted for Conspiracy.

In this subpart of his ninth ground for relief, Issa notes that in seeking the

admission of Bonnie Willis' testimony, the prosecutor argued that her testimony would

establish "the threshold requirements for a conspiracy."  (Trial Trans. Vol. IV at 1068.)

Issa's trial counsel objected, arguing that the state had not established the necessary

requisites of conspiracy under Ohio law.  The trial court then ruled that both of the

Willises would be permitted to testify (as is quoted above regarding Issa's sixth ground

for relief).  Issa argues that appellate counsel should have appealed the trial court's

ruling regarding statements of a co-conspirator.  He notes that his indictment charged

him with violating Ohio Rev. Code 2903.01(A), aggravated murder with two death

penalty specifications.  He was not indicted under Ohio Rev. Code 2923.01, which

codifies the separate crime of conspiracy to commit aggravated murder.

   This issue is related to Issa's Sixth Ground for Relief, claiming that the trial court

violated Issa's constitutional rights by permitting Bonnie and Josh to testify. He also

raised the conspiracy argument in his objections regarding his Seventh Ground for

Relief (weight of the evidence claim), discussed above. The Ohio Supreme Court

reviewed the trial court's ruling in Issa's direct appeal, finding no error under Ohio law

and no violation of Issa's Confrontation Clause rights.  The Court did not expressly

address the trial court's initial statement regarding the co-conspirator rule and Miles'

statements to Joshua **before** the murders. But the entirety of the Willises' testimony

about Miles, both before and after the murders, was clearly placed at issue before the

Ohio Supreme Court, which concluded that the admission of their testimony as a whole did not violate Issa's constitutional rights. Even if there was some error in admitting the pre-murder statement by Miles to Josh, the balance of the Willises' testimony was far more damaging, was not admitted under the co-conspirator exception, and clearly implicated Issa in Maher's murder. The Court cannot conclude that the testimony concerning Miles' pre-murder statement to Josh unduly prejudiced Issa's defense, or that the exclusion of this portion of the testimony would have resulted in a different outcome. The Court therefore cannot conclude that appellate counsel's failure to specifically raise the co-conspirator aspect of the trial court's discussion of the Willis' testimony amounts to constitutionally ineffective assistance of appellate counsel.

(c)    Failure to Seek Dismissal of Issa's Indictment Based on the Unconstitutionality of Ohio's Proportionate Review Procedure.

Issa next asserts that Ohio's proportionality review system is constitutionally flawed, because the only comparison by which the appropriateness of a death sentence is measured are other cases where death was imposed. It is not ineffective assistance of counsel to fail to raise a futile issue on appeal. Ohio's death penalty proportionality review procedure has uniformly been upheld by the Ohio Supreme Court. See State v. Jackson, 141 Ohio St.3d 171, 221 (Ohio 2014) and cases cited therein. The Supreme Court has consistently held that proportionality and appropriateness review is properly limited to cases in which the death penalty is actually imposed. Moreover, this sub-claim does not rise to the level of constitutional error. In Pulley v. Harris, 465 U.S. 37, 50 (1984), the Supreme Court held that a comparative proportionality review is not constitutionally required in every capital case. The Ohio capital sentencing statute, like

the California statute at issue in <u>Pulley</u>, is not fatally vague in defining aggravating

factors, nor "so lacking in other checks on arbitrariness that it would not pass

constitutional muster without comparative proportionality review, ...".  <u>Id</u>. at 51.  This

sub-part of Issa's ninth claim is therefore denied.

        (d)    <u>Trial Counsel's Failure to Retain an Independent Translator for Pre-Trial
Preparations</u>.

Issa contends in this sub-part that trial counsel was deficient in relying upon the

translating services of Issa's cousin Abraham (or Ibrahim) Issa, who lived in the

Cincinnati area.  Abraham spoke and understood English but he admitted to Issa's trial

counsel that he had some biases against Issa.  Issa notes that his trial counsel told the

trial court that there were language barriers between counsel and Issa's Jordanian

family members, yet counsel failed to retain a professional translator to facilitate

discussions with the family.  This issue was also mentioned by Jim Crates, Issa's

mitigation specialist, who criticized trial counsel for relying on Issa's cousin for

assistance in communicating with his family instead of using an independent translator.

(Doc. 113, Evid. Hrg. Trans. at 35-38.)

Issa has not produced any evidence demonstrating how he might have actually

been prejudiced by his counsel's decision.  There is no evidence that Abraham falsely

translated anything, or misled anyone in an attempt to harm Issa's defense.  Several of

the post-conviction affidavits from Issa's family members contend that Abraham falsely

told the Khriss family members in Jordan that Issa had confessed to the murder.

Whether or not this is true, at the very best it may suggest that Abraham was biased

against Issa, which he had freely admitted.  Defense counsel Agar testified that she

-53-

> ... had spoken to [Abraham] before we ever used him as an interpreter about his potential as a mitigation witness, since he was the only person that Mr. Issa had actually informed us of in terms of family in this country, and he was quite candid with us about the fact that he could not supply helpful material for us in mitigation, and that in fact if cross-examined, a good deal of what would come out would be quite unhelpful to Mr. Issa.
>
> He had, however, great respect for Mr. Issa's family and it was very well known to him, especially Mr. Issa's mother, and she was already quite nervous and uncomfortable with being translated into another culture and another country where she didn't speak the language very well of appearing in trial, and he had agreed to assist us in helping in any way he could to prepare her for that even though he himself could not be helpful in that regard.

(Doc. 112, Evid. Hrg. Trans. at 106-107.)

Agar's decision to use a family member to translate, rather than a stranger, was clearly her conscious strategic choice, one that this Court cannot find to be unreasonable nor ineffective assistance of trial counsel under Strickland. The failure to raise this issue on appeal is not ineffective assistance of appellate counsel for the same reasons.

(e) Failure to Appeal Prosecutorial Misconduct.

Before Issa's trial began, it was unclear whether Andre Miles would actually testify for the state. Issa filed a motion in limine to exclude any reference by the prosecution to Miles' statements made either to the police or to the Willises, but the trial court had not ruled on that motion before the trial's start. Just before opening statements, the prosecutor informed the court that she would refrain from mentioning "the details" of Andre Miles' taped statement to the police. (Trial Trans. Vol. III at 683.) Despite this agreement, Issa contends that the prosecutor made several references in

her opening statement to Miles' statement to the police as well as his statements to

Bonnie and Josh Willis.  (Third Amended Petition at 52, ¶214.)  The prosecutor told the

jury that Miles made a taped statement in the early morning of December 5, 1997, and

that he drew the police a map showing where to find the murder weapon.  (Trial Trans.

Vol. III at 696-697.)  She described the statements Miles made to Bonnie and Josh

Willis, and that Miles told Josh "I have to kill somebody for Mike for money.  Do you

want a part of it?"  (Id. at  698)  She also stated that after the murders, Miles told Josh

that he "did it" and that the gun he used was hidden in their backyard.  (Id. at 699)

Issa's counsel objected at the first break following opening statements, and the trial

court stated that the objection was "noted for the record."  (Id. at 746-748.)  No further

mention of the objection was apparently raised with the trial court, and the issue was not

raised in Issa's direct appeal.

As discussed previously, even if the prosecutor's challenged conduct was

improper or "universally condemned," habeas relief is not available unless the

misconduct was so flagrant that it rendered Issa's trial fundamentally unfair.  See

Johnson v. Bell, 525 F.3d 466, 482 (6th Cir. 2008).  Assuming that the prosecutor's

references to Miles' statement to the police and the map he drew were improper

because they violated the state's agreement not to mention "details," Issa must show

that the prosecutor's conduct was flagrant and deprived him of a fundamentally fair trial.

This Court cannot agree that he has done so.  The references to Miles' statements and

to the map did not infect the trial with constitutional error.  The references were brief,

and came at the beginning of a multi-day trial.  The map was later admitted as an

exhibit without objection.  The references to Bonnie and Josh Willis are harmless in view

of the admission of their testimony confirming the prosecutor's description of what Miles had said.  Even if the prosecutor's references were **intentional** misconduct, which the Court cannot conclude based on the context in which they were made, the references did not result in a fundamentally unfair trial.

(f)     Trial Counsel's Failure to Interview Issa's Mother as a
        Potential Merits Witness.

At the end of the first day of trial testimony (August 21, 1998), the court inquired of counsel about the anticipated length of the trial.  Issa's counsel told the judge that Issa's mother might have relevant information concerning the night of the murders, especially the time period from when Issa left the store, and when he and Souhail Gammoh went to a bar.  Counsel said she needed to speak with Issa's mother before resting Issa's case, because she did not know "how much his mother can narrow it down.  We might use her simply in terms of whether she observed any weapons, whether she was present on the occasion when other people claimed that he had a weapon in his possession.  I haven't had a chance to talk to her personally."  Issa's mother was scheduled to leave Jordan for the United States on August 27.  (Trial Trans. Vol. III at 791-793.)  The defense rested on the afternoon of August 28, and the jury reached a verdict on September 2.  Issa claims here that counsel's failure to speak with his mother before the close of the guilt phase of the trial was ineffective assistance of counsel.  This issue was not raised on direct appeal.

The Court assumes that counsel should have and did not follow up on this statement to the trial court, and did not ascertain whether or not Issa's mother may have had any helpful information before resting Issa's case.  However, Issa also must show

that he was prejudiced by trial counsel's failure to do so, and thus by appellate counsel's failure to appeal on this basis. This he has not done. He simply assumes that his mother's testimony would have been favorable to him in some fashion.

Sarah Issa's post-conviction affidavit stated that she was with Linda Khriss the night of the murders and helped Linda close the store. Issa drove Sarah to his apartment and then took Souhail home; Sarah averred that it "took only 15 to 30 minutes for Ahmed to return from dropping Suheel [sic] off. I was still up when Ahmed returned and we stayed up talking. After a while, we went to bed. I did not notice any behavior out of the ordinary from my son. He was all quite normal." (Apx. Vol. IV at 50.) Sarah also stated that Linda Khriss had told her about Maher receiving threats from his business partner (as Khriss described in her own trial testimony discussed above).

Actual prejudice cannot be presumed. Issa must demonstrate that his trial was unfair and the result was unreliable. Hall v. Vasbinder, 563 F.3d 222, 237 (6th Cir. 2009). In Bigelow v. Haviland, 583 F.3d 670 (6th Cir. 2009), the court concluded that Bigelow's counsel unreasonably failed to investigate facts that would have established an alibi defense. Bigelow had given his attorney several names of people he believed could confirm his alibi (that he was working in another city on the day of the crime), and another witness had contacted the lawyer just before Bigelow's trial. The lawyer neglected to speak with this person. Bigelow presented three additional disinterested witnesses at his habeas evidentiary hearing, all of whom saw Bigelow at their job site in a different city on the day of the crime. These witnesses could easily have been discovered by counsel prior to Bigelow's trial, especially the owner of the job site where

Bigelow was working that day.

Moreover, the state's evidence of Bigelow's guilt was based entirely upon the victim's questionable identification and even weaker testimony from a bystander.  The Sixth Circuit found it reasonable to conclude that the three witnesses could easily have strengthened the inference of reasonable doubt as to Bigelow's presence at the crime scene, and the state court's contrary conclusion in denying Bigelow's post-conviction claim was an unreasonable application of Strickland.  See also, Clinkscale v. Carter, 375 F.3d 430 (6th Cir. 2004), granting habeas relief based upon trial counsel's failure to file a notice of alibi, resulting in the trial court's  exclusion of the testimony of three witnesses who each would have placed defendant with them in another city on the night of the crime.  The resulting prejudice was especially clear due to the "notable weaknesses" in the prosecution's case, which relied  entirely upon the questionable identification testimony from the victim.

Here, Issa does not contend that his mother was an alibi witness whose testimony would establish a likelihood that he was innocent.  At best, Sarah's untested affidavit might contradict Souhail's testimony about the exact timing of Issa's return to his apartment later on that evening, or how long the two of them remained at the bar. On the critical issue, the time when neither Sarah nor Souhail was with Issa (during which the prosecution argued that Issa met Miles and drove him away from the scene), Sarah and Souhail do not directly contradict each other.  Sarah's affidavit stated that Issa was gone about 15 to 30 minutes; Souhail estimated that Issa did not return to his apartment for about 30-35 minutes.

Moreover, the strength of the other evidence against Issa was considerable: two

witnesses saw Issa with a rifle in his apartment.  Issa told one of them (Howard) not to tell anyone else about the rifle.  Sarah Issa's affidavit is silent on this issue.  Andre Miles' statements to Bonnie and Josh Willis clearly implicated Issa, and other witnesses saw Issa with Miles at the store a few hours before the murders.  After the murders, Issa told Bonnie Willis to warn Miles not to come to the store.  Souhail testified that Issa asked him to tell the police that they were together the entire evening after leaving the store.  Hayes saw Khriss hand Issa a large amount of cash before Khriss left for Jordan.  The police discovered a rifle shell in Issa's bedroom that matched the rifle used to commit the murders.  Given all of this, the potential discrepancy between Sarah and Souhail about whether Issa went out later that evening, or how long he was gone, does not establish a reasonable probability of a different outcome of Issa's trial.  The Court therefore concludes that Issa has not established that he was actually prejudiced by his trial counsel's failure to interview Sarah Issa prior to the close of the guilt phase of his trial.  Appellate counsel's failure to appeal this issue therefore does not amount to ineffective assistance of appellate counsel.

     (g)    <u>Trial Counsel's Failure to Object to Admission of Transcripts of the Willises' Prior Testimony and Statements</u>.

The exhibits admitted at Issa's trial included State's Exhibits 33 and 34, the transcripts of the statements made to the police by Josh and Bonnie Willis; State's Exhibit 35, a transcript of the grand jury testimony of Josh and Bonnie; and Defense Exhibits 3 and 5, transcripts of their testimony during the Linda Khriss trial.  No objections were made to the admission of these transcripts, and defense counsel

affirmatively sought admission of the Khriss trial transcripts.  In this sub-part of his Ninth Ground for Relief, Issa contends that the admission of these transcripts was error that amounted to ineffective assistance of counsel.  Since both Bonnie and Josh testified at Issa's trial, Issa argues that the only proper use of these transcripts would have been to impeach them pursuant to Ohio Evid. Rule 613(B).

As discussed above, before Bonnie or Josh Willis testified in front of the jury, the trial court observed that there were inconsistencies among the various statements Bonnie had given.  The majority of the cross-examination by Issa's counsel of both Bonnie (Trial Trans. Vol. V at 1122-1152) and of Josh (Id. at 1162-1247) consisted of challenging them about the inconsistencies and discrepancies in their stories.  In closing argument, Issa's counsel suggested that the Willises may have told the police about Issa's alleged involvement in Miles' crimes in order to deflect suspicion from themselves.  Counsel specifically encouraged the jury to study all of their statements and the inconsistencies in their testimony when considering the state's evidence.

Based upon counsel's obvious cross-examination strategy and closing arguments attacking the Willises' credibility, it is apparent to the Court that counsel's decisions with respect to the transcripts of the Willises' several statements was a strategic one.  If the jury had doubts about the accuracy or reliability of their testimony at trial incriminating Issa, given the inconsistencies with their other statements, the jury could have returned a favorable verdict.  This strategy is one that clearly falls within the deference this Court must accord to trial counsels' decisions, as Strickland requires.  The Court therefore cannot conclude that the decision to admit these exhibits at trial amounted to ineffective assistance of counsel.  The failure to raise this issue in Issa's

direct appeal was not ineffective assistance of appellate counsel.

      (h)    <u>Failure to Appeal "Continuous and Pervasive" Prosecutorial Misconduct</u>.

In this sub-part, Issa contends that his trial was infected with prosecutorial misconduct.  He notes that the lead prosecutor had been sanctioned in one prior case, and that the Ohio Supreme Court sharply criticized her performance in another.  (Doc. 62, Third Am. Pet. at 60, ¶¶242-243.)  Issa contends that cumulative misconduct in his trial occurred, specifically the alleged "deal" concerning Linda Khriss, the admission of the Willis transcripts, and the opening argument references to Miles' statements.  He also complains about the prosecutor's closing argument, urging the jury to consider both the consistencies and the inconsistencies in the various Willis' statements.

The Court has reviewed these instances of alleged misconduct and found each of them to be without merit.  The Court has also reviewed the trial transcript and cannot conclude that the state's prosecutor exceeded the bounds of vigorous advocacy in her closing argument.  Moreover, there is nothing improper about bringing to the attention of the jury the **consistencies** in the Willises' statements.  Even generously assuming that some intentional misconduct may have occurred, Issa's trial was not rendered unconstitutionally unfair as a result of these incidents, either individually or collectively.

In summary, assuming that Issa would be entitled to equitable tolling in order to reach the merits of his Ninth Ground for Relief, the Court denies his claims.

**Tenth Ground for Relief**

Issa contends that the Ohio procedure set forth in <u>State v. Murnahan</u>[8] and Ohio

---

[8] <u>State v. Murnahan</u>, 63 Ohio St.3d 60, 584 N.E.2d 1204 (1992).

Appellate Rule 26(B), to prosecute a claim of ineffective assistance of appellate counsel provided on direct appeal, is unconstitutional.  He argues that Ohio's procedure fails to provide a meaningful, adequate and effective review of these issues, as evidenced by the Ohio Supreme Court's cursory rejection of his own Murnahan application on this issue.

The Magistrate Judge noted that the applicable law has changed since Issa initially raised this claim for relief.  In Lopez v. Wilson, 426 F.3d 339 (6th Cir. 2005) (en banc), the Sixth Circuit overruled White v. Schotten, 201 F.3d 743 (6th Cir. 2000), and held that an Ohio Rule 26(B) application to reopen a direct appeal to raise an ineffective assistance of appellate counsel claim, is a post-conviction proceeding and not an extension of a defendant's direct appeal.  The court relied on Morgan v. Eads, 104 Ohio St.3d 142, 818 N.E.2d 1157 (Ohio 2004), where the Ohio Supreme Court resolved a conflict among the lower Ohio appellate courts on this question.  Because a Murnahan petition to re-open is a post-conviction proceeding, there is no federal constitutional right to the effective assistance of counsel to pursue these proceedings.  And since no federal constitutional right is implicated, there is no injury cognizable in a habeas corpus proceeding.  Lopez, 426 F.3d at 353.

Issa has not raised any substantive objections to the Magistrate Judge's cogent analysis.  The Court has reviewed that analysis and concludes that this claim cannot be addressed in this proceeding for the reasons explained in Lopez.  The Tenth Ground for Relief is therefore denied.

**Eleventh Ground for Relief**

Issa contends that his death sentence is unconstitutionally excessive or

disproportionate to the penalty imposed in other cases, particularly the sentences received by his death-eligible co-defendants Linda Khriss and Andre Miles. He alleges this outcome demonstrates that death penalty cases "are nothing more than a deadly lottery, in which whether a Defendant lives or dies depends on his particular attorneys, judge, prosecutors or jury." (Doc. 62, Third Am. Petition at ¶260.) He argues that his sentence therefore violates the Eighth Amendment's ban on cruel and unusual punishment.

Issa raised this ground for relief in his direct appeal, and the Ohio Supreme Court denied it on the merits. The Court rejected comparing Issa's sentence with those received by Khriss and Miles because neither of them received a death sentence, and because the records of their cases were not before the Court. Citing State v. Steffen, 31 Ohio St. 3d 111 (1987), the court held that the proportionality review required by Ohio Rev. Code 2929.05(A) "is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." State v. Issa, 93 Ohio St.3d at 72.[9]

Issa presents a viscerally appealing argument. This is reflected in his appellate lawyer's testimony that he was "somewhat offended by the fact that there was no rational relationship between what happened to the three people, at least from a penalty standpoint ... . But what we have right here is an individual that, in my mind, who was subordinate to the other two people but nonetheless had the most serious

---

[9] The dissent concluded that Issa's sentence was disproportionate to those of his accomplices, and that the Ohio Supreme Court's proportionality review is unfairly restricted by confining that review to death sentences. State v. Issa, 93 Ohio St.3d at 75-76 (Pfeifer, J., concurring in part and dissenting in part).

-63-

consequences imposed upon him." (Doc. 112, Evid. Hrg. Trans. at 28.)  But this Court's duty is to determine if the Ohio Supreme Court's decision is contrary to or an unreasonable application of federal law, based upon the record before that court at the time of its decision.  As already discussed, the United States Constitution contains no requirement for a proportionality review based upon sentences received by other similarly situated defendants.  See Pulley v. Harris, 465 U.S. at 42-44.

And in Getsy v. Mitchell, 495 F.3d 295 (6th Cir. 2007) (en banc), the Sixth Circuit rejected an Ohio petitioner's claim that he received a disproportionate sentence compared to that received by the instigator of a murder-for-hire scheme.  Getsy was the actual shooter in the scheme; he was found guilty and sentenced to death.  The instigator of Getsy's scheme, who was tried after Getsy, was found guilty but received a life sentence.  Here, the alleged instigator (Linda Khriss) was found not guilty; Andre Miles, who actually shot and killed both victims, received a life sentence while Issa received the death penalty.  The Sixth Circuit observed that when Supreme Court has struck down a death sentence based on Eighth Amendment proportionality, it has done so premised upon an evaluation of a specific defendant's culpability for the crime compared with the punishment that defendant received.  See Getsy, 495 F.3d at 305, and citing several such cases.  Moreover, Getsy noted that Ohio's statutory proportionality review "actually adds an additional safeguard beyond the requirements of the Eighth Amendment," citing a long line of cases rejecting various constitutional challenges to Ohio's procedure.  Id. at 306.  See also, Beuke v. Houk, 537 F.3d 618 (6th Cir. 2008), citing Getsy and rejecting petitioner's habeas proportionality claim that ten other defendants convicted of aggravated murder from the same Ohio county did

not receive the death penalty.

Whether or not Ohio's proportionality review would be more "fair" if it considered defendants who did not receive death sentences, or considered sentences received by accomplices and co-defendants, is not before this Court.  As the Sixth Circuit noted in Getsy, "This is not to say that the incongruous results from the separate trials of Getsy and Santine [the instigator] are not a matter of concern.  We share that concern, recognizing at the same time that reasonable people can disagree over the relative moral turpitude of the instigator of an assassination on the one hand and the killer hired to carry out the violent act on the other. Nevertheless, we are not empowered to answer this philosophical question by bypassing the limitations that both Congress and the Supreme Court have placed upon our power to grant relief under the circumstances of this case."  Getsy, 495 F.3d at 309.  This Court must conclude that the Ohio Supreme Court's decision rejecting Issa's proportionality claim is not contrary to federal law, nor is it an unreasonable application of federal law concerning proportionality review.  Issa's eleventh ground for relief is therefore denied.

**Twelfth Ground for Relief**

Issa claims he received ineffective assistance of trial counsel at the penalty phase of his trial, because his lawyers did not communicate with and properly direct the investigation of his mitigation specialist.  The state trial court granted Issa funds to retain this specialist, Jim Crates.  Issa argues that his lawyers failed to meaningfully  assist Crates in investigating Issa's background and potential avenues of mitigation evidence, particularly the "tribal truce" agreement between the Khriss and Issa families in Jordan, discussed previously.

This claim was raised in Issa's state post-conviction petition, supported by affidavits from Jim Crates and one of the trial jurors.  The trial court denied the petition without a hearing, which was affirmed by the Court of Appeals.  Regarding evidence of the "tribal truce" and the fact that Crates did not know about it until just before Issa's trial, the Court of Appeals concluded that Issa did not establish any prejudice from the lack of this evidence.  The court noted that none of Issa's family members had expressed a specific fear of the Khriss family, or a reluctance to assist Issa by testifying on his behalf.  (Apx. Vol. VII at 377-378.)

As the Court held above concerning Issa's Third, Fourth and Fifth Grounds for Relief, juror affidavits concerning perceptions of the trial are incompetent evidence and will not be considered.  Moreover, since the Ohio Court of Appeals rejected this claim on the merits and with Crates' affidavit in the record, Crates' testimony at the evidentiary hearing in this case should not be considered under Pinholster.  But even with that testimony, Issa's claim would fail.

Crates testified that he asked Issa's lawyer to retain a clinical psychologist to examine Issa, but that was not done.  Crates did not suggest what a psychologist might have added to the mitigation evidence that was presented.  Crates described his difficulties communicating with Issa's family members in Jordan due to language barriers and time differences.  He said that when Issa's mother and brother arrived in Cincinnati, it was clear to him they had no real understanding of why they were there, and only a "marginal understanding" of the procedures of an American death penalty trial.  (Doc. 113, Evid. Hrg. Trans. at  21-22.)   Crates testified that trial counsel did not participate in his telephone calls with Issa's Jordanian family members, and it was not

feasible for any member of the defense team to travel to Jordan to personally interview family members.  Crates' time records reflect several telephone calls he made to universities, attempting to locate a cultural expert to assist with presenting a mitigation theory.  He said Issa's lawyer rejected the idea of presenting such an expert as "too esoteric" and not necessary to Issa's defense.  (Id. at 31)

Crates also criticized trial counsel for their failure to use an independent translator to assist with their interviews of Issa's family, rather than rely upon Issa's cousin.  Crates asserted that trial counsel had a "hands off" approach to mitigation until just before that phase of trial began, and that he never had a personal meeting with counsel or the defense "team" until the evening prior to the hearing, when Issa's mother and brother were being prepared for their testimony.  He was concerned about the family's attitude toward retribution, and the discovery of the "tribal truce" heightened his concern that presenting these  witnesses to the jury was akin to walking in a "mine field."  (Id. at 45-46.)  Crates said that he did not see the actual "tribal truce" document until sometime during Issa's post-conviction proceedings.

As discussed above, Strickland cautions that ineffective assistance of counsel claims must be deferentially reviewed, and the Court must make every effort to evaluate a defense lawyer's performance without the "distorting effects of hindsight." Strickland v. Washington, 466 U.S. at 694.  Much of Crates' testimony amounts to his belief that "more could have been done" to assist him in his investigation, or that he would have "liked" to employ a cultural expert or a psychologist.  But Issa must also demonstrate that this failure to do more caused him actual prejudice.  He must establish a reasonable probability that his jury would have arrived at a different sentence.  As

discussed above, the Supreme Court has made it abundantly clear that it is not enough to argue that "more" mitigation evidence or witnesses should have been presented. See Bobby v. VanHook, supra, 558 U.S. at 18-19.  Absent any demonstration of what a psychologist's examination might have revealed, the mere failure to retain a psychologist does not warrant habeas relief.  It is not enough to argue that a more comprehensive investigation would have been better or perhaps more helpful. Speculation about additional investigative efforts and whether they might have altered the trial result does not establish actual prejudice.  See Wiles v. Bagley, 561 F.3d 636, 641 (6th Cir. 2009), rejecting an argument that trial counsel failed to fully investigate petitioner's head injury sustained twelve days before the murder.  The Sixth Circuit held that mere speculation of what might have been uncovered by a neurologist or by further psychological testing failed to establish prejudice under Strickland.

Crates asserts that the family's fear of retribution was a significant impediment to securing assistance from Issa's family.  But his testimony described problems caused by distance, the time zone difference, and the fact that all but one of the Jordanian family members spoke no English.  Crates also admitted that he discovered

> ... some disgust on the part of the family that Mr. Issa was allegedly involved in this kind of behavior, and it was suggested to me that, you know, if in fact he was found guilty of this, there would be – you know, he would bring - the family might just throw up their hands and abandon him.  So it was a very fine line I was walking to make sure that I was not misleading them in any way, but also being vague enough that they wouldn't make any predeterminations prior [to] my getting them on U.S. soil to testify.

(Doc. 113, Evid. Hrg. Trans. at 38.)  While all of these obstacles may have been difficult, they do not reflect any reluctance on the part of the family to assist Crates because of

-68-

threats of retribution.  Moreover, as the Ohio Court of Appeals correctly observed, "not one family member stated in their affidavits that they would not have testified on Issa's behalf because of the fear of retribution.  To the contrary, they all stated that if defense counsel had asked them, they would have testified."  (Apx. Vol. VII at 378.)  Issa does not explain how the earlier discovery of the tribal truce document would have led to any significant and different mitigating evidence that his counsel failed to discover and would have used.

Issa's Third and Fourth Grounds for Relief discussed above contend that counsel failed to adequately investigate and present the available mitigation evidence, grounds which this Court has already rejected.  This claim, arguing that trial counsel failed to more significantly interact with his mitigation specialist in order to develop and present mitigation evidence, is also rejected.  For the reasons discussed above, the Court finds that Issa has not demonstrated that this alleged failure actually prejudiced his defense.

**Thirteenth Ground for Relief**

Issa contends in this ground for relief that he was incompetent to stand trial, and therefore his prosecution violated the Sixth and Eighth amendments.  He argues that he was unable to understand spoken English, which left him unable to meaningfully consult with and assist his lawyers, and denied him a "rational as well as factual understanding of the proceedings, including testimony, against him."  (Third Am. Petition at 68, ¶279.) Issa raised this claim in his direct appeal, and the Ohio Supreme Court addressed his language ability in the context of Issa's ineffective assistance of counsel claim, based on his lawyer's failure to raise the competency issue in the trial court.  The Supreme Court noted that Issa's unsworn statement to the jury

> ... demonstrated that he understood and could speak English well. ... Furthermore, [Issa] was clearly intelligent, having completed two years of college in Jordan before emigrating to the United States.  For these reasons, [Issa] was clearly capable of understanding the nature and objective of the proceedings against him and assisting in his own defense.

State v. Issa, 93 Ohio St.3d at 67-68.  Issa also raised this issue in his post-conviction petition but the Court of Appeals did not address it, finding it was barred by Ohio's res judicata rule.  (Apx. Vol. VII at 378.)

This Court agrees with the Magistrate Judge's conclusion that the Ohio Court of Appeals misapplied Ohio's res judicata rule, because the substantive question of Issa's competency to stand trial differs from his ineffective assistance of counsel claim based on a failure to challenge his competency.  See, e.g., White v. Mitchell, 431 F.3d 517, 526 (6th Cir. 2005), finding that where two similar claims are based on different legal theories, exhaustion of one does not exhaust the other, and citing Prather v. Rees, 822 F.2d 1418, 1421 (6th Cir. 1987).  The competency claim which Issa raised on direct appeal but was not specifically addressed by the Ohio Supreme Court is therefore preserved for review here.

However, the record fails to support the merits of this claim.  The only evidence suggesting that Issa lacked an adequate understanding of English is his own post-hoc, unsworn affidavit.  The Ohio Supreme Court cited his unsworn statement to the jury during the mitigation hearing as further evidence of his English-speaking abilities. The Court has reviewed that statement (see Trial Trans. Vol. VII at 1574-1580), and agrees with that conclusion.  Moreover, Issa's education records submitted with his post-conviction petition show that he studied English in Jordan and received passing grades.

-70-

(Apx. Vol. III at 184-187.)  And in this proceeding, his trial counsel, his appellate

counsel, and his mitigation specialist all testified that they had no problems

communicating with him in English.  Issa has not shown that he was incompetent due to

a lack of English comprehension, and this ground for relief is therefore denied.

**Fourteenth Ground for Relief**

Issa contends that his trial lawyers were ineffective by failing to conduct an

adequate and reasonable investigation into juror bias during voir dire, and by failing to

present evidence and arguments that would counterbalance those biases.  He contends

that his constitutional rights under the Fifth, Sixth and Eighth Amendments were violated

as a result.  Issa raised this claim in his post-conviction petition and the trial court

rejected it, noting that trial counsel did question the jury venire about potential biases

against Muslims and Arabs.  (Apx. Vol. V at 310.)  The court of appeals affirmed, noting

that "[Issa] did not demonstrate that any particular juror was biased against him

because of his nationality.  Generalized assertions in an affidavit that American jurors in

general have biases against Arabs are insufficient to demonstrate prejudice."  (Apx. Vol.

V at 379.)

There is a fundamental constitutional right to a neutral and impartial jury.  In Ham

v. South Carolina, 409 U.S. 524 (1973), the Court vacated a defendant's drug

possession conviction because the trial court had refused his request to question the

jury about racial bias.  The defendant was a lifelong resident of Florence County, South

Carolina (described in the Court's opinion as "a young, bearded Negro").  He was well

known for his civil rights work with the Southern Christian Leadership Conference and a

local civic committee, and had never been convicted of a crime.  He argued that local

law enforcement officers "set him up" on drug possession charges because of his civil rights activities.  He requested the trial court to ask the jury venire two questions on the subject:  "1.  Would you fairly try this case on the basis of the evidence and disregarding the defendant's race?  2. You have no prejudice against negroes?  Against black people?  You would not be influenced by the use of the term 'black'?"  Ham, 409 U.S. at 526 n. 2.  The trial court refused his request, and the jury convicted him of possession of marijuana.  The Supreme Court reversed Ham's conviction, citing Aldridge v. United States, 283 U.S. 308 (1931), which recognized a right of a "negro" defendant accused of killing a white policeman to have the trial court question the jurors about racial prejudice.  The Court found that an inquiry into racial prejudice is firmly grounded in the Fourteenth Amendment.

In Ristaino v. Ross, 424 U.S. 589 (1976), a black defendant was charged with armed robbery, assault and battery of a white security guard.  The trial court denied his request to inquire about racial prejudice, finding that standard instructions and the juror's oath both required impartiality.  At least one prospective juror admitted to racial bias during voir dire, and was excused.  After defendant's conviction was affirmed, he was granted habeas relief because the trial court refused to question the entire panel about bias.  The Supreme Court reversed, holding that Ham did not announce "a requirement of universal applicability," and rejecting a per se rule requiring voir dire on racial prejudice any time the race of a victim and a defendant differed.  The Court did note that "the wiser course generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant."  Id. at 598, n.9.

And in Turner v. Murray, 476 U.S. 28 (1986), the Court considered a claim by a

-72-

black defendant sentenced to death for the murder of a white storekeeper.  The trial court refused the defendant's request to question the jury venire about racial prejudice, because the prospective jurors did not know the race of the victim. The Supreme Court reversed the lower courts' denial of habeas relief, noting that capital sentencing proceedings may create a "unique opportunity for racial prejudice to operate but remain undetected." Id. at 35.  The majority opinion noted that there is plainly a risk of racial prejudice whenever a crime involves interracial violence, and that "the only question is at what point that risk becomes constitutionally unacceptable." Id. at 38, n.8.  The Court held that the trial court's denial of defendant's request to ask the prospective jurors about racial prejudice violated the defendant's constitutional right to an impartial jury.

Here, Issa is a step removed from the defendants in Ham, Ristaino, and Turner. He does not assert an error by the trial court: he asserts ineffective assistance of counsel because his lawyer did not ask the trial court to question the venire about bias, and did not voir dire the potential jurors in a manner he believes was sufficient to uncover any such bias.  Thus the issue is not only whether the circumstances of the case demonstrate a likelihood of juror bias against Issa; the Court must also apply Strickland to determine if counsel's lack of questioning resulted in actual prejudice.

In his amended petition, Issa contends that potential juror bias was clearly a danger based upon his nationality; a bomb scare that apparently required evacuation of the county courthouse on the first day of his trial; and the terrorist fears that existed nationally at the time of his trial. The 1998 American embassy bombings in Kenya and Tanzania occurred just two weeks before his trial started, and the courthouse bomb threat took place when prospective jurors were completing their questionnaires.  He

contends that any juror's general statement about his or her ability to remain impartial is plainly insufficient against that backdrop of factors. And he contends that his trial counsel ignored all of those events, as well as his "stereotypical" appearance, during voir dire. He cites repeated references by both the prosecutor and his own lawyer to "Arabian" nationality, race, culture or countries, even though the term is a misnomer.[10] He argues that his trial counsel made no attempt to acquaint the jury with the rich cultural history of both Middle Eastern culture and the Islamic religion.

During voir dire, one juror described spending two weeks in Gaza with a medical relief operation. She described her time in Gaza as a "... real eye-opener. I have never traveled abroad before. I led a sheltered life. It was very different, but if I did or didn't agree with things, I had to respect them; that's their culture. It's not for me to say that it is right or wrong. That's their culture, their religious beliefs and their political beliefs." (Trial Trans. Vol. II at 459.) Issa complains that his lawyer did not ask follow-up questions after these statements, to probe whether the juror's statements regarding "their" beliefs or "their" culture indicated some bias that might cause this juror to treat Issa differently.

The state questioned the potential jurors about anti-Arabian or anti-Jordanian bias. (Trial Trans. Vol. II at 342-343.) The prosecutor asked if they all agreed that an Arabian national should be tried under the same laws as everyone else, and no one disagreed. (Id. at 366.) Defense counsel also asked the entire panel:

> Do you understand that there is still some unconscious

---

[10] Issa's family is Palestinian, originally from Gaza; his parents left Gaza some years ago and eventually settled in Jordan.

association that people make in their mind and in giving everything a word association:  With the word "Arab," how many do you think would say "terrorists," a word that pops into your mind especially with some things we have had in the news lately.  Those kind of things we don't think about consciously, but then, we would condemn them.  If somebody else says that all Arabians are terrorists, they should be thrown out of the country, it is still very important to the way you think about something.

Do you think that the fact that Mr. Issa is a Jordanian makes you more likely to carry an automatic weapon? [sic]

Prospective Juror:   No.

[Defense counsel]: Do you think that that should be taken into account at all?

[Prospective juror]: Being an Arab?

[Defense counsel]:   Yes.

[Prospective juror]: No.

...

Defense counsel then questioned another juror about comments about Arabs being "extreme."  The juror responded:

... their culture is so different from ours, maybe they have started on a different base line than I do.  I don't feel from what I have heard so far it really matters that much.

[Defense counsel]: There's no allegations here that this is a terrorist act or there's any political or religious motivations.  Do you understand that?

Do you understand that it would not be fair to allow those feelings and beliefs in, in light of the press coverage we have seen in some of the cases.  These are very legitimate feelings and something that might be in the back of the mind with a lot of people; but this particular case, and this particular individual, you have to judge on the evidence from the witness stand and the evidence presented in this courtroom and not on the stories on the five o'clock news

> whether it be about that case or whether it be about
> something else in general, about a particular nationality or
> race or religion. ...

(Id. at 437-438.)

Strickland sets a high standard Issa must meet to sustain this claim of ineffective

assistance.  In view of the extent of voir dire that was actually conducted, the Court

concludes that Issa has not shown that the state court's decision on this issue was an

unreasonable application of federal law.  And assuming that the evidentiary hearing

testimony in this case should even be considered, defense counsel Agar's testimony

makes it clear that her decisions with respect to voir dire were strategic ones.  She

testified that she believed being an Arab citizen is "a fairly strong negative" especially in

a "conservative county" like Hamilton County.  (Doc. 112, Evid. Hrg. Trans. at 97.)

When she was asked how she would have more thoroughly prepared the jury panel for

the fact that Issa's mother did not speak English and would be wearing traditional

garments and a veil, she responded:

> Apart from the fact that the jury was aware of the fact that all
> of the people involved here, not just Mr. Issa but almost all of
> the witnesses, the victims and the prosecutor's witnesses
> were Arab-Americans, I don't know how else we would have
> prepared them for that fact. **We certainly didn't want to
> spend a great deal of time in voir dire in a discussion of
> the Arab culture and terrorism and bombings and things
> like that because we thought all that was going to do
> was reemphasize to the jury the differences**.

Id. at 152 (emphasis added).  Counsel's reasoned and considered decision not to

further question the panel is entitled to deference under Strickland.  This claim is

therefore denied.

**Fifteenth Ground for Relief**

For his fifteenth ground, Issa contends that his rights under Article 36 of the

Vienna Convention on Consular Relations were violated, because law enforcement

authorities failed to contact the Jordanian Consulate after his arrest.  He argues this

failure amounts to structural error that violated his constitutional rights. Article 36 of the

Vienna Convention states that law enforcement authorities "shall" inform "without delay"

an arrestee who is a foreign national of his rights to freely communicate with and seek

the assistance of his Consulate.

Issa raised this issue as his first claim in his direct appeal to the Ohio Supreme

Court, arguing that the treaty violation rendered his post-arrest statement to the police

inadmissible.  The Ohio Supreme Court assumed that a treaty violation occurred.  But

because Issa failed to raise the issue before trial, the court reviewed only for plain error.

Under that standard, the court found that the testimony of Cincinnati Police Officer

Feldhaus about Issa's post-arrest statement did not affect the outcome of the trial, and

its admission was harmless.  Officer Feldhaus questioned Issa after his arrest; he

testified that Issa had denied any involvement in the murders, and told Feldhaus that

after closing the store that night, he put Maher's keys under his truck, drove his mother

home, and then went with Souhail Gammoh to a bar.  Gammoh testified that Issa told

him not to tell the police that approximately 30 minutes elapsed between the time Issa

dropped Gammoh off at his apartment, and the time that Issa returned to pick him up to

go to the bar.  The Ohio Supreme Court noted that the jury could have found that

Gammoh's testimony suggested that Issa was being deceitful with Feldhaus, and not

simply mistaken about the timeline of events that evening.  The court also held that the

rest of the evidence was so strong that it could not conclude that the outcome would

have been different if Issa's statements to Feldhaus had been excluded.  See State v.

Issa, 93 Ohio St.3d at 56-57.

The Ohio Supreme Court also rejected the argument of the National Association

of Criminal Defense Lawyers (which filed an amicus brief on Issa's behalf), that the

Jordanian consulate would have offered more substantial assistance with mitigation

evidence by providing more complete educational records, or by procuring a Jordanian

exit visa for Issa's other brother.  The court found that this information would not have

added significantly to the weight of the mitigating evidence that was before the jury.

In his habeas petition, Issa urges this Court to adopt an exclusionary remedy for

the treaty violation which the Ohio Supreme Court assumed occurred.  He relies in

particular on the dissent in his direct appeal, which would have held that the treaty

violation was tantamount to structural error that infected Issa's entire prosecution and

trial.  State v. Issa, 93 Ohio St.3d at 76 (Lundberg Stratton, J., dissenting).

The Magistrate Judge concluded that this claim was procedurally defaulted, as

the Ohio Supreme Court reviewed only for plain error and enforced Ohio's res judicata

rule.  (See Doc. 134 at 8-11)  Issa initially did not object to this conclusion.  (Doc. 138 at

1)  However, in his objections to the Magistrate Judge's final corrected report (Doc. 148

at 69-83), Issa contends that the Ohio Supreme Court's statement that "each" of his

claims was reviewed and that none justified reversal of his conviction, is effectively a

ruling "on the merits" of each and every one of his claims.  This Court disagrees; the

paragraph Issa relies on from the court's opinion summarizing the ultimate outcome of

Issa's appeal is just that, a summary; it is not a discussion of the merits of any of his

claims. The court simply stated that none of the claims "justifies reversal" of Issa's

conviction. See <u>State v. Issa</u>, 93 Ohio St.3d at 54.

Issa then argues that while the Supreme Court used the term "plain error review,"

in reality the Court reviewed this claim on the merits. In reviewing a claim of error that

was not brought to the attention of the trial court, Ohio law

> ... places three limitations on a reviewing court's decision to
> correct an error despite the absence of a timely objection at
> trial: (1) there must be an error, i.e., a deviation from a legal
> rule, (2) the error must be plain, so that it constitutes an
> obvious defect in the trial proceedings, and (3) the error
> must have affected substantial rights such that the trial
> court's error must have affected the outcome of the trial.

<u>State v. Barnes</u>, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) (internal quotations

omitted). The decision to correct a plain error is discretionary and should be made "with

the utmost caution, under exceptional circumstances and only to prevent a manifest

miscarriage of justice." <u>Id</u>. (internal citation omitted). The Ohio Supreme Court cited

this rule and assumed that an appropriate remedy for the treaty violation would have

been the exclusion of Issa's statement to Feldhaus. Given those assumptions,

however, the Court found that any error in admitting the testimony did not affect the

trial's outcome, especially in view of the weight of the other evidence against Issa.

While the Supreme Court discussed the issue in some depth, the Court cannot

conclude that the court ignored Ohio's well-established plain error rules and the res

judicata doctrine it specifically cited in its opinion. The concurring justices' opinion

supports this conclusion, as they would have rejected even plain error review, citing

<u>United States v. Olano</u>, 507 U.S. 725 (1993). Ohio's res judicata rule has been upheld

as an independent and adequate state procedural ground for denying habeas relief,

absent cause and prejudice. See Coleman v. Mitchell, 268 F.3d 417, 427 (6th Cir. 2001). And a state court's plain error review does not amount to a waiver of procedural default rules. See Cooey v. Coyle, 289 F.3d 882, 897 (6th Cir. 2002).

Issa does not demonstrate cause for the default of this issue, nor does he articulate any resulting actual prejudice. He suggests that ineffective assistance of his trial counsel caused the default, but that claim is not preserved for habeas review. It was not raised in his direct appeal nor in his post-conviction petition, and he does not assert this failure as a ground for relief with his other ineffective assistance of trial counsel claims included in this proceeding.

In any event, as the Magistrate Judge noted, Supreme Court precedent forecloses Issa's claim. In Breard v. Greene, 523 U.S. 371 (1998), the Supreme Court held that a similar claim brought by a foreign national defendant was procedurally defaulted, based on the general rule that treaties are subject to the procedural rules of the forum state. This holding was reaffirmed in Sanchez-Llamas v. Oregon, 548 U.S. 331 (2006), where the Court held that neither the terms of the Convention, nor a subsequent opinion from the International Court of Justice,[11] holding that the United States violated the Convention which precluded the application of state procedural default rules to 51 convicted Mexican nationals, justified revisiting Breard. The Supreme Court observed that procedural default often bars a habeas petitioner from raising federal constitutional claims, and the defaulted petitioner in that case offered no cogent reason to analyze treaty claims differently.

---

[11] Case Concerning Avena and Other Mexican Nationals (Mex. v. U. S.), 2004 I.C..J. 12 (hereinafter "Avena").

The Court then addressed petitioner Sanchez-Llamas' treaty claim, because unlike the other petitioner, he had timely raised his Vienna Convention claim in a motion to suppress filed in the state trial court. The court assumed without deciding that Article 36 granted individual rights to Sanchez-Llamas that had been violated by the state. But the court held that it had no authority to impose an exclusionary remedy for such a violation upon the states, absent a self-executing treaty that was binding under the Supremacy Clause. It also found that suppression of the defendant's statements given without consular notification would be inappropriate:

> Article 36 has nothing whatsoever to do with searches or interrogations. Indeed, Article 36 does not guarantee defendants any assistance at all. The provision secures only a right of foreign nationals to have their consulate informed of their arrest or detention--not to have their consulate intervene, or to have law enforcement authorities cease their investigation pending any such notice or intervention. In most circumstances, there is likely to be little connection between an Article 36 violation and evidence or statements obtained by police.

Sanchez-Llamas, 548 U.S. at 349.[12]

And in Medellin v. Texas, 552 U.S. 491 (2008), the Court again considered a Vienna Convention claim, this time brought by a state death penalty habeas petitioner. Medellin had first raised his treaty claim in his state post-conviction application, where it was denied as procedurally defaulted under state law. His habeas claim was denied on the same basis, and the Fifth Circuit affirmed, relying on Breard. While Medellin's

---

[12] The Court also observed that shortly after the ICJ's decision in Avena, the United States withdrew from the Optional Protocol concerning disputes under the Vienna Convention. That Protocol, ratified in 1969 along with the Convention, states that disputes "arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction" of the ICJ.

habeas appeal was pending, the ICJ issued its <u>Avena</u> decision. Medellin was one of the 51 Mexican nationals specifically discussed in <u>Avena</u>. After <u>Avena</u>, President Bush issued a memorandum to his Attorney General, directing that the United States would "discharge its international obligations ... by having State courts give effect" to the decision in <u>Avena</u> in each of the 51 cases involving Mexican nationals. (<u>Id</u>. at 503.) Medellin then filed a second state post-conviction application, which the Texas state court dismissed, holding that neither the ICJ's decision in <u>Avena</u> nor the Presidential Memorandum was "binding federal law" that trumped the state's procedural rules. The Supreme Court granted certiorari and affirmed, concluding that neither <u>Avena</u> nor the President's Memorandum were directly enforceable federal law that would prevent the application of state procedural limits on filing successive habeas petitions.

Given these recent Supreme Court decisions, this Court must conclude that Issa's Vienna Convention claim is procedurally defaulted. Assuming that Issa has individual rights under Article 36 that were violated, those rights cannot be enforced by this federal habeas court when doing so would trump state procedural law that is consistently applied by the Ohio courts, and was actually applied during Issa's appeal. For the same reasons, the Court rejects Issa's contention that the treaty violation amounts to structural error. Structural errors are those that "defy analysis by harmless error standards because they affect the framework within which the trial proceeds, and are not simply an error in the trial process itself." <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 148 (2006) (internal quotations and citations omitted). Such errors include the denial of legal representation; the denial of a public trial; or giving a jury defective reasonable-doubt instructions. <u>Id</u>. (citing cases). Issa's treaty violation claim does not

rise to that level of constitutional error. Nor does it defy analysis under plain error standards, as the Ohio Supreme Court found. That decision was not an unreasonable application of federal law, and this ground for relief is therefore denied.

**Sixteenth Ground for Relief**

Issa contends he was denied the effective assistance of trial counsel because they failed to retain an independent firearms expert, a criminal investigator, and a crime scene expert. He also contends that his trial counsel failed to file a motion to suppress the evidence found in his apartment, one bullet of the same caliber as that used in the murder weapon.

Issa argued on direct appeal that he had been unable to adequately defend himself because a lack of funds prevented him from retaining investigators and a forensic pathologist. The Ohio Supreme Court noted that the trial court granted Issa's request for funds to retain a mitigation specialist, a translator, and for travel and lodging expenses for Issa's family members who came from Jordan. But no request had been made to the trial court for the experts he argued on appeal were necessary. Since no request had been made, the Supreme Court reviewed for plain error. Under that standard, Issa failed to establish that (1) there was a reasonable probability that the additional experts would have aided his defense, and (2) a lack of funds resulted in an unfair trial. Even if a request for funds had been timely made, the court held that the trial court would have been justified in denying it. The court also rejected his ineffective assistance of trial counsel claim on this ground for the same reasons. State v. Issa, 93 Ohio St. 3d at 63, 68.

Counsel's failure to file a motion to suppress was also raised on direct appeal.

The Supreme Court noted that because the issue had not been raised in the trial court, the record was silent as to the basis for the search warrant for Issa's apartment.  But the court found that by the time police executed the search, "... they had probable cause to do so.  By that time, police had talked to Bonnie and Joshua regarding Miles's confession implicating [Issa], arrested Miles and obtained his confession, and recovered the murder weapon and ammunition clip."  State v. Issa, 93 Ohio St.3d at 68.  The court alternatively concluded that even if the bullet had been excluded, the result would not have been different because other more compelling evidence linking Issa to the murder weapon was introduced through the testimony of Howard, who saw Issa with a rifle, and through the testimony of Bonnie and Josh Willis.

This ground for relief was not included in Issa's state post-conviction petition, and thus no evidence dehors the record was presented to the state court, such as an affidavit from a firearms expert, a crime scene expert, or some facts demonstrating that a motion to suppress the search warrant may have had merit.  Issa does not present any evidence on these issues in this case.  Any meaningful assistance these additional experts might have provided, and the absence of which resulted in an unfair trial, is a matter of pure speculation.  The same conclusion applies with respect to the failure to file a suppression motion.  The Court therefore denies this ground for relief.

**Seventeenth and Nineteenth Grounds for Relief**

In his seventeenth claim, Issa contends that the indictment against him was returned by an improperly constituted grand jury due to its discriminatory racial composition.  His nineteenth claim argues that the selection process for grand jury foremen in Hamilton County, Ohio is biased geographically, racially, and socio-

economically.  Issa raised these claims in his direct appeal, and the Ohio Supreme

Court held they were waived because they had not been raised at trial, citing State v.

Williams, 51 Ohio St.2d 112, 364 N.E.2d 1364 (Ohio 1977).  The Court also observed

that the argument would fail even if it had been preserved, because the use of voter

registration lists to select grand jurors was found to be constitutional in State v. Moore,

81 Ohio St.3d 22, 689 N.E.2d 1 (1998).  With respect to the grand jury foremen

selection process, the Court held that the claim was not supported by any evidence in

the record.  See State v. Issa, 93 Ohio St.3d at 61-62.

Issa also raised the grand jury foreman claim in his state post-conviction

proceeding as his twenty-first claim for relief.  The Ohio Court of Appeals held that the

statistical evidence he provided to support this claim existed at the time of trial and

could have been presented to the trial court.  Therefore, applying State v. Perry, 10

Ohio St.2d 175, 226 N.E.2d 104 (1967), Ohio's res judicata rule barred review of the

question.

Issa's Traverse Brief argued that any default or res judicata bar on both of these

issues was due to ineffective assistance of trial counsel.  But that contention has not

been preserved for review, because Issa did not raise an ineffective assistance claim on

these grounds in **any** prior proceeding.  He also suggests that the Ohio Supreme Court

did not actually enforce the procedural rule, and addressed his grand jury claims on the

merits.  This Court disagrees: the Supreme Court explicitly held that Issa had "waived"

both of these claims.  The Court's alternate, "even if" discussion (referring to State v.

Moore and observing that Issa lacked evidence to challenge the foreman selection

process) cannot be considered a decision on the merits.  These claims are not properly

-85-

preserved for habeas review.

Even if this Court were inclined to find that the claims are not waived because the state court briefly addressed them, Issa has not demonstrated a basis for relief. The materials submitted with Issa's post-conviction petition include a June 29, 1998 affidavit of Kimberlee Gray, a private investigator who previously worked for the Ohio Public Defender's office. She states that in twenty-one cases involving Hamilton County death penalty prosecutions, 19 of 21 grand jury foremen were white, and 2 individuals could not be located. (Apx. Vol. V at 68-71.) Issa submitted voluminous pages of lists of county grand jurors from January 1985 through December 1990, but with no analysis of how these individuals were chosen. (Apx. Vol. V at 72-303.) He submitted a Spring 1998 report from the NAACP Legal Defense and Education Fund on death row inmates by race and gender, along with state-by-state statistics on the imposition of the death penalty; and a 1997 Annual Report from the Ohio Public Defender's Office along with several 1993 newspaper articles, noting that Hamilton County sent more individuals to "death row" than any other county in the state. (Apx. Vol. V at 349-383.)

None of these materials support a proper constitutional challenge to the selection of the grand jury that actually returned the indictment against Issa. In order to establish a presumption of a discriminatory selection process, Issa must come forward with some evidence establishing under-representation of his identifiable group. See Castaneda v. Partida, 430 U.S. 482, 494 (1977). See also, Jefferson v. Morgan, 962 F.2d 1185, 1191 (6th Cir. 1992), holding that a defendant must show under-representation and a potentially discriminatory selection process, or systematic, long-term under-representation. Statistics concerning Hamilton County's rate of death penalty

convictions do not establish any discriminatory grand jury selection process, nor suggest a systematic or long-term under-representation of minorities in general or of Arab-Americans in particular.  Issa has failed to satisfy either prong of the Jefferson test, and his claim would be denied even if it had been properly preserved.

**Eighteenth Ground for Relief**

Issa's eighteenth ground for relief argues that prejudicial publicity both before and during his trial violated his constitutional rights to a fair trial and sentencing hearing. This claim was presented on direct appeal, but the Ohio Supreme Court found it had been waived by Issa's failure to move for a change of venue prior to trial, citing State v. Campbell, 90 Ohio St.3d 320, 336, 738 N.E.2d 1178 (2000).  The Court also noted that there was nothing in the record to support his claim.  Only one juror stated during voir dire that he recalled some publicity about the crimes.  On one occasion during the trial, the trial court specifically inquired if anyone on the jury had obtained any information about the case other than in the courtroom, and no juror responded affirmatively.  (Trial Trans. Vol. V at 1085.)  The trial judge also repeatedly admonished the jurors to avoid reading or hearing about the case.

As with the other defaulted claims discussed above, the Court concludes this claim is not properly preserved for habeas review.  Even if it were preserved, Issa offers no evidence of the allegedly prejudicial pre-trial publicity.  He suggests that "widespread" media coverage "saturated" the community prior to his trial, but there is simply no evidence in the record supporting this assertion.  This claim is therefore denied.

**Twentieth Ground for Relief**

Issa contends that his constitutional rights to a proper defense were infringed by the trial court's failure to provide funds to hire additional investigators to assist him.  He notes that numerous law enforcement officers and the county medical examiner testified for the state, but that he lacked funds for appropriate investigators who could uncover evidence to challenge their testimony.  Issa raised this claim as his ninth claim on direct appeal.  The Ohio Supreme Court rejected it, first noting that Issa did not ask the trial court for funds for any investigator.  The Court also stated:

> Moreover, in State v. Mason (1998), 82 Ohio St. 3d 144, 694 N.E.2d 932, syllabus, we held that due process "requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial."  The circumstances surrounding this case do not support [Issa's] assertion that the lack of these experts resulted in an unfair trial.

> The cause of Maher's death was clear, and the crime scene evidence did not suggest justifiable homicide.  In addition, the fact that Miles was the actual killer was not in question.  Moreover, the record reveals a thorough, professional, and well-documented autopsy and police investigation.  For these reasons, [Issa] would have been unable to make the particularized showing required by Mason.  Thus, if [Issa] had filed a motion for funds for these experts the trial court would have been justified in denying it.

> For the foregoing reasons, [Issa's] ninth proposition of law is overruled.

State v. Issa, 93 Ohio St.3d at 63.

As the Magistrate Judge concluded, this discussion leaves some doubt as to the basis for the Supreme Court's decision.  In contrast to other claims that the Court clearly

and explicitly stated had been waived and which were reviewed for plain error, here the Court cited the substantive due process analysis from State v. Mason, and actually applied that analysis. The Court did not clearly and expressly rely on waiver or res judicata.

Assuming the claim is reviewable here, Issa has failed to adequately demonstrate how the absence of these additional investigators actually hampered his defense. He suggests that an investigator would have interviewed Linda Khriss, or taken pictures of the Willis' backyard (perhaps to test their assertion that they saw a white plastic bag through a window in their home). He suggests that a crime scene investigator could have determined the manufacturer of the gun, or of the six cartridges found at the murder scene. But Issa does not explain what these efforts would have yielded with respect to his defense or his sentence. As the Supreme Court noted, the cause of Maher's death was clear, and the identity of the gun manufacturer would have been irrelevant to Issa's guilt or innocence. Issa did not submit any evidence dehors the record on this issue with his state post-conviction petition, such as photos of the Willis' backyard, or any suggestion that an investigator's interview of Linda Khriss would have yielded helpful evidence. And he presented no evidence on this issue in this proceeding.

Therefore, this Court cannot conclude that the Ohio Supreme Court's decision is contrary to or an unreasonable application of federal law. This claim for relief is therefore denied.

**Twenty-First Ground for Relief**

Issa contends that the trial court's admission into evidence of "gruesome,

inflammatory and cumulative photographs" prejudiced his defense and denied him a fair trial.  He raised this issue on direct appeal; the Ohio Supreme Court reviewed the photographs of the murder victims that were admitted in Issa's trial, most taken at the crime scene and a few at the morgue.  The court described the photos as showing the victims in the parking lot, lying on their backs with bare chests visible.  Trial Exhibits 3, 4, 5, 6, 30 and 31 were described as having been taken several feet away from the bodies, and the court found they were not gruesome.  Two of the photographs, Trial Exhibits 7 and 8, were close views of Maher's body.  Issa's counsel objected to the admission of both of these, arguing that No. 8 was a particularly gruesome photo: "It does not depict the body in the way it was when [police medics] arrived on the scene.  There is obvious signs of treatment [sic], because an airway is placed in the mouth and some other apparatus apparently on the chest. ... It is rather gruesome... ."  (Trial Trans. Vol. VI at 1334.)  The trial court overruled this objection, because the photo in question showed a gunshot wound to Maher's hand that several witnesses had testified about, and because the photograph had already been used during the coroner's testimony to the jury.  The Ohio Supreme Court affirmed the trial court's ruling, finding the photo also assisted the jury in evaluating Issa's theory (argued in closing by his lawyer) that the location of the fatal wound demonstrated that Miles could not have been intent on killing Maher.  State v. Issa, 93 Ohio St.3d at 65.

These photographs are not in the record before this Court.  Based on the descriptions provided by Issa's counsel in the trial transcript and in the Supreme Court's opinion, Exhibits 7 and 8 may have been disturbing or shocking.  But Issa has not directly addressed the Supreme Court's conclusion that their admission did not

prejudice his defense, and that the photos assisted the jury in applying and understanding some of the trial testimony. Claims of erroneous admission of evidence are not generally cognizable in a habeas proceeding "... unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." Biros v. Bagley, 422 F.3d 379, 391 (6th Cir. 2005) (internal citations omitted), affirming the denial of habeas relief based on admission of decidedly gruesome photographs of the victim (whom defendant had killed and then dismembered). The court found that the photographs were relevant to the defendant's contention that he accidentally killed the victim.

Issa has not demonstrated that the admission of the two photographs denied him a fair trial, or that the decision of the Ohio Supreme Court rejecting this claim was contrary to or an unreasonable application of federal law. This ground for relief is therefore denied.

**Twenty-Second Ground for Relief**

Issa contends that the Ohio death penalty sentencing procedure, under which a capital defendant must prove the existence of a mitigating factor by a preponderance of the evidence, is unconstitutional. He argues that "all relevant mitigating evidence" should be weighed against the statutory aggravating circumstances. The Ohio Supreme Court summarily rejected this argument in Issa's direct appeal, citing Delo v. Lashley, 507 U.S. 272, 275-276 (1993), and State v. Jenkins, 15 Ohio St.3d 164, 171, 473 N.E.2d 264 (1984). Issa admits that the preponderance standard was found to be constitutionally acceptable by the United States Supreme Court in Delo. His petition states that he wishes to preserve this issue in the event the United States Supreme

-91-

Court should reconsider or revisit this question.  (Doc. 62, Third Am. Pet., p. 88 at

¶360.)  This ground for relief therefore needs no extended discussion, and it is denied.

**Twenty-Third Ground for Relief**

Issa contends that the trial court's instructions to the jury in the sentencing phase

of his trial created an unconstitutional presumption in favor of death.  Issa's trial counsel

did not object to the instructions on this basis, and this claim was not raised on direct

appeal.  Issa's post-conviction petition raised this claim, and both the trial court and the

Court of Appeals found it was barred by Ohio's res judicata rule.

The Court must conclude that this claim of error in jury instructions is defaulted,

as the Ohio Court of Appeals plainly concluded.  The Court notes that the Magistrate

Judge's initial Report and Recommendation on procedural issues analyzed at length the

procedural default issue, and rejected Issa's assertions that the claim was preserved.

(See Doc. 134 at 17-20.)  The Court has carefully reviewed that analysis and adopts it

here.  Issa failed to timely raise this claim on direct appeal, and he may not argue

ineffective assistance of counsel in this case in an attempt to resuscitate it.  And even if

the claim is not defaulted, Issa has failed to demonstrate a basis upon which habeas

relief might be granted.  To support this claim, Issa submitted a September 1994

affidavit of Michael Geis with his state post-conviction petition.  (Apx. Vol. III at 217-

252.)  Geis, a Professor of Linguistics, offered a lengthy exposition on what he asserts

are shortcomings in the standard Ohio Jury Instruction on aggravating and mitigating

factors.  There is nothing in the Geis affidavit that ties his general critique to the facts of

Issa's case, and most of his observations are very broad and somewhat vague.  As but

one example, Geis states that a prosecutor "may" draw the attention of the jury to

improper considerations.  (Id. at 220-221.)  But neither Geis nor Issa contend that this actually occurred during Issa's trial.

Issa also cites Geis' critique of the "catchall" factor of Ohio Rev. Code 2929.04(B)(7), which states that the jury shall consider "any other factors that are relevant to the issue of whether the defendant should be sentenced to death."  Geis opines that this phrase encourages juries to consider negatives that would support the death penalty, instead of mitigating factors that would support life.  It is not at all obvious to the Court that a reference to "any other factors" is an invitation, much less a directive, to a jury consider only "negative" factors, especially when counsel is fully able to argue in favor of the positive, mitigating factors presented to the jury.  Professor Geis provided no curriculum vitae, he did not testify in any proceeding, and the Court lacks any evidence by which to determine if his general opinions would qualify as expert linguistic testimony.  This ground for relief is therefore denied.

**Twenty-Fourth Ground for Relief**

Issa contends that Ohio's statutory definition of "reasonable doubt" is a constitutionally inadequate basis upon which to impose the death penalty.  Issa raised this claim on direct appeal and it was summarily denied:  "In his fourteenth proposition of law, [Issa] argues that Ohio's statutory definition of reasonable doubt is unconstitutional when applied to the penalty phase of a capital case.  We reject this argument on the authority of State v. Goff ...".  State v. Issa, 93 Ohio St.3d at 69.

In State v. Goff, 82 Ohio St.3d 123, 694 N.E.2d 916 (1998), the Ohio Supreme Court considered a challenge to a penalty phase jury instruction which stated:

Reasonable doubt is present when after you have carefully

> considered and compared all the evidence, you cannot say
> you are firmly convinced of the truth of the charge.
> Reasonable doubt is a doubt based upon reason and
> common sense. Reasonable doubt is a doubt -- reasonable
> doubt is not mere possible doubt, because everything
> relating to human affairs or depending on moral courage --
> on moral evidence is open to some possible doubt. Proof
> beyond a reasonable doubt is proof of such character that an
> ordinary person would be willing to rely and act upon it in the
> most important of his or her own affairs.

Id. at 131-132. In an earlier case, the Supreme Court had questioned whether a similar

instruction was "fully appropriate" for use in the penalty phase. Goff clarified that the

prior case question was not tantamount to a holding that the instruction was

constitutionally unsound. Rather, the Court held that an appropriate penalty phase

reasonable doubt instruction "should convey to jurors that they must be firmly convinced

that the aggravating circumstance(s) outweigh the mitigation factors(s), if any."

Considering all of the instructions that had been given in that case, the Goff court found

no prejudicial or constitutional error in giving the challenged instruction.

Here, the challenged instruction given in Issa's penalty phase trial stated:

> Reasonable doubt is present when after carefully
> considering and comparing all the evidence you cannot say
> that you are firmly convinced that the aggravated
> circumstance outweighs the factors in mitigation.
> Reasonable doubt is present when you are not firmly
> convinced that death is the appropriate punishment.
> Reasonable doubt is a doubt based on reason and common
> sense. Reasonable doubt is not mere possible doubt,
> because everything relating to human affairs or depending
> upon moral evidence is open to some possible or imaginary
> doubt. Proof beyond a reasonable doubt is proof of such
> character that an ordinary person would be willing to rely
> upon it and act upon it in the most important of his or her
> own affairs.

(Trial Trans. Vol. VII at 1614-1615.)

-94-

This instruction is legally indistinguishable from that discussed and approved by the Ohio Supreme Court in <u>Goff</u>.  Moreover, it clearly instructs the jury that the aggravating circumstance must outweigh the mitigation factors.  The Sixth Circuit has addressed and rejected due process challenges to essentially the same instruction on several occasions.  See <u>White v. Mitchell</u>, 431 F.3d 517, 533-534 (6th Cir. 2005), noting that jury instruction errors must be "so egregious that they render the entire trial fundamentally unfair."  See also, <u>Buell v. Mitchell</u>, 274 F.3d 337 (6th Cir. 2001), and <u>Coleman v. Mitchell</u>, 268 F.3d 417 (6th Cir. 2001), both cited in <u>White</u>.

Issa does not articulate any basis upon which to find that the state court's decision on this claim is contrary to or an unreasonable application of federal law.  This ground for relief is therefore denied.

**Twenty-Fifth Ground for Relief**

Issa argues that Ohio's death penalty laws are constitutionally defective, and violate the Eighth Amendment's prohibition of cruel and unusual punishment.  This ground for relief levels a number of broad attacks on Ohio's statutory scheme.  (See Doc. 62, Third Am. Pet. at 97-111.)  Issa contends that the statute vests virtually uncontrolled discretion in state prosecutors, leading to the imposition of the death penalty in a racially discriminatory manner.  He argues that the death penalty is neither the least restrictive nor most effective means of deterring crime.  He claims that instructing juries that aggravating circumstances must "outweigh" mitigating factors invites arbitrary decisions, and that the statutory mitigating factors are unconstitutionally vague.  Ohio law requires proof of an aggravating circumstance in the guilt phase trial, which Issa contends is unconstitutional because it prevents a sufficiently individualized

sentencing determination.  He also notes that a capital defendant who pleads guilty may benefit from Ohio Rule of Criminal Procedure 11(C)(3), granting the courts discretion to dismiss death penalty specifications "in the interest of justice."  But a defendant who exercises the right to stand trial has no similar opportunity, a distinction  noted in the concurring opinion in Lockett v. Ohio, 438 U.S. 586, 617 (1978) (Blackmun, J., concurring).[13]

Issa also attacks Ohio's felony-murder sentencing laws, arguing that felony murderers are treated more harshly than intentional murderers.  He asserts that a "killer who kills with prior calculation and design is treated less severely, which is nonsensical because his blame worthiness or moral guilt is higher, and arguably the ability to deter him [is] less."  (Doc. 62 at ¶430.)  He contends that Ohio lacks an adequate system of data tracking concerning the imposition of the death penalty, which prohibits constitutionally adequate appellate and proportionality reviews.  He argues that the Ohio Supreme Court's appropriateness and proportionality reviews are cursory, as he claims it was in his own direct appeal, and fail to adequately distinguish between those defendants deserving of death and those who are not.

Issa raised this panoply of challenges on direct appeal.  The Ohio Supreme Court summarily rejected all of his arguments, relying on several of its prior decisions.  See State v. Issa, 93 Ohio St.3d at 69.  Issa does not present facts or law upon which this Court could conclude that the Ohio Supreme Court's decision was contrary to, or an unreasonable application of, federal law.  His arguments with respect to arbitrary

_____

[13] The concurring opinion would have found an unconstitutional disparity resulting from this different treatment, a position not adopted by the majority.

-96-

prosecutorial discretion fail in light of <u>Buell v. Mitchell</u>, 274 F.3d 337, 367 (6th Cir. 2001), rejecting a similar argument that Ohio's statute violates due process or equal protection, and finding that it does not run afoul of any constitutional right.  The Supreme Court has never, to this Court's knowledge, required that a state must demonstrate the **absence** of mitigating factors in order to impose a death sentence, and Issa does not cite any such authority.  In <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 244-246 (1988), the Supreme Court held that the trier of fact must find one aggravating circumstance at **either** the guilt or penalty phase, in order to convict a defendant of death-eligible murder.  The Ohio statute plainly requires that one statutorily-defined aggravating circumstance be specified in the indictment and proved beyond a reasonable doubt; see Ohio Rev. Code 2929.04(A).

<u>Lowenfield</u> also disposes of Issa's arguments about the death penalty's overbreadth, and about the disproportionately harsh treatment of felony murderers. With respect to Issa's contention that the sentencing statute's mitigating factors are vague, the Court cannot meaningfully evaluate that claim because he does not identify any specific factor he alleges is unconstitutionally vague.  His attacks on the aggravating and mitigating factor weighing process and statutory definitions fail in light of <u>Tuilaepa v. California</u>, 512 U.S. 967, 973 (1994), which held that a mitigating factor must have some "common-sense core of meaning" that juries are capable of understanding, in order to pass constitutional muster.  <u>Tuilaepa</u> rejected a vagueness challenge to a statutory sentencing factor requiring the jury to consider "the presence or absence of criminal activity by the defendant which involved the use or attempted use of

force or violence or the express or implied threat to use force or violence."  The court

found that this language used conventional terms, and essentially required the jury to

determine whether a certain event had occurred or not.  It did not require a forward-

looking or vague and broadly-worded inquiry, such as whether the defendant was a

"continuing threat to society." Id. at 976-977.  In contrast, in Maynard v. Cartwright, 486

U.S. 356, 363-364 (1988), the Supreme Court concluded that an aggravating factor

requiring the jury to determine if a killing was "especially heinous, atrocious, or cruel"

was unconstitutionally vague, because it failed to properly channel the jury's discretion

in making that determination.

Ohio's statutory mitigating factors set forth in Ohio Rev. Code 2929.04(B)(1) - (7)

do not suffer from the type of impermissible vagueness found in Maynard.  Rather, the

statute lists factors that the Supreme Court has specifically approved, such as whether

the victim induced the offense, whether the offender was under duress, coercion or

provocation, or the offender's lack of criminal history.  These factors are not

constitutionally infirm or vague.  For similar reasons, the Court rejects Issa's contention

that Ohio Rev. Code 2929.03(D)(1) renders the statutory mitigation factors

unconstitutionally arbitrary.  (See Doc. 62 at 107-108.)  Section 2929.03(D) sets forth

the procedure to be followed for a death-eligible aggravated murder defendant,

including the requirement of a pre-sentence investigation and mental examination if

requested by a defendant.  It provides that the trier of fact shall hear relevant evidence

concerning the nature and circumstances of the aggravating factors, and any evidence

in mitigation of a death sentence.  The defendant "shall be given great latitude in the

presentation of evidence of the mitigating factors set forth in [Section 2929.04(B)] and of

any other factors in mitigation of the imposition of the sentence of death." This statute does not impermissibly skew the weighing process required under Section 2929.04.

Issa also argues that Ohio law does not require the trier of fact to specifically identify any mitigating factors that would lead to imposition of a life sentence, rather than a death sentence. Without a requirement of specific findings on mitigation, Issa argues that no significant comparison of the two types of sentences is possible. This lack of specific findings, he claims, hinders the appellate court in performing its duty to determine the appropriateness of the death penalty in each case, as required by Ohio Rev. Code 2929.05(A), and renders Ohio's proportionality review procedure unconstitutional. (See Doc. 62 at 109-110.) As was noted above with respect to Issa's eleventh ground for relief, there is no federal constitutional right to sentencing proportionality review in every case. In Buell v. Mitchell, 274 F.3d 337, 369 (6th Cir. 2001), the Sixth Circuit noted that a state has "great latitude" in conducting proportionality review, and choosing which sentences will be considered as part of that review. The Ohio statute does not require a jury to make a specific finding on each and every mitigation factor presented by a defendant, or to determine if each such factor supports life or death. This procedure falls comfortably within the "great latitude" accorded to the states.

The Court also rejects Issa's argument that the Ohio Supreme Court gives only "cursory" consideration to its statutorily-required proportionality review. In Issa's case, the Supreme Court discussed in some detail the facts concerning the aggravating factor found by the jury (murder for hire), as well as a lengthy review of Issa's mitigation arguments. See State v. Issa, 93 Ohio St. 3d at 70-72. This can hardly be described as

-99-

a "cursory" treatment of Issa's arguments. Ohio's proportionality review procedure, limited to defendants who have received the death penalty, is not constitutionally infirm.

For all of these reasons, the Court denies Issa's twenty-fifth ground for relief.

**Twenty-Sixth Ground for Relief**

Issa contends that he received ineffective assistance of trial counsel during the penalty phase because his lawyers failed to present testimony from two jail inmates, Rayshawn Johnson and Gary Hughbanks. Andre Miles, Johnson and Hughbanks were incarcerated together. Johnson and Hughbanks submitted affidavits in Issa's post-conviction proceeding, stating that Miles told each of them that Miles murdered Maher and his brother during a robbery. Miles said he implicated Issa because Miles and Issa had a disagreement about money, and Miles wanted revenge. During the guilt phase of Issa's trial, another inmate, Johnny Floyd, testified to the same effect. Issa contends that Floyd was not recalled during Issa's penalty phase, and neither Johnson nor Hughbanks ever testified in Issa's trial.

Issa raised this claim in his post-conviction proceeding, and the Court of Appeals rejected it:

> The decision whether to call a witness involves trial strategy, and, absent prejudice, the failure to call a witness does not constitute ineffective assistance of counsel. In this case, counsel presented the testimony of another witness who testified to the same facts. The presentation of additional witnesses on the issue would have been cumulative, and Issa did not demonstrate that the failure to call these witnesses prejudiced the defense.

State v. Issa, 2001 Ohio 3910 at *18.

Trial counsel's decision whether to recall Johnny Floyd in the penalty phase was

clearly a strategic choice that was made.  Counsel clearly knew who Floyd was and where he could be found.  The jury had already heard and considered his testimony, and obviously concluded it was insufficient to establish Issa's innocence.  There would have been obvious risks in recalling Floyd to repeat that testimony during Issa's penalty phase.

Regarding Gary Hughbanks, his affidavit states that Miles told him he intended to rob Maher Khriss, but then he shot and killed both Maher and Maher's brother.  Miles also told Hughbanks that he blamed his incarceration on Issa.  None of Hughbanks' statements suggest that Issa was actually innocent, or that Miles "set him up."  Miles might well "blame" Issa because Issa involved Miles in the scheme.  Taking Hughbanks' affidavit at face value, the failure to call him as a witness in any part of Issa's trial did not clearly prejudice Issa's defense, because the Hughbanks affidavit does not establish a reasonable probability of a different outcome.

Rayshawn Johnson testified at the evidentiary hearing in this case.  Even if his testimony should be considered at this juncture, it does not support Issa's claim. Johnson said he had many conversations with Andre Miles, all of which were more or less "... that he done the crime and, you know, he wanted to bring Ahmad Issa and Linda Khriss into it because he got – he didn't want – he got caught, he didn't want to go down by himself."  (Doc. 112, Evid. Hrg. Trans. at 58-59.)  Johnson was also shown a hand-written letter (Evid. Hrg. Ex. 4) which Johnson believed Miles wrote to him, although the circumstances of his receipt of the letter are somewhat murky.  (Johnson said that "someone" gave it to him in prison and it did not come through the normal mailroom.)  In the letter, which was clearly written after Miles' trial, Miles states: "I think

the whole Legal system is messed up.  I should be there and not Mike.  Look if I could

do anything for Mike I would.  In his letter I told him, that all he has to do is say so."

(Issa's nickname is Mike.)

Whatever relevance this letter may have, it clearly was not in existence at the

time of Issa's trial, so trial counsel could not have discovered it.  And Johnson's

testimony about Miles' jailhouse statement does not suggest that Miles was telling

Johnson that Issa was **innocent**.  Miles' letter claims that Miles "should be there and

not [Issa]."  This is hardly persuasive evidence that Issa was not involved in Maher's

murder.  As this Court views it, the import of Johnson's testimony and post-conviction

affidavit was that Miles did not want to face punishment by himself.  Miles did not tell

Johnson that he had "set up" Issa.  And even assuming that Johnson's testimony might

suggest that fact, Johnson's testimony would have clearly been cumulative to that

offered by Johnny Floyd.  The same potential risks that counsel would have faced by

putting Floyd back in front of the jury to suggest that Issa was innocent after the jury had

found otherwise, would apply with equal force to Johnson.

For these reasons, the Court cannot conclude that the Ohio Court of Appeals'

decision with respect to this ground for relief was contrary to or an unreasonable

application of Strickland.  This claim is therefore denied.

**Twenty-Seventh Ground for Relief**

One of Issa's two appellate lawyers who represented him in his direct appeal,

also represented Andre Miles in his direct appeal of his own conviction.  Issa contends

that this lawyer, Herbert Freeman, had an irreconcilable conflict of interest in separately

-102-

representing both Issa and Miles.  Issa alleges that he was prejudiced by this conflict,

relying on his claims of ineffective assistance of appellate counsel raised in his Ninth

Ground for Relief, all of which he suggests were caused by Freeman's conflict of

interest.  Issa contends that he was unaware of Freeman's representation of Miles until

the spring of 2005, during the pendency of this proceeding.  Issa had been granted

leave to depose Freeman, and during his deposition, Freeman disclosed that he had a

file at home regarding Issa's case.  In that file was a letter Freeman wrote to Issa's

appellate co-counsel, stating in pertinent part:

> Enclosed please find a photocopy of the rough draft of the
> "Statement of Facts" from the appellate brief of Andre Miles.
> You will recall that he was a codefendant to Mr. Issa,
> although he was tried separately.  I am sending it to you,
> because I am lead counsel appealing Miles' case in the
> Court of Appeals (he was the "shooter," but he avoided the
> death penalty).  It will be in many ways virtually the same as
> the testimony elicited against Mr. Issa.

(Doc. 139, Supplemental Appendix at 32.)  After the letter was discovered, Issa was

granted leave to file his Third Amended Petition to include this ground for relief, and the

Magistrate Judge held this case in abeyance while Issa exhausted the claim by filing a

Murnahan/Rule 26 motion before the Ohio Supreme Court.  (Doc. 64)  That court

denied Issa's motion because it was untimely "... and because second or successive

applications for reopening are not permitted under the rule."  State v. Issa, 106 Ohio

St.3d 1407, 2005 Ohio 3154 (June 29, 2005).

        Initially, the Court must determine if this claim is reviewable, because the Ohio

Supreme Court enforced its procedural rule by finding Issa's Murnahan motion to

reopen untimely.  The Magistrate Judge concluded that Issa's application to reopen

"was futile from the beginning," and that Issa did not discover the factual predicate for this claim until the proceedings in this case.  (Doc. 146 at 85-86)   The Magistrate Judge cited Franklin v. Anderson, 434 F.3d 412 (6th Cir. 2006), where the Sixth Circuit reviewed the background of Murnahan and the adoption of Ohio Rule 26(B)'s time limitations on such motions.  The court found that the "Ohio Supreme Court has been erratic in its handling of untimely Rule 26(B) applications in capital cases," and citing a group of cases in which the Rule's time requirements were enforced, and a group of other cases where untimely applications were reviewed on the merits.  Id. at 420-421.  While consistent enforcement of the Rule apparently began again around the time that Issa filed his Rule 26 motion on April 22, 2005, the Sixth Circuit stated that the resumed "pattern" was demonstrated by only three cases.  In view of this history, the court held that Rule 26(B)'s time bar was not an adequate and independent state rule that was regularly followed and enforced by the state courts at the time of the petitioner's proceeding.  And in Hoffner v. Bradshaw, 622 F.3d 487 (6th Cir. 2010), the petitioner had filed his Rule 26(B) application to reopen on June 6, 2006; the court of appeals denied it because it was untimely and on the merits of his claims.  The Ohio Supreme Court affirmed solely on the basis of untimeliness.  In his subsequent habeas case, the Sixth Circuit found his claims procedurally defaulted because Rule 26(B)'s time requirements were firmly established and regularly followed by the Ohio courts in June 2006.

This Court agrees with the Magistrate Judge's conclusion that when the Ohio Supreme Court denied Issa's April 2005 Murnahan motion to reopen as untimely, the court was not yet regularly adhering to a "firmly established" rule regarding timeliness of

Rule 26(B) petitions.  The Court also agrees that this ground for relief is not time-barred

by AEDPA's one-year statute of limitations.  Issa has demonstrated that he did not

discover the fact of Freeman's representation of Miles until he conducted discovery in

this case.  While the fact of Miles' representation might have been uncovered, there is

no evidence that Issa failed to exercise due diligence in attempting to discover this fact.

The Court finds that this claim is timely, as it was asserted within one year of Issa's

discovery of the fact of Freeman's representation of Miles.

Attorney Freeman testified at the evidentiary hearing in this case.  He was asked

to compare several sections of an unrelated appellate brief he had prepared with the

brief he filed for Issa, which demonstrated an overlap of several issues.  Freeman could

not recall the details of the dispute concerning Linda Khriss' testimony, nor whether

Issa's trial counsel had requested funds for a cultural expert.  Freeman believes that

defendants who are foreign nationals or from another country, regardless of whether

they have become citizens, need a cultural representative

> ... as much, if not more, than they need a lawyer.  The
> lawyer is often seen as someone who is another middle-
> aged white person who is working for the government, and
> it's hard for foreigners, especially from countries where the
> government is all seen as one entity and seen as the other
> side, to differentiate the role of a defense lawyer from the
> role of a prosecutor or the role of a judge.

(Doc. 112, Evid. Hrg. Trans. at 12.)  Freeman testified that he believed the process of

helping Issa's jury understand his mitigation evidence would have been improved by

using a "cultural interpreter."  But Freeman also said that whether the failure of trial

counsel to do so amounted to ineffective assistance of counsel was hard to analyze,

and he was not sure that it was.  Freeman also stated that he did not omit any issues

from Issa's appeal due to his representation of Miles.

Issa was entitled to constitutionally effective representation for his direct appeal that was free of any conflict of interest. Cuyler v. Sullivan, 446 U.S. 335, 344 (1980). Issa must demonstrate the existence of a conflict, and that the conflict in Freeman's representation of Miles caused some adverse effect on his direct appeal. Possibilities and conjectures about potential harm that might have resulted are insufficient to meet this burden.

In McFarland v. Yukins, 356 F.3d 688 (6th Cir. 2004), the Sixth Circuit affirmed the grant of habeas relief to petitioner based on her attorney's conflict of interest. Petitioner and her daughter had been convicted of drug offenses, and one lawyer had represented both of them. Although they were tried separately, their trials took place on the same day before different judges. The Sixth Circuit observed that petitioner's "best defense" would have been to argue that the drugs, which had been found in a locked bedroom in the house they shared, belonged to her daughter and not to her. Despite strong evidence adduced at the daughter's trial that the drugs did in fact belong to the daughter, the petitioner's lawyer failed to cross-examine the prosecution witnesses about that evidence during petitioner's trial. Of course, if the lawyer **had** argued that the daughter was the guilty party, he clearly would have violated his ethical duty to the daughter. Because the conflict was clear and the adverse effect of that conflict on the mother's defense was undeniable, the district court's grant of habeas relief was affirmed.

Here, in contrast, Issa does not identify any adverse effect on the prosecution of his direct appeal that resulted from Freeman's appellate representation of Miles. His

Third Amended Petition merely alleges that the purported conflict provides an "alternative explanation" for the various ineffective assistance of counsel claims that are raised in his ninth ground for relief.  (Doc. 62, p. 113 at ¶488.)  And he suggests that the difficulties he faced during his own trial that "related to" Andre Miles make Freeman's conflict apparent and sufficient to establish ineffective assistance of appellate counsel.

Issa's ninth ground for relief raised eight instances of his trial counsel's errors which Issa contends Freeman should have raised in his direct appeal and did not.  The Court rejected all of these claims.  And of those eight instances, only three (subparts (a), (b) and (e), Doc. 62 at pp. 40, 43, and 51) are tangentially related to Andre Miles. Subpart (a) alleges that Freeman should have appealed trial counsel's failure to read Miles' testimony from the Linda Khriss trial.  This Court concluded that this claim would fail on the merits, as the excerpts of Miles' testimony are not as favorable to Issa's defense as he suggests.  As Issa did not establish actual prejudice, as required under Strickland, to maintain his ineffective assistance of trial counsel claim on this basis, the same conclusion applied to his claim of ineffective assistance of appellate counsel.  In this ground for relief, Issa does not explain how Freeman's conflict of interest would have prevented Freeman from raising this issue in Issa's direct appeal.  Speculation that this is so, or that the result might have been different if Miles or Issa had a different lawyer, is plainly insufficient under Strickland.

The Court reaches the same conclusion concerning subparts (b) and (e) of Issa's ninth ground for relief.  Subpart (b) deals with the admission of Bonnie Willis' testimony about Miles, and the state's failure to charge Issa with conspiracy; and subpart (e) alleges prosecutorial misconduct in mentioning Miles' statements to police and the

Willises during the opening statement.  Even assuming that either of these sub-claims amounts to cognizable error in Issa's trial, Issa has not provided any explanation of how the alleged conflict of interest prevented Freeman from raising these claims in Issa's direct appeal.  The key question in Issa's trial that related to Miles, whether the testimony of Bonnie and Joshua Willis about Miles' hearsay statements implicating Issa should have been admitted at all, **was** raised in Issa's appeal and was rejected on the merits by the Ohio Supreme Court.

This Court must conclude that Issa has failed to demonstrate that Freeman's conflict of interest resulted in any actual prejudice during the prosecution of Issa's direct appeal.  That defect is fatal to this claim of ineffective assistance of appellate counsel. This ground for relief is therefore denied.

**Issa's Lethal Injection Claims**

On September 17, 2012, while Issa's objections to the Magistrate Judge's recommendations regarding Claims 1 through 27 were pending for decision, Issa sought leave to amend his petition to add two new claims:  Claim 28, alleging that Ohio's September 18, 2011 lethal injection protocol and procedures violate the Eighth Amendment; and Claim 29, alleging that the protocol and procedures violate the Equal Protection Clause of the Fourteenth Amendment.  (Doc. 172-1)  Issa alleged that the Section 1983 litigation (In re Ohio Execution Protocol Litigation) was ongoing and that evidence in that case was relevant to his proposed new habeas claims.  (Issa had intervened as a plaintiff in the Section 1983 litigation in November 2011.)  But he alleged that the relief he sought in the two cases was different.

The state opposed the motion, arguing that Issa's proposed claims were too vaguely pled to allow the state or the Court to determine if they were properly asserted in this habeas petition, or if they should be pursued under Section 1983.  This Court recommitted the matter to Magistrate Judge Merz, who granted leave to amend on January 2, 2013.  (Doc. 180) Judge Merz held that Issa's claims are justiciable here "because they assert that the State of Ohio cannot constitutionally carry out a constitutional execution of Petitioner using lethal injection," and citing Adams v. Bradshaw, 644 F.3d 481 (6th Cir. 2011).  Judge Merz also found that the two new claims were not barred by AEDPA's one-year statute of limitations, because they challenged Ohio's September 2011 protocol and were filed within one year of the state's adoption of that protocol.

The state then filed a motion for judgment on the pleadings, arguing that Issa's lethal injection habeas claims were procedurally defaulted, and were not a proper basis for granting habeas corpus relief.  Any stay of this case to allow Issa to exhaust his claims in state court would be futile, because the claims were plainly meritless under clearly established federal law.  (Doc. 191)  After that motion was fully briefed, the State of Ohio announced its intent to amend its lethal injection protocol.  Issa requested a stay of this case and a decision on the state's motion.  (Doc. 196)  The Magistrate Judge denied the stay for failure to comply with Local Rule 7.3, but also found the state's motion moot, in light of the impending amended protocol.

Nothing further was filed in the case by February 11, 2014, when the court issued an order to show cause why Issa's lethal injection claims (Claims 28 and 29) should not be dismissed without prejudice as moot.  (Doc. 197)  Issa conceded that those claims in

the Fourth Amended Petition were moot due to the amended October 2013 protocol. But he asked the Court to stay any consideration of his claims until March 17, 2014, after the scheduled execution of Dennis McGuire.  McGuire was executed in January 2014 under the October 2013 protocol that specified the use of hydromorphone and midazolam.  After McGuire was executed, Governor Kasich postponed the next scheduled execution and an investigation into the execution was in process.  The state did not oppose Issa's request, and it was granted.  Then on March 17, Issa asked the Court to continue the stay until another scheduled execution took place.  (Doc. 199) Issa announced his intent to seek leave to amend his lethal injection claims based upon the evidence collected about these executions.  The state did not oppose this request, and it was granted.

    Almost a year later, with no further activity in the case, Judge Merz issued a sua sponte order, vacating the stay and ordering Issa to show cause why his lethal injection claims as pled in the Fourth Amended Petition should not be dismissed as moot.  Issa responded by seeking leave to amend Claims 28 and 29 and to add eight new claims, all raising challenges to Ohio's lethal injection procedures and policies.  (Doc. 210)  The state opposed the motion, renewing its Rule 12(c) arguments that the proposed claims are not cognizable in this habeas case.  Judge Merz recommended that Claims 28 and 29, directed to the September 2011 protocol, be dismissed as moot.  (Doc. 208)  Judge Merz observed that Issa's response to the OSC was to submit amended claims, and he failed to show that his pending claims were not moot.  He ordered Issa to file a properly supported motion to amend by May 1, and alternatively suggested that Issa file a new habeas case to prosecute his lethal injection claims.

Issa filed a motion for leave to amend (Doc. 210) and objected to the dismissal of pending Claims 28 and 29. (Doc. 211) In a supplemental Report (Doc. 213), Judge Merz again recommended that the pending claims be dismissed as moot. The same day, he issued an order denying Issa's motion to amend. (Doc. 214) Judge Merz noted that in this and other habeas cases, the court had typically allowed amended claims when Ohio adopted new or amended lethal injection protocols. He also noted Issa's objections to filing a new habeas petition, rather than amending his claims in this case; Issa argued that he could be prejudiced because the state of Ohio opposes the concept of new or successive habeas petitions, and the proposal had not been approved by either the Sixth Circuit or the U.S. Supreme Court. Appellate decisions encourage timely and prompt litigation of habeas claims, and Issa could face the dismissal of all of his lethal injection claims if he failed to raise them in this case. But Judge Merz concluded that Issa would not be prejudiced by denying him leave to amend, citing several appellate decisions reflecting a liberal approach to second or successive habeas petitions that satisfy AEDPA's requirements. Judge Merz also noted that the Ohio Supreme Court had recently set new execution dates, with the first scheduled for May 2019. Issa therefore faces little if any reasonable chance of execution if this case proceeds on his original 27 claims, leaving him to raise his lethal injection challenges separately.

Issa objects to the Supplemental Report and Recommendation, and to Judge Merz's order denying leave to amend. (Doc. 217) He argues that the Court should disregard any potential prejudice to the state caused by delays in resolving this case, because the state alone decides when and how to amend its lethal injection protocol.

Issa is not responsible for the problems the state has encountered that have prompted the protocol amendments that have occurred since September 2011. Issa also argues that Claims 28 and 29 of the Fourth Amended Petition, directed to the September 2011 protocol, are not moot. Later amendments changed the drugs used in execution but did not amend other procedures that he challenges in those claims. Issa renews his objection to filing a second or successive petition, noting that it is not a sanctioned process and it could lead to serial amendments every time Ohio amends its protocol. That would be an inefficient manner by which to resolve his claims. He also contends that he should be granted leave to amend his claims again, to specifically address the latest Ohio protocol adopted in June 2015, and the Supreme Court's decision in Glossip v. Gross, 135 S.Ct. 2726 (June 26, 2015).

The Court believes that the primary issues raised by the proceedings to date on Issa's lethal injection claims are: (1) whether leave to amend should have been granted; and (2) are any of Issa's lethal injection claims properly litigated in this habeas case?

The question of whether the type of specific challenges to methods of lethal injection that Issa wishes to raise here are appropriately prosecuted in habeas corpus has been the subject of many decisions. Issa notes that many courts in the Sixth Circuit have held that his claims and similar ones are cognizable habeas claims, specifically Adams v. Bradshaw, 644 F.3d 481 (6th Cir. 2011), relied on by the Magistrate Judge in 2012 when granting Issa leave to add Claims 28 and 29. Issa also cites a large group of cases in both the Southern and Northern Districts of Ohio that have allowed such claims. (See Doc. 181 at ¶500) He argues that Ohio lacks a forum to litigate method of execution claims, pursuant to Scott v. Houk, 127 Ohio St.3d 317, 939 N.E.2d 835 (Ohio

2010), and therefore his claims are not procedurally defaulted.  In <u>Scott v. Houk</u>, the

Ohio Supreme Court answered a certified question from the federal district court by

stating:

> The Ohio General Assembly has not yet provided an Ohio-
> law cause of action for Ohio courts to process challenges to
> a lethal-injection protocol, and given the review available on
> this issue through [42 U.S.C. §1983 actions] for injunctive
> relief against appropriate officers or federal habeas corpus
> petitions, we need not judicially craft a separate method of
> review under Ohio law.  Accordingly, until the General
> Assembly explicitly expands state review of death-penalty
> cases by creating a methodology for reviewing Ohio's lethal
> injection protocol, we must answer the certified question as
> follows: There is no state postconviction relief or other state-
> law mode of action to litigate the issue of whether a specific
> lethal injection protocol is constitutional under <u>Baze v. Rees</u>
> ... or under Ohio law.

127 Ohio St.3d at 318-319.

 Issa further alleges that because Ohio law states that lethal injection is the sole method

by which to administer the death penalty, his sentence is unconstitutional, entitling him

to habeas relief.

Judge Merz originally concluded that Claims 28 and 29 were appropriately raised

here, relying on <u>Adams v. Bradshaw</u>.  In that case, the petitioner Adams filed his

habeas petition in 2006, including a claim that lethal injection violates the Eighth

Amendment.  The district court denied all of his claims and denied a certificate of

appealability on the lethal injection claim.  The Sixth Circuit granted a COA on the lethal

injection claim, and in February 2009, stayed the appeal and remanded that claim to the

district court for factual development of the record.  On remand, the state moved to

dismiss for lack of jurisdiction, which the district court denied based on the limited

mandate on remand from the court of appeals. The Sixth Circuit granted the state's request for interlocutory review and affirmed, relying on Hill v. McDonough, 547 U.S. 573 (2006) and Nelson v. Campbell, 541 U.S. 637 (2004), which both held that Section 1983 claims challenging lethal injection methods could proceed under that statute, and should not be exclusively treated as second or successive habeas claims.[14]

In Nelson, the inmate challenged a "cut down" procedure the state planned to use to access his severely compromised veins in order to administer the lethal drugs. The lower courts treated his complaint as the "functional equivalent" of a successive habeas petition and dismissed it. The Supreme Court reversed, holding that if the cut-down was mandated in the state lethal injection statute, or if Nelson was "unable or unwilling to concede acceptable alternatives for gaining venous access," his claims would come close to asserting a traditional habeas claim. But Nelson had identified an alternative (a percutaneous central line) that would accomplish lethal injection in a less invasive and safer way. The Supreme Court remanded for an evidentiary hearing to determine whether the cut-down procedure was required, and if so, how to properly characterize and rule on Nelson's claim. The Court specifically expressed concern that method-of-execution challenges brought under Section 1983 not be used to accomplish indirectly what may not be done directly: challenge the imposition of the death sentence without complying with the procedural limitations of the federal habeas statute. Id. at 647. (The Court notes that after the case returned to the district court, it was litigated

---

[14] After the Sixth Circuit's decision, the Adams case returned to district court; a factual record largely taken from the Section 1983 lethal injection litigation was compiled and the case returned to the Sixth Circuit, where it remains pending (Case No. 07-3688). According to the docket sheet, oral argument is scheduled for October 7, 2015.

for approximately five years.  The inmate apparently died and the case was terminated

without a ruling.)  And in <u>Hill v. McDonough</u>, the petitioners challenged the state's three-

drug protocol under Section 1983.  The Supreme Court held the case could proceed

under that statute, relying on <u>Nelson</u>.

Then in <u>Scott v. Houk</u>, 760 F.3d 497 (6th Cir. 2014), the Sixth Circuit again

considered the propriety of habeas claims challenging the constitutionality of Ohio's

lethal injection methods.  As noted above, the district court had certified a question to

the Ohio Supreme Court concerning the state's contention that Scott's lethal injection

claims were procedurally defaulted.  After the Ohio Supreme Court's decision, the

district court held that the claims were not defaulted but they lacked merit, because the

death penalty is constitutional, and the Supreme Court upheld Kentucky's lethal

injection protocol (which was similar to Ohio's at that time) in <u>Baze v. Rees</u>, 553 U.S. 35

(2008).  The district court also denied Scott leave to amend to add an equal protection

claim,  finding it was untimely and that Scott could prosecute that claim in the Section

1983 case.  On appeal, Scott argued that lethal injection cannot be constitutionally

administered, and therefore he must litigate his claims in his habeas case.  The Sixth

Circuit agreed that the claims were not defaulted but affirmed the district court's denial

of habeas relief:

> Although we understand Scott's point—that the relief he
> seeks is available only through a federal habeas claim—we
> decline to grant Scott's request for a remand.  As the law
> currently stands, there is no merit to Scott's assertion that his
> sentence is void because lethal injection is unconstitutional.
> Simply put, lethal injection does not violate the Constitution
> per se, and Scott acknowledges as much in his brief. See
> *Baze v. Rees*, 553 U.S. 35, 128 S. Ct. 1520, 170 L. Ed. 2d
> 420; *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009).

> Therefore, in order to obtain relief from his sentence, Scott
> would first have to gather facts showing that Ohio is unable
> to administer lethal injection in a constitutionally permissible
> manner. And this is precisely the type of discovery that Scott
> can pursue in his §1983 litigation.
>
> We are assured that Scott's death sentence will not be
> carried out if, and so long as, a federal court determines that
> Ohio is incapable of doing so in accordance with the law.
> The district court properly denied this claim.

Id., 760 F.3d at 512.[15]

The issue arose again in Frazier v. Jenkins, 770 F.3d 485 (6th Cir. 2014).

Frazier's 2009 federal habeas petition included a claim that lethal injection violated the

Eighth Amendment.  The district court denied the claim, and on appeal Frazier argued

that Ohio's method of lethal injection "could implicate the Eighth Amendment prohibition

against cruel and unusual punishment."  The Sixth Circuit relied on Scott v. Houk to

conclude that Frazier could pursue those claims in the Section 1983 litigation, and

affirmed the district court's denial of habeas relief.

Assuming that Issa's lethal injection claims **could** be raised here (and that they

are not defaulted), this Court will deny them.  Other cases in this district have reached

that result.  See Hill v. Mitchell, 2013 U.S. Dist. LEXIS 45919 (S.D. Ohio, March 29,

2013)(Sargus, J.), and Lynch v. Hudson, 2011 U.S. Dist. LEXIS 110652 (S.D. Ohio

Sept. 28, 2011)(Frost, J.).  In those cases, the courts held that the petitioner failed to

cite any clearly established federal law, as determined by the U.S. Supreme Court, that

lethal injection constitutes cruel and unusual punishment, or violates a petitioner's Due

---

[15] The U.S. Supreme Court denied certiorari; Scott v. Forshey, 2015 U.S. LEXIS
2093 (March 23, 2015).

Process or Equal Protection rights.  Rather, the Supreme Court has repeatedly held that

the death penalty is constitutional; and Baze v. Rees held that Kentucky's lethal

injection protocol did not violate the Eighth Amendment.  This Court rejected a lethal

injection habeas claim in Hand v. Houk, Case No. 2:07-cv-846, 2011 U.S. Dist. LEXIS

14960 (S.D. Ohio, Feb. 26, 2009), which alleged that a previous Ohio protocol using

pentobarbital violated the Eighth Amendment.  This Court concluded that Hand's claim

was barred by the "ground rules" set forth in Baze v. Rees, and adopted by the Sixth

Circuit in Cooey v. Strickland, 589 F.3d 210, 220-221 (6th Cir. 2009), regarding lethal

injection claims.  Those courts held that "... the Constitution does not allow the federal

courts to act as a best-practices board empowered to demand that states adopt the

least risky execution protocol possible."

This Court finds that the rationale articulated by the Sixth Circuit in Scott v. Houk

and reiterated in Frazier v. Jenkins fully applies to Issa's claims and proposed claims.

In Claims 28 and 29 of the Fourth Amended Petition and in his proposed amended

claims, Issa repeatedly alleges that problems and irregularities in Ohio's administration

of lethal injection (lack of access to FDA-approved drugs, use of compounded drugs,

lack of medical personnel, etc.) prevents the state from carrying out his death sentence

in a constitutional manner.  Part of the relief he seeks is the right to conduct discovery,

to issue subpoenas for witnesses and documents, and to expand the record in this case

to support these claims.  The Court notes that his proposed Fifth Amended Petition is

laced with references to discovery obtained and orders entered in the ongoing Section

1983 litigation pending before Judge Frost in Columbus, in which Issa is a plaintiff.  The

relief Issa seeks, an injunction prohibiting his execution by some method of lethal

injection, has been granted to other plaintiffs in that case.  (See, e.g., Cooey v. Kasich, 801 F.Supp.2d 623 (S.D. Ohio July 8, 2011), granting preliminary injunction and stay of execution to plaintiff Kenneth Smith; Opinion and Order, Case No. 2:11-cv-1016, January 11, 2012, granting preliminary injunction and stay of execution to plaintiff Charles Lorraine.)

Moreover, **this** case has been pending in this Court for over twelve years.  From the standpoint of efficient litigation management - with full recognition of the importance of the issues Issa raises in his claims - it appears to the Court to impose an unnecessary burden on the parties here and upon this Court to permit Issa to engage in the same discovery that is ongoing in the Section 1983 litigation, to essentially replicate that record here, and to pose the risk of two judicial opinions on essentially the same question: does Ohio's method of execution pass constitutional muster?  All the while with no decision regarding Issa's substantive habeas claims.

One district court squarely rejected a habeas petitioner's claims which are essentially identical to those Issa wishes to raise here, based on the concern about duplicative proceedings.  In Treesh v. Robinson, Case No. 1:12-cv-2322, 2012 U.S. Dist. LEXIS 163601 (N.D. Ohio, Nov. 15, 2012), the petitioner, whose first habeas petition had previously been denied, intervened as a plaintiff in the Section 1983 lethal injection litigation.  He then filed a second habeas petition, alleging claims challenging the 2011 lethal injection protocol.  The district court found that any "general" constitutional challenge to lethal injection would be barred as a second or successive habeas petition.  And with regard to his specific challenges to Ohio's methods of lethal injection, the district court found they were identical to the claims being litigated in the

-118-

Section 1983 case, and therefore were not cognizable in habeas corpus.  As pertinent

here, the district court observed: "The pursuit of lethal injection challenges in

simultaneous Section 1983 and habeas actions has created confusion for both the

courts and the parties.  Making sense of the intersecting (and often conflicting)

arguments presented in these parallel actions is particularly challenging in light of the

lack of clear authority regarding how to analyze method of execution claims generally.

This confusion has opened the door to multiple, duplicative actions pending before

various judges in different district courts in this Circuit, creating the potential for

conflicting decisions and significant delay."  Id. at 15-16.  The Sixth Circuit denied a

certificate of appealability; see Treesh v. Robinson, 2013 U.S. App. LEXIS 3878 (6th

Cir., Feb. 13, 2013).

        This Court concludes that the Sixth Circuit's recent decisions in Scott v. Houk

and Frazier v. Jenkins provide the "clear authority" from the appellate court that the

district court in Treesh found to be lacking at the time of its decision.  Both of the Sixth

Circuit's decisions clearly support the Court's conclusion that Issa's lethal injection

habeas claims, both the pending Claims 28 and 29 and his proposed amended Claims

28 through 37, should be denied.  Issa will have a full opportunity to litigate those claims

(and any other claims the plaintiffs intend to raise regarding the most recent June 2015

Ohio protocol) in the Section 1983 litigation.  This Court is confident (as was the Sixth

Circuit in Scott v. Houk) that Issa's death sentence will not be carried out if, and so long

as, that court determines that Ohio is incapable of doing so in accordance with the

Constitution.

        Finally, the Supreme Court's most recent decision regarding lethal injection

-119-

challenges, Glossip v. Gross, __ U.S. __, 135 S.Ct. 2726 (June 29, 2015), supports the denial of Issa's habeas claims (and denying him leave to amend them as futile in this case). There, the Supreme Court rejected several Oklahoma inmates' Section 1983 challenges to that state's protocol which used 500 mgs. of midazolam as the first drug of a three-drug protocol. The Supreme Court reiterated its holding in Baze, that in order to establish an Eighth Amendment claim, a plaintiff must identify a "known and available alternative method of execution." Id. at 2738. The petitioner suggested that Oklahoma could use sodium thiopental or pentobarbital, but those drugs are now unavailable to the state despite a good faith effort to procure them. In the absence of an acceptable alternative, the petitioners' Eighth Amendment claims failed. Issa alleges that a sentence of life without parole could be imposed on all Ohio death row inmates, because it "costs less and serves all of the safety interests of the State." (Doc. 210-1, proposed Fifth Amended Petition at 189, ¶862.) This failure to identify an alternative would also support the denial of Issa's Eighth Amendment claims.

Finally, the Court notes a recent Report and Recommendation by Magistrate Judge Merz in Landrum v. Robinson, 2015 U.S. Dist. LEXIS 116914 (S.D. Ohio, Sept. 2, 2015). Magistrate Judge Merz recommended that the district court dismiss Landrum's lethal injection habeas claims on the basis of Glossip, concluding that its holding is irreconcilable with Adams v. Bradshaw: "Insofar as Adams reads Hill [v. McDonough] as permitting an inmate to bring the same lethal injection claim in both 1983 and habeas, it cannot survive Glossip." Id. at *8. This Report and its cogent analysis further buttress this Court's decision to deny all of Issa's lethal injection claims.

For all of these reasons, the Court dismisses as moot Issa's Claims 28 and 29 as

pled in the Fourth Amended Petition. The Court agrees with the Magistrate Judge's Reports (Docs. 208 and 213) on this issue. Even if those claims are not moot, the Court denies them because they are not cognizable in this case and should be prosecuted in the Section 1983 litigation. The Court denies leave to amend his claims as proposed in his Fifth Amended Petition, as leave to amend would be futile for the reasons discussed above. Issa's objections to the Magistrate Judge's Report and Recommendations (Doc. 217) are overruled.

Nothing in this Order is intended to affect or interfere with Issa's right to fully participate in the Section 1983 lethal injection litigation, In re Ohio Execution Protocol Litigation, Case No. 2:11-cv-1016 (S.D. Ohio, Eastern Division).

## CONCLUSION

For all of the foregoing reasons, the Court hereby denies Issa's petition for a writ of habeas corpus. Issa moved for a certificate of appealability on Grounds One, Three, Four, Five, Six, Nine, Eleven, Twelve, Fourteen, Fifteen, and Twenty-Seven. (Doc. 159) The Magistrate Judge recommended issuance on Grounds One, Three, Four, Six, Nine, and Twenty-Seven. (Doc. 166) Issa objected with respect to Grounds Five, Eleven, and Twelve. (Doc. 169)

After considering the Magistrate Judge's recommendations (Doc. 166) and Issa's responses, the Court will grant a certificate of appealability on the following grounds for relief: One (failure to interview or call Linda Khriss as a witness); Three and Four (failure to perform adequate mitigation investigation and present additional mitigation witnesses); Five (failure to obtain cultural expert and/or professional translator); Six (admission of Willises' testimony about Miles); Nine (equitable tolling for ineffective

assistance of appellate counsel claim); Eleven (disproportionate sentence); Twelve

(failure to utilize mitigation expert); and Twenty-Seven (appellate counsel's conflict of

interest).  The Court will also grant a certificate of appealability on Issa's lethal injection

claims, pending Claims 28 and 29 and proposed claims 28 through 37.  The Court

specifically finds with respect to each of these claims that reasonable jurists could reach

different conclusions on the constitutional issues raised in these claims, and that Issa

has made a sufficient demonstration of a constitutional deprivation.

The Court denies a certificate of appealability on grounds for relief Two, Seven,

Eight, Ten, and Thirteen through Twenty-Six.  Issa may request issuance of a certificate

of appealability from the Court of Appeals pursuant to 28 U.S.C. §2253(c), and Fed. R.

App. P. 22(b).

SO ORDERED.

THIS CASE IS CLOSED.

Dated: September 21, 2015                    s/Sandra S. Beckwith
                                             Sandra S. Beckwith, Senior Judge
                                             United States District Court